UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X

ROSWELL CAPITAL PARTNERS, LLC, as Collateral
Agent; BRIDGEPOINTE MASTER FUND LTD.;
CAMHZN MASTER LDC; and CAMOFI MASTER
LDC,

              Plaintiffs,

        v.

ALTERNATIVE CONSTRUCTION
TECHNOLOGIES, INC. f/k/a ALTERNATIVE
CONSTRUCTION COMPANY, INC.;
ALTERNATIVE CONSTRUCTION BY PROSTEEL
BUILDERS, INC. f/k/a PROSTEEL BUILDERS,
CORP.; ALTERNATIVE CONSTRUCTION
TECHNOLOGIES CORPORATION; ALTERNATIVE
CONSTRUCTION MANUFACTURING OF
TENNESSEE, INC. f/k/a ALTERNATIVE
CONSTRUCTION TECHNOLOGIES
CORPORATION; ALTERNATIVE
CONSTRUCTION SAFE ROOMS, INC. f/k/a
UNIVERSAL SAFE STRUCTURES, INC.; FUTURE
OF BUILDING INSTITUTE, INC.; ALTERNATIVE
CONSTRUCTION MANUFACTURING OF
FLORIDA, INC.; ALTERNATIVE CONSTRUCTION
BY IONIAN, INC. f/k/a IONIAN CONSTRUCTION,
INC.; ALTERNATIVE CONSTRUCTION BY
REVELS, INC.; ALTERNATIVE CONSTRUCTION
CONSULTING SERVICES, INC.; ALTERNATIVE
CONSTRUCTION DESIGN INC.; SOLAR 18
ACTECH PANEL, INC.; MODULAR RENTAL &
LEASING CORPORATION; JOHN DOES 1-10,

              Defendants.
----------------------------------------------------------------- X

08 Civ. 10647 ( )

**COMPLAINT**

       Plaintiffs, Roswell Capital Partners, LLC ("Roswell"), as Collateral Agent, BridgePointe

Master Fund Ltd. ("BridgePointe"), CAMHZN Master LDC ("CAMHZN") and CAMOFI

Master LDC ("CAMOFI") (collectively "Plaintiffs"), by their undersigned attorneys, file this

Complaint and allege:

## **INTRODUCTION**

1.     Plaintiffs bring this action to foreclose upon their perfected security interests in the ACT Defendants' (as defined below) collateral and for breach of various loan and related agreements.

2.     Specifically, in June 2007, Plaintiffs BridgePointe, CAMHZN and CAMOFI (the "Secured Lenders") agreed to lend defendant Alternative Construction Technologies, Inc. ("ACT") $4,000,000 in exchange for certain Senior Secured Convertible Debentures and warrants to purchase shares of ACT stock.  Under the terms of the Senior Secured Debentures, ACT agreed to make monthly interest and principal payments to the Lender Plaintiffs.

3.     As further consideration for the June 2007 loan, ACT and four of its affiliates entered into a Security Agreement (the "2007 Security Agreement") through which ACT and the affiliates gave the Secured Lenders a perfected senior security interest, and lien upon all of the assets of ACT and the four affiliates.  The four ACT affiliates also entered into a separate subsidiary guarantee, further guaranteeing the $4,000,000 loan.

4.     In May 2008, two of the Secured Lenders, BridgePointe and CAMOFI, entered into a Line of Credit Agreement with ACT, providing ACT with a line of credit for up to $3,000,000.  ACT provided both BridgePointe and CAMOFI with a Senior Secured Grid Note in the principal sum of $1,500,000 or so much thereof as was advanced to ACT under the Line of Credit Agreement.

5.     As further consideration for the Line of Credit Agreement, in May 2008, ACT entered into a Lockbox Agreement with Plaintiffs BridgePointe, CAMOFI and Roswell. The Lockbox Agreement required that all payments from various ACT contracts would be paid into a lockbox account, and those funds would ultimately be paid to BridgePointe and CAMOFI.

6.    ACT's obligations under the Line of Credit Agreement, Senior Secured Notes and related agreements were secured by a Security Agreement (the "2008 Security Agreement"). Like the 2007 Security Agreement, in the 2008 Security Agreement, ACT and a number of its affiliates granted BridgePointe and CAMOFI a senior security interest and lien upon all of the assets of ACT and its affiliates.

7.    ACT and its affiliates have defaulted on their various obligations under the agreements they entered into with the Secured Lenders. ACT has acknowledged these defaults in its publicly filed SEC documents and elsewhere. There is no genuine dispute that these defaults have taken place.

8.    In light of these defaults, Plaintiffs bring this action to foreclose on their security interest in the assets of ACT and its affiliates. Plaintiffs also seek provisional relief to prevent Defendants from transferring, misappropriating or dissipating these assets pending foreclosure.

## PARTIES

9.    Plaintiff Roswell is a Georgia limited liability company located in Alpharetta, Georgia, and all of its members reside in the State of Georgia. Roswell is a plaintiff in this action acting in its capacity as Collateral Agent for BridgePointe, CAMHZN and CAMOFI.

10.    Plaintiff BridgePointe is a Cayman Islands Exempted Company with its principal place of business in the Cayman Islands.

11.    Plaintiff CAMHZN is a Cayman Islands Limited Duration Company with its principal place of business in the Cayman Islands.

12.    Plaintiff CAMOFI is a Cayman Islands Limited Duration Company with its principal place of business in the Cayman Islands.

13. BridgePointe, CAMHZN and CAMOFI are referred to herein collectively as the Secured Lenders.

14. Defendant Alternative Construction Technologies, Inc. f/k/a Alternative Construction Company, Inc. ("ACT") is a Florida corporation with its principal place of business located at 2910 Bush Drive, Melbourne, Florida 32935.

15. Defendant Alternative Construction By Prosteel Builders, Inc. f/k/a Prosteel Builders, Corp. ("Prosteel") is a subsidiary owned entirely or primarily by ACT and is a Florida corporation and, on information and belief, has its principal place of business in Melbourne, Florida.

16. Defendant Alternative Construction Technologies Corporation ("ACT Corp.") is a subsidiary owned entirely or primarily by ACT and is a Delaware corporation and, on information and belief, has its principal place of business in Melbourne, Florida.

17. Defendant Alternative Construction Manufacturing Of Tennessee, Inc. f/k/a Alternative Construction Technologies Corporation is a subsidiary owned entirely or primarily by ACT and is a Florida corporation and, on information and belief, has its principal place of business in Melbourne, Florida.

18. Defendant Alternative Construction Safe Rooms, Inc. f/k/a Universal Safe Structures, Inc., ("Safe Rooms") is a subsidiary owned entirely or primarily by ACT and is a Florida corporation and, on information and belief, has its principal place of business in Melbourne, Florida.

19. Defendant Future Of Building Institute, Inc. ("FOBI") is a subsidiary owned entirely or primarily by ACT and is a Florida corporation and, on information and belief, has its principal place of business in Melbourne, Florida.

20.    Defendant Alternative Construction Manufacturing Of Florida, Inc. is a subsidiary owned entirely or primarily by ACT and is a Florida corporation and, on information and belief, has its principal place of business in Melbourne, Florida.

21.    Defendant Alternative Construction By Ionian, Inc. f/k/a Ionian Construction, Inc. is a subsidiary owned entirely or primarily by ACT and is a Tennessee corporation and, on information and belief, has its principal place of business in Melbourne, Florida.

22.    Defendant Alternative Construction By Revels, Inc. is a subsidiary owned entirely or primarily by ACT and is a Florida corporation and, on information and belief, has its principal place of business in Melbourne, Florida.

23.    Defendant Alternative Construction Consulting Services, Inc. is a subsidiary owned entirely or primarily by ACT and is a Florida corporation and, on information and belief, has its principal place of business in Melbourne, Florida.

24.    Defendant Alternative Construction Design Inc. is a subsidiary owned entirely or primarily by ACT and is a Florida corporation and, on information and belief, has its principal place of business in Melbourne, Florida.

25.    Defendant Solar 18 Actech Panel, Inc. is a subsidiary owned entirely or primarily by ACT and is a Florida corporation and, on information and belief, has its principal place of business in Melbourne, Florida.

26.    Defendant Modular Rental & Leasing Corporation is a subsidiary owned entirely or primarily by ACT and is a Florida corporation and, on information and belief, has its principal place of business in Melbourne, Florida.

27.    The Defendants identified in paragraphs 15 through 26 above, all of which are subsidiaries of ACT, are hereafter referred to as the "ACT Subsidiary Defendants." ACT and the ACT Subsidiary Defendants are referred to collectively as the "ACT Defendants."

28.    The John Doe 1-10 defendants may assert liens, claims or interests in the collateral described below, but such liens, claims or interests are subordinate to Plaintiffs' security interests in the collateral.

## JURISDICTION AND VENUE

29.    This Court has diversity jurisdiction under 28 U.S.C. §1332(a)(2) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

30.    Venue is proper in this District under 28 U.S.C. § 1391(a)(1) & (c). In addition, venue is proper in this District pursuant to the terms of the Agreements entered into by Plaintiffs and the ACT Defendants, which provide, in pertinent part, that all proceedings relating to these matters shall be exclusively brought in the state or federal courts of New York, borough of Manhattan.

## FACTUAL BACKGROUND

### A.    The 2007 Agreements

31.    On or about June 30, 2007, ACT, on the one hand, and the Secured Lenders, on the other hand, entered into a Securities Purchase Agreement (the "2007 Purchase Agreement") for the purchase and sale of certain Senior Secured Convertible Debentures and for warrants (the "2007 Warrants") to purchase shares of common stock in ACT, no par value per share (the "Common Stock"). ACT's Common Stock is traded on the OTC Bulletin Board under the stock symbol "ACCY." A copy of the 2007 Purchase Agreement is attached hereto as Exhibit A.

32.    Under the terms of the 2007 Purchase Agreement and related agreements, on or about June 30, 2007, the Secured Lenders lent ACT $4,000,000. In this transaction, BridgePointe paid ACT $2,000,000 for a Senior Secured Convertible Debenture with an aggregate principal amount of $2,173,913 and warrants entitling BridgePointe to acquire 815,217 shares of Common Stock. CAMOFI paid ACT $1,500,000 for a Senior Secured Convertible Debenture with an aggregate principal amount of $1,630,434.70 and warrants entitling CAMOFI to acquire 611,413 shares of Common Stock. CAMHZN paid ACT $500,000 for a Senior Secured Convertible Debenture with an aggregate principal amount of $543,478.26 and warrants entitling CAMHZN to acquire 203,804 shares of Common Stock.

33.    Copies of the Senior Secured Convertible Debentures, all of which are dated June 30, 2007 and due on June 30, 2009 in favor of BridgePointe, CAMOFI and CAMHZN are attached hereto as Exhibit B (each individually a "Debenture"; collectively, the "Debentures").

34.    Copies of the 2007 Warrants issued on June 30, 2007 to BridgePointe, CAMOFI and CAMHZN are attached hereto as Exhibit C.

35.    Pursuant to the terms of the Debentures, ACT agreed to pay interest to the Secured Lenders on a monthly basis at the rate of 10% per annum. In addition, pursuant to Section 9 of the Debentures, starting on the first business day of each month beginning on July 1, 2008, ACT agreed to pay the Secured Lenders 1/24th of the "Original Principal Amount" of the Debentures.

36.    To induce the Secured Lenders to loan ACT the $4,000,000, ACT and four of the ACT Subsidiary Defendants (namely, Prosteel, ACT Corp., FOBI and Safe Rooms) entered into the "2007 Security Agreement," whereby ACT and each of the above-mentioned

four ACT Subsidiary Defendants "unconditionally and irrevocably pledge[d], grant[ed], and hypothecate[d] to the Secured [Lenders] a continuing and perfected security interest in and to, a lien upon and a right of set-off against all of their respective right, title and interest of whatsoever kind and nature in and to, the Collateral." The Collateral comprised all of the property and assets of ACT and the ACT Subsidiary Defendants. A copy of the 2007 Security Agreement is attached hereto as Exhibit D.

     37.    The Collateral subject to Secured Lenders' security interest and lien as set forth in the 2007 Security Agreement includes the following:

     (i)    All goods, including, without limitations, (A) all machinery, equipment, computers, vehicles, trucks, tanks, boats, ships, appliances, furniture, special and general tools, fixtures, test and quality control devices and other equipment of every kind and nature and wherever situated. . .

     (ii)    All contract rights and other general intangibles, including, without limitation, all partnership interests, membership interests, stock or other securities, rights under any of the Organizational Documents, agreements related to the Pledged Securities, licenses, distribution and other agreements, computer software (whether "off-the-shelf", licensed from any third party or developed by any Debtor), computer software development rights, leases, franchises, customer lists, quality control procedures, grants and rights, goodwill, trademarks, service marks, trade styles, trade names, patents, patent applications, copyrights, Intellectual Property, and income tax refunds;

     (iii)    All accounts, together with all instruments, all documents of title representing any of the foregoing, all rights in any merchandising, goods, equipment, motor vehicles and trucks which any of the same may represent, and all right, title, security and guaranties with respect to each account, including any right of stoppage in transit;

     (iv)    All documents, letter-of-credit rights, instruments and chattel paper;

     (v)    All commercial tort claims;

     (vi)    All deposit accounts and all cash (whether or not deposited in such deposit accounts);

(vii)            All investment property;

(viii)           All supporting obligations; and

(ix)            All files, records, books of account, business papers, and computer programs; and

(x)             the products and proceeds of all of the foregoing Collateral set forth in clauses (i)-(ix) above.

Without limiting the generality of the foregoing, the "Collateral" shall include all investment property and general intangibles respecting ownership and/or other equity interests in each Guarantor, including, without limitation, the shares of capital stock and the other equity interests . . . and any other shares of capital stock and/or other equity interests of any other direct or indirect subsidiary of any Debtor obtained in the future, and, in each case, all certificates representing such shares and/or equity interests and, in each case, all rights, options, warrants, stock, other securities and/or equity interests that may hereafter be received, receivable or distributed in respect of, or exchanged for, any of the foregoing (all of the foregoing being referred to herein as the "Pledged Securities")....

(Ex. D, at pp. 2-3).

38.    Under Section 4(q) of the 2007 Security Agreement, ACT and each of the aforementioned ACT Subsidiary Defendants agreed that they would "permit the Secured [Lenders] and the representatives and agents to inspect the Collateral at any time, and to make copies of records pertaining to the Collateral as may be requested by a Secured [Lender] from time to time." (Id., at p. 8).

39.    The Secured Lenders perfected the security interest granted under the 2007 Security Agreement by filing UCC Financing Statements covering the Collateral with the Florida Secretary of State in July and September 2007.  Copies of these UCC Financing Statements are attached hereto as Exhibit E.

40.    In addition, on June 30, 2007, ACT entered into a Patent Security Agreement (the "Patent Security Agreement") whereby ACT granted a security interest in ACT's

3 patents: U.S. Patent registration nos. 5,373,678; 5,827,458 and 6,438,906 (the "Patents"). A copy of the Patent Security Agreement is attached hereto as Exhibit F.

41.     The security interest in the Patents was duly perfected by recording with the United States Patent and Trademark Office and receiving a Notice of Recordation of Assignment dated August 7, 2007, a copy of which is attached hereto as Exhibit G.

42.     The security interest in certain real property of ACT located in Tennessee was duly perfected by the filing of a Deed of Trust, on August 15, 2007 with the Register of Hardeman County, Tennessee, in the Trust Deed Book 660 pp. 231-38. A copy of the recorded Deed of Trust is attached hereto as Exhibit H.

43.     On or about June 30, 2007, four of the ACT Subsidiary Defendants -- namely, Prosteel, ACT Corp., FOBI and Safe Rooms -- entered into a Subsidiary Guarantee (the "2007 Subsidiary Guarantee") whereby each of them "jointly and severally, unconditionally and irrevocably" guaranteed to the Secured Lenders "all obligations and undertakings of [ACT] of whatever nature, monetary or otherwise," under the Debentures, the 2007 Purchase Agreement, the 2007 Security Agreement, the 2007 Warrants, related agreements and "any other future agreement or obligations undertaken" by ACT to the Secured Lenders, together with all reasonable attorneys' fees, disbursements and all other costs and expenses of collection incurred by the Secured Lenders in enforcing any of ACT's obligations and the 2007 Subsidiary Guarantee. A copy of the 2007 Subsidiary Guarantee is attached hereto as Exhibit I. (Ex. I at p. 1.)

**B.     The 2008 Agreements**

44.     On or about May 8, 2008, ACT entered into a Line of Credit Agreement (the "Line of Credit Agreement") with BridgePointe and CAMOFI whereby BridgePointe and CAMOFI agreed to provide a line of credit to ACT up to a maximum original amount of

$1,500,000 each, for an aggregate maximum original amount of $3,000,000. A copy of the Line of Credit Agreement is attached hereto as Exhibit J.

45.     ACT evidenced its obligation to repay any monies borrowed under the Line of Credit Agreement with two Senior Secured Grid Notes, each dated May 8, 2008 (the "Notes"), one of which is payable to BridgePointe and the other of which is payable to CAMOFI, each in the principal sum of $1,500,000 or so much thereof as was advanced to ACT under the Line of Credit Agreement. Copies of the Notes to BridgePointe and CAMOFI respectively are attached hereto as Exhibit K.

46.     The Notes constituted senior debt in right of payment of ACT. ACT agreed that all future debt it incurred would be subordinated to the Notes. Interest was payable monthly under the Notes at a rate of 13% per annum.

47.     Further, on May 8, 2008, ACT, BridgePointe, CAMOFI and Roswell entered into a lockbox arrangement, denominated as an Agreement Re Blocked Deposit Accounts (the "Lockbox Agreement"). Under the Lockbox Agreement and the Line of Credit Agreement, all payments from various "Eligible Contracts" would be paid into a lockbox account to which only Roswell, as Collateral Agent, would have access and to which BridgePointe and CAMOFI would have a continuing lien and security interest. A copy of the Lockbox Agreement is attached hereto as Exhibit L.

48.     Pursuant to the terms of the Line of Credit Agreement, BridgePointe and CAMOFI each advanced and loaned to ACT $776,242 on or about May 8, 2008 and $231,004 on or about June 19, 2008 for a total aggregate advance and loan of $2,014,492.

49.     ACT's obligations under the Notes, Line of Credit Agreement and related agreements were secured by the 2008 Security Agreement and an Intellectual Property Security

Agreement, both dated May 8, 2008.  The 2008 Security Agreement is attached hereto as Exhibit

M and the Intellectual Property Security Agreement is attached hereto as Exhibit N.  Under the

2008 Security Agreement, ACT and each ACT Subsidiary Defendant "unconditionally and

irrevocably pledge[d], grant[ed] and hypothecate[d]" to BridgePointe and CAMOFI a "security

interest in and to, a lien upon and a right of set-off against all of their respective right, title and

interest of whatsoever kind and nature in and to, the Collateral."  (Ex. M, at p. 5.)  The Collateral

of ACT and each of the ACT Subsidiary Defendants consisted of:

> (a)     "Collateral" means all of the real property and personal property of
> the Debtors and which shall include the following personal property of the
> Debtors...
>
> > (i)          All goods, including, without limitations, (A) all
> > machinery, equipment, computers, motor vehicles, trucks, tanks, boats,
> > ships, appliances, furniture, special and general tools, fixtures, test and
> > quality control devices and other equipment of every kind and nature and
> > wherever situated, together with all documents of title and documents
> > representing the same . . .
> >
> > (ii)         All contract rights and other general intangibles,
> > including, without limitation, all partnership interests, membership
> > interests, stock or other securities, rights under any of the Organizational
> > Documents, agreements related to the Pledged Securities, licenses,
> > distribution and other agreements, computer software (whether "off-the-
> > shelf", licensed from any third party or developed by Debtor), computer
> > software development rights, leases, franchises, customer lists, quality
> > control procedures, grants and rights, goodwill, trademarks, service marks,
> > trade styles, trade names, patents, patent applications, copyrights, and
> > income tax refunds;
> >
> > (iii)        All accounts, together with all instruments, all
> > documents of title representing any of the foregoing, all rights in any
> > merchandising, goods, equipment, motor vehicles and trucks which any of
> > the same may represent, and all right, title, security and guaranties with
> > respect to each account, including any right of stoppage in transit;
> >
> > (iv)         All documents, letter-of-credit rights, instruments
> > and chattel paper;
> >
> > (v)          All commercial tort claims;

       (vi)         All deposit accounts and all cash (whether or not deposited in such deposit accounts);

       (vii)        All investment property;

       (viii)       All supporting obligations;

       (ix)         All files, records, books of account, business papers, and computer programs;

       (x)          All real property of the Debtors, and any fixtures, structures, and improvements thereupon and appurtenances thereto (collectively, the "Real Property"); and

       (xi)        the Senior Secured Contracts (as such term is defined in the Line of Credit Agreement); and

       (xii)        The products and proceeds of all of the foregoing Collateral set forth in clauses (i)-(xi) above.

Without limiting the generality of the foregoing, the "Collateral" shall include all investment property and general intangibles respecting ownership and/or other equity interests in each Guarantor, including, without limitation, the shares of capital stock and the other equity interests . . . and any other shares of capital stock and/or other equity interests of any other direct or indirect subsidiary of any Debtor obtained in the future, and, in each case, all certificates representing such shares and/or equity interests and, in each case, all rights, options, warrants, stock, other securities and/or equity interests that may hereafter be received, receivable or distributed in respect of, or exchanged for, any of the foregoing and all rights arising under or in connection with the Pledged Securities, including, but not limited to, all dividends, interest and cash.

(Ex. M, at pp. 2-3.)

50.    Under Section 4(q) of the 2008 Security Agreement, ACT and each of the aforementioned ACT Subsidiary Defendants agreed to "permit the Agent and its representatives and agents to inspect the Collateral during normal business hours and upon reasonable prior notice, and to make copies of records pertaining to the Collateral as may be reasonably requested by the Agent from time to time."  (Ex. M, at p. 10.)

51.    Roswell, as Collateral Agent, perfected BridgePointe's and CAMOFI's security interests under the 2008 Security Agreement by filing UCC Financing Statements covering the Collateral, with the Delaware Secretary of State, the Florida Secretary of State, and the Tennessee Secretary of State in May, June and July 2008 respectively.    Copies of these UCC Financing Statements are attached hereto as Exhibit O.

52.    As further consideration for BridgePointe's and CAMOFI's loan under the Line of Credit Agreement, on May 8, 2008, ACT issued warrants (the "2008 Warrants") to BridgePointe and CAMOFI to permit each of them to purchase 900,000 shares of Common Stock.  Copies of the 2008 Warrants are attached hereto as Exhibit P.

53.    Further, on May 8, 2008, ACT, the Secured Lenders and Roswell entered into a Collateral Agency and Intercreditor Agreement (the "Agency Agreement") whereby Roswell was appointed as Collateral Agent by the Secured Lenders under the 2007 Security Agreement, the 2008 Security Agreement, the Intellectual Property Security Agreement and related agreements.  A copy of the Agency Agreement is attached hereto as Exhibit Q.

54.    On or about May 8, 2008, each of the ACT Subsidiary Defendants entered into a Subsidiary Guarantee (the "2008 Subsidiary Guarantee") whereby each of them "jointly and severally, unconditionally and irrevocably" guaranteed to BridgePointe and CAMOFI "all obligations of [ACT]" under the Notes, the Line of Credit Agreement, the 2008 Security Agreement, the 2008 Warrants, related agreements and "any other future agreement or obligations undertaken" by ACT  to BridgePointe and CAMOFI, together with all reasonable attorneys' fees, disbursements and all other costs and expenses of collection incurred by BridgePointe and CAMOFI in enforcing any of ACT's obligations and the 2008 Subsidiary

Guarantee. A copy of the 2008 Subsidiary Guarantee is attached hereto as Exhibit R. (Ex. R, at pp. 1-2.)

C. **Events of Default Under the 2007 Agreements**

55.     ACT has breached its obligations and committed multiple events of default under the foregoing agreements with the Secured Lenders entered into in 2007.

56.     ACT failed to make the "Required Principal Payment" of $90,579.71 to BridgePointe when due and payable on July 1, 2008 as required by Section 9(a) of the Debentures.

57.     ACT failed to make the required interest payment of $17,867.78 to BridgePointe when due and payable on July 1, 2008 as required by the Debentures.

58.     ACT failed to make the "Required Principal Payment" to CAMOFI and CAMHZN of $67,934.78 and $22,644.93, respectively, when due on July 1, 2008 as required by the Debentures.

59.     ACT also failed to make the required interest payments to CAMOFI and CAMHZN in amounts totaling $24,574.39 and $8,414.29, respectively, when due on June 1, 2008 and July 1, 2008 as required by the Debentures.

60.     ACT's foregoing payment failures under the Debentures have continued and have never been cured and constitute "Events of Default" under Section 7(a) of the Debentures.

61.     Pursuant to Section 8(a) of the Debentures, counsel for BridgePointe delivered a Default Notice to ACT, dated July 31, 2008, a copy of which is attached hereto as Exhibit S.

62.     Pursuant to Section 8(a) of the Debentures, counsel for CAMOFI and CAMHZN delivered a Default Notice to ACT dated October 21, 2008, a copy of which is attached hereto as Exhibit T.

63.     Pursuant to Section 8(a) of the Debentures, the Secured Lenders accelerated all of ACT's payment obligations under the Debentures, as they were entitled to do thereunder, and demanded a "Mandatory Redemption" of all amounts due and payable by ACT under the Debentures – i.e., the "Default Amount" or "Mandatory Redemption Amount" as provided for in the Debentures.

64.     Section 8(a) of the Debentures provides that if ACT fails to pay the Default Amount within 10 business days of demand thereof, interest accrues thereon at a rate of 18% (compounded monthly) or at the maximum amount allowed by law.

65.     At no time did ACT ever pay the amounts due or otherwise cure the defaults which gave rise to the foregoing Events of Default and to ACT's obligation to pay the Default Amount or the Mandatory Redemption Amount.

66.     Section 7(n) of the Debentures provides that an Event of Default in any one Debenture shall constitute an Event of Default under the other Debentures.  Accordingly, an Event of Default under BridgePointe's Debenture also constituted an Event of Default under CAMOFI's and CAMHZN's Debentures.

67.     ACT also failed to make all Required Principal Payments and related interest payments to the Secured Lenders as due and required by Section 9 of the Debentures on August 1, 2008, September 1, 2008 and October 1, 2008.

68.     Accordingly, ACT is in default of its obligations under the Debentures. As a result, as of October 31, 2008, ACT owed a Default Amount or Mandatory Redemption

Amount under the Debentures to BridgePointe in excess of $2,642,064.48 plus interest thereon at the maximum rate permitted by law from August 10, 2008. As of October 31, 2008, ACT owed a Default Amount or Mandatory Redemption Amount under the Debentures to: (i) CAMOFI in the amount of $1,934,981.89, plus interest thereon at the maximum rate permitted by law from October 31, 2008, and (ii) CAMHZN in the amount of $662,911.56, plus interest thereon at the maximum rate permitted by the law from October 31, 2008.

69.     Under Section 11(a)(v) of the 2007 Warrants, a default under the Debentures constitutes an Event of Default under the 2007 Warrants.

70.     Accordingly, the 2007 Warrants are in default.

71.     Similarly, Section 6 of the 2007 Security Agreement provides that an Event of Default under the Debentures constitutes an Event of Default under the 2007 Security Agreement. In addition, an Event of Default under Section 3 of the 2007 Security Agreement has occurred by the failure to deliver to the Secured Lenders the stock certificates pledged by the ACT Defendants.

72.     Section 8(a) of the 2007 Security Agreement provides that if an Event of Default occurs and continues, the Secured Lenders shall have all the rights and remedies of a secured party under the UCC, including without limitation the following rights and remedies:

> (i)         The Secured Parties shall have the right to take possession of the Collateral and, for that purpose, enter, with the aid and assistance of any person, any premises where the Collateral, or any part thereof, is or may be placed and remove the same, and each Debtor shall assemble the Collateral and make it available to the Secured Parties at places which the Secured Parties shall reasonably select, whether at such Debtor's premises or elsewhere, and make available to the Secured Parties, without rent, all of such Debtor's respective premises and facilities for the purpose of the Secured Parties taking possession of, removing or putting the Collateral in saleable or disposable form.

> (ii)        Upon notice to the Debtors by the Secured Parties, all rights of each Debtor to exercise the voting and other consensual rights

which it would otherwise be entitled to exercise and all rights of each Debtor to receive the dividends and interest which it would otherwise be authorized to receive and retain, shall cease. Upon such notice, the Secured Parties shall have the right to receive any interest, cash dividends or other payments on the Collateral and, at the option oft, to exercise in such the Secured Parties' discretion all voting rights pertaining thereto . . .

      (iii)      The Secured Parties shall have the right to operate the business of each Debtor using the Collateral and shall have the right to assign, sell, lease or otherwise dispose of and deliver all or any part of the Collateral, at public or private sale or otherwise, either with or without special conditions or stipulations, for cash or on credit for future delivery, in such parcel or parcels and at such time or times and at such place or places, and upon such terms and conditions as the Secured Parties may deem commercially reasonable, all without (except as shall be required by applicable statute and cannot be waived) advertisement or demand upon or notice to any Debtor or right of redemption of a Debtor, which are hereby expressly waived. Upon each such sale, lease, assignment or other transfer of Collateral, the Secured Parties may, unless prohibited by applicable law which cannot be waived, purchase all or any part of the Collateral being sold, free from and discharged of all trusts, claims, right of redemption and equities of any Debtor, which are hereby waived and released.

      (iv)      The Secured Parties shall have the right (but not the obligation) to notify any account debtors and any obligors under instruments or accounts to make payments directly to the Secured Parties and to enforce the Debtors' rights against such account debtors and obligors.

      (v)      The Secured Parties may (but are not obligated to) direct any financial intermediary or any other person or entity holding any investment property to transfer the same to the Secured Parties or their designee.

      (vi)      The Secured Parties may (but are not obligated to) transfer any or all Intellectual Property registered in the name of any Debtor at the United States Patent and Trademark Office and/or Copyright Office into the name of the Secured Parties or any designee or any purchaser of any Collateral.

      (b)     The Secured Parties may comply with any applicable law in connection with a disposition of Collateral and such compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral. The Secured Parties may sell the Collateral without giving any warranties and may specifically disclaim such warranties. If the Secured Parties sells any of the Collateral on credit, the Debtors will only be credited with

payments actually made by the purchaser. In addition, each Debtor waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of the Secured Parties' rights and remedies hereunder, including, without limitation, its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.

(c)    For the purpose of enabling the Secured Parties to further exercise rights and remedies under this Section 8 or elsewhere provided by agreement or applicable law, each Debtor hereby grants to the Secured Parties an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to such Debtor) to use, license or sublicense following an Event of Default, any Intellectual Property now owned or hereafter acquired by such Debtor, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof.

(Ex. D, at pp. 13-14.)

## D.    Defaults under the 2008 Agreements

73.    ACT has also failed to comply with the terms, conditions and its

obligations under the Line of Credit Agreement, Lockbox Agreement, Notes and related above-

mentioned agreements entered into in 2008.

74.    Section 6(b) of the Line of Credit Agreement provides as follows:

[ACT] agrees that, promptly upon closing of the Line of Credit Agreement (with regard to existing customers under current Eligible Contracts) and promptly upon entering into any new Eligible Contract (with respect to future customers), [ACT] will send instructions (each, "Lockbox Payment Instructions") to the customer requiring that payments on the Eligible Contract be remitted directly to the Lockbox Account [as defined in the Lockbox Agreement]. Upon shipment of product to a customer under any Eligible Contract, [ACT] shall provide the customer with an invoice requiring that payments on the Eligible Contract be remitted directly to the Lockbox Account (each, a "Lockbox Invoice"). [ACT] shall promptly provide each of the Lenders with a copy of each Lockbox Payment Instructions and each Lockbox Invoice, together with evidence that each has been delivered to the applicable customer.

(Ex. J, at p. 9) (emphasis omitted).

75.    Section 1 of the Lockbox Agreement provides that:

The Eligible Clients (as defined in the [Line of Credit] Agreement) of the
Borrower have been, or will be instructed irrevocably to remit (i) all envelopes
containing Items . . . to be processed through the Lockbox and (ii) all electronic
funds transfer payments to the appropriate address set forth on the [Private Bank
Lockbox Services Agreement].

(Ex. L, at p. 2.)

76.    Upon information and belief, ACT failed to provide one or more of the

Eligible Clients with Lockbox Payment Instructions and a Lockbox Invoice when required under

the foregoing agreements, and failed to provide BridgePointe and CAMOFI with copies of such

Lockbox Payment Instructions and Lockbox Invoices.

77.    Upon information and belief, ACT has further breached its obligations

under the foregoing agreements by instructing Eligible Clients to make payments directly to

ACT's operating bank account and by permitting approximately $500,000 in payments by

Eligible Clients to be deposited in ACT's operating account instead of being paid directly to the

Lockbox Account as required, thereby circumventing the agreed-to protections of the Line of

Credit Agreement, the Lockbox Agreement and other applicable agreements.

78.    Section 7(c) of the Notes declares that it shall be an Event of Default if the

following occurs:

[ACT] breaches any representation, warranty, covenant or other term  or
condition of this Note, or any of the other Transaction Documents [e.g., the Line
of Credit Agreement, the Lockbox Agreement, etc.] in any respect, and such
breach is not cured by the earlier to occur of (i) five (5) Business Days after
written notice of such breach to [ACT] from the Holder [e.g., BridgePointe or
CAMOFI] and (ii) ten (10) Business Days after [ACT] has become or should have
become aware of such breach;

(Ex. K, at p. 11).

79.    ACT's failure to comply with the foregoing obligations concerning

Lockbox Payment Instructions constitutes a breach of its covenants in the Line of Credit

Agreement – which breach ACT knew or should have known at the time of the breach. Such failures constitute an "Event of Default" under Section 7(c) of the Notes.

80.    Further, section 7(n) of the Notes declares that it shall be an "Event of Default" if ACT "defaults in the payment when due on any indebtedness, individually or in the aggregate, in excess of $175,000." (Ex. K, at p. 12.)

81.    ACT's default in the payment of indebtedness to the Secured Lenders in excess of $175,000 under the Debentures therefore constituted an "Event of Default" under the Notes.

82.    On August 1, 2008, BridgePointe's counsel gave Default Notice to ACT of the foregoing defaults under the Line of Credit Agreement, the Lockbox Agreement and the Notes, a copy of which notice is attached hereto as Exhibit U.

83.    On October 21, 2008, CAMOFI's counsel gave Default Notice to ACT of the foregoing defaults under the Line of Credit Agreement, the Lockbox Agreement and Notes (Ex. T).

84.    Pursuant to Section 8(a) of the Notes, the foregoing Events of Default under the Notes and the subsequent Default Notices delivered by Secured Lenders' respective counsel caused the Notes to "accelerate and become immediately due and payable" and ACT was obligated to immediately pay BridgePointe and CAMOFI the "Default Amount" or the "Mandatory Redemption Amount" as provided for in the Notes. (Ex. K, at p.12.)

85.    Under Sections 10 and 11 of the Notes, ACT's failure to pay the Default Amount or the Mandatory Redemption Amount when due caused interest to accrue on the outstanding amounts due under the Notes at the rate of 18% per annum or at the maximum rate permitted by law.

86.     Accordingly, as of October 31, 2008, ACT owed BridgePointe under the Notes a Default Amount in excess of $1,267,449.50 plus interest thereon at the maximum rate permitted by law.  As of October 31, 2008, ACT owed CAMOFI under the Notes a Default Amount in excess of $1,267,449.50 plus interest thereon at the maximum rate permitted by law. At no time did ACT pay to BridgePointe and CAMOFI any monies due under the Notes as required.

87.     Under Section 6(a) of the 2008 Security Agreement, an Event of Default occurs thereunder if there has been an Event of Default under the Notes.  In addition, an Event of Default under Section 3(a) of the 2008 Security Agreement has occurred by the failure to deliver to the Secured Lenders the stock certificates pledged by the ACT Defendants.

88.     Under Sections 8(a-c) of the 2008 Security Agreement, upon the occurrence of any Event of Default under that agreement, BridgePointe and CAMOFI shall have all the rights and remedies of a secured party under the UCC and Roswell, as their Collateral Agent, shall have the following rights and powers for their benefit:

(i)     The Agent shall have the right to take possession of the Collateral and, for that purpose, enter, with the aid and assistance of any person, any premises where the Collateral, or any part thereof, is or may be placed and remove the same, and each Debtor shall assemble the Collateral and make it available to the Agent at places which the Agent shall reasonably select, whether at such Debtor's premises or elsewhere, and make available to the Agent, without rent, all of such Debtor's respective premises and facilities for the purpose of the Agent taking possession of, removing or putting the Collateral in saleable or disposable form.

(ii)     Upon notice to the Debtors by Agent, all rights of each Debtor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise and all rights of each Debtor to receive the dividends and interest which it would otherwise be authorized to receive and retain, shall cease.  Upon such notice, Agent shall have the right to receive, for the benefit of the Secured Parties, any interest, cash dividends or other payments on the Collateral and, at the option of Agent, to exercise in such Agent's discretion all voting rights pertaining thereto...

     (iii)        The Agent shall have the right to operate the business of each Debtor using the Collateral and shall have the right to assign, sell, lease or otherwise dispose of and deliver all or any part of the Collateral, at public or private sale or otherwise, either with or without special conditions or stipulations, for cash or on credit or for future delivery, in such parcel or parcels and at such time or times and at such place or places, and upon such terms and conditions as the Agent may deem commercially reasonable, all without (except as shall be required by applicable statute and cannot be waived) advertisement or demand upon or notice to any Debtor or right of redemption of a Debtor which are hereby expressly waived. Upon each such sale, lease, assignment or other transfer of Collateral, the Agent, for the benefit of the Secured Parties, may, unless prohibited by applicable law which cannot be waived, purchase all or any part of the Collateral being sold, free from and discharged of all trusts, claims, right of redemption and equities of any Debtor, which are hereby waived and released.

     (iv)        The Agent shall have the right (but not the obligation) to notify any account debtors and any obligors under instruments or accounts to make payments directly to the Agent, on behalf of the Secured Parties, and to enforce the Debtors' rights against such account debtors and obligors.

     (v)        The Agent, for the benefit of the Secured Parties, may (but is not obligated to) direct any financial intermediary or any other person or entity holding any investment property to transfer the same to the Agent, on behalf of the Secured Parties or its designee.

     (vi)        The Agent may (but is not obligated to) transfer any or all Intellectual Property registered in the name of any Debtor at the United States Patent and Trademark Office and/or Copyright Office into the name of the Secured Parties or any designee or any purchaser of any Collateral.

     (b)        The Agent may comply with any applicable law in connection with a disposition of Collateral and such compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral. The Agent may sell the Collateral without giving any warranties and may specifically disclaim such warranties. If the Agent sells any of the Collateral on credit, the Debtors will only be credited with payments actually made by the purchaser. In addition, each Debtor waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of the Agent's rights and remedies hereunder, including, without limitation, its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.

       (c)     For the purpose of enabling the Agent to further exercise rights and remedies under this Section 8 or elsewhere provided by agreement or applicable law, each Debtor hereby grants to the Agent, for the benefit of the Agent and the Secured Parties, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to such Debtor) to use, license or sublicense following an Event of Default, any Intellectual Property now owned or hereafter acquired by such Debtor, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof.

(Ex. M, at pp. 15-17.)

       89.     In addition to the foregoing Events of Default, ACT has breached other obligations under the 2008 Security Agreement. Under Section 3(b) of the 2008 Security Agreement, ACT and each of the ACT Subsidiary Defendants were required to make filings to perfect BridgePointe's and CAMOFI's security interests in certain of ACT's real property:

     Within ten (10) Business Days (as such is defined in the Notes) following the execution of this Agreement . . . each Debtor shall deliver or cause to be delivered to the Agent Deeds of Trust (or, as applicable, Amended Deeds of Trust) granting the Secured Parties a lien on the Real Property of the Debtors, and shall cause such Deeds of Trust (or Amended Deeds of Trust, as applicable) to be recorded in the public real estate records in the state and county where such Real Property is located.

(Ex. M, at p. 6.)

       90.     Despite numerous requests by Roswell on behalf of BridgePointe and CAMOFI, ACT failed to provide Roswell with a copy of an additional or amended Deed of Trust granting BridgePointe and CAMOFI a further lien on the real property of ACT or with evidence that such Deed of Trust was filed in real estate records of the appropriate governmental office. Such failure constitutes a further breach by ACT of the 2008 Security Agreement, and therefore another Event of Default under the Notes.

       91.     By letter dated August 19, 2008, BridgePointe's counsel gave ACT notice of this additional Event of Default, a copy of which notice is attached hereto as Exhibit V.

92.    At no time has ACT cured any of the Events of Default under any of the above-referenced agreements with BridgePointe, CAMOFI and Roswell.

93.    Indeed, ACT has admitted in its public securities filings required by applicable law, including but not limited to its Form 10-Q filed with the Securities Exchange Commission ("SEC") on August 19, 2008, and its Form 10-Q filed with the SEC on November 20, 2008, that it has defaulted in its obligations.  Among other things, ACT has conceded in its SEC filings that ACT was not then able to make the payments required by the Debentures on July 1, 2008 and August 1, 2008 and has deposited customers' checks into its general operating account which were required to be deposited into the Lockbox Account, in breach of its contractual obligations.  ACT repeated these same admissions in its 10-Q filed with the Securities and Exchange Commission on November 20, 2008.  ACT's August 19, 2008 10-Q is attached hereto as Exhibit W.  ACT's November 20, 2008 10-Q is attached hereto as Exhibit X.

94.    At various times throughout August, September and October, 2008, BridgePointe, CAMOFI, Roswell and their respective representatives have attempted in good faith to negotiate with ACT to try to resolve ACT's various Events of Default under the above-mentioned agreements and other related issues.  While such efforts ultimately proved fruitless, in the process, ACT was advised repeatedly by BridgePointe, CAMOFI, Roswell and their respective representatives that ACT was in continuing breach of its contractual obligations to BridgePointe and CAMOFI and the various above-mentioned Events of Default remained uncured.

95.    All conditions precedent to the relief demanded herein have been performed or have occurred.

96.     Plaintiffs have retained the undersigned attorneys and are obligated to pay them a reasonable fee for their services in connection with this action for which Defendants are liable under applicable law.

97.     Plaintiffs own and hold the 2007 Purchase Agreement, Debentures, 2007 Warrants, 2007 Security Agreement, UCC Financing Statements, Patent Security Agreement, Notice of Recordation of Assignment of Patents, Deed of Trust, 2007 Subsidiary Guarantees, Line of Credit Agreement, Senior Secured Grid Notes, Lockbox Agreement, 2008 Security Agreement, Intellectual Property Security Agreement, 2008 Warrants, and 2008 Subsidiary Guarantees.

98.     The ACT Defendants own and are in possession of the Collateral described above.

**COUNT I**
**(Breach of the Debentures)**

99.     Plaintiffs BridgePointe, CAMOFI and CAMHZN repeat and reallege each and every allegation contained in paragraphs 1- 98.

100.     Plaintiffs have complied with every obligation required of them under the Debentures.

101.     As alleged above, ACT's failure to timely pay the Secured Lenders various required payments as and when due under the Debentures constitutes an Event of Default thereunder.

102.     As a result, the Secured Lenders are entitled to recover from ACT the Default Amount or Mandatory Redemption Amount as provided for in the Debentures.

103.     As of October 31, 2008, ACT owed a Default Amount or Mandatory Redemption Amount under the Debentures to BridgePointe in an amount in excess of

$2,642,064.48 plus any additional interest accrued after October 31, 2008. As of October 31, 2008, ACT owed a Default Amount or Mandatory Redemption Amount under the Debentures to: (i) CAMOFI in the amount of $1,934,981.89, plus any additional interest accrued after October 31, 2008; and (ii) CAMHZN in the amount of $662,911.56, plus any additional interest accrued after October 31, 2008.

104.    In addition, ACT is obligated to pay interest, costs and attorneys' fees in accordance with the terms of the Debentures in an amount to be determined.

## COUNT II
## (Breach of the 2007 Warrants)

105.    Plaintiffs BridgePointe, CAMOFI and CAMHZN repeat and reallege each and every allegation contained in paragraphs 1-104

106.    BridgePointe, CAMOFI and CAMHZN have complied with any obligation required of them under the 2007 Warrants.

107.    Under Section 11(a)(v), a default under the Debentures constitutes an Event of Default under the 2007 Warrants.

108.    By the July 31, 2008 Default Notice (Ex. S), BridgePointe demanded ACT immediately pay the Mandatory Redemption Amount or Default Amount due under the 2007 Warrants in accordance with Section 11(b).

109.    By the October 21, 2008 Default Notice (Ex. T), CAMOFI and CAMHZN demanded ACT immediately pay the Mandatory Redemption Amount or Default Amount due under the 2007 Warrants in accordance with Section 11(b) thereof.

110.    ACT has breached its obligations under the 2007 Warrants and failed to pay BridgePointe, CAMOFI and CAMHZN the Default Amount or Mandatory Redemption

Amount as determined under the 2007 Warrants to which they are entitled thereunder, plus 18% interest per annum or at the maximum rate permitted by law.

## COUNT III
### (Breach of the 2007 Security Agreement)

111.    Roswell, as Collateral Agent for BridgePointe, CAMOFI and CAMHZN, repeats and realleges each and every allegation contained in paragraphs 1-110.

112.    Plaintiffs have complied with all of their obligations under the 2007 Security Agreement.

113.    In accordance with their rights under Section 4(q) of the 2007 Security Agreement, Plaintiffs sought to inspect and copy the books and records of ACT and the ACT Subsidiary Defendants pertaining to the Collateral.

114.    The ACT Defendants blocked, interfered with and failed to grant the Secured Lenders and their agents access to inspect and copy the books and records pertaining to the Collateral, save only for ACT's accounts payable and accounts receivable.

115.    Such failure constitutes a breach of the 2007 Security Agreement by the ACT Defendants.

116.    By reason of the foregoing, Plaintiffs have suffered irreparable harm.

117.    Plaintiffs have no adequate remedy at law.

## COUNT IV
### (Breach of the Line of Credit Agreement)

118.    Plaintiffs BridgePointe and CAMOFI repeat and reallege each and every allegation contained in paragraphs 1-117.

119.    Plaintiffs BridgePointe and CAMOFI have complied with any obligation required of them under the Line of Credit Agreement.

120.     Under Section 6(b) of the Line of Credit Agreement, ACT was obligated to send instructions and invoices to each customer with an "Eligible Contact" directing them to make all payments to ACT into the "Lockbox Account."

121.     ACT failed to do so and thereby breached the Line of Credit Agreement.

122.     As a result, on information and belief, various Eligible Clients paid approximately $500,000 to ACT directly instead of into the Lockbox Account.

123.     By reason of the foregoing, BridgePointe and CAMOFI suffered damages in an amount to be determined at trial.

## COUNT V
### (Breach of the Lockbox Agreement)

124.     Plaintiffs BridgePointe and CAMOFI repeat and reallege each and every allegation contained in paragraphs 1-123.

125.     Plaintiffs BridgePointe and CAMOFI have complied with any obligation required of them under the Lockbox Agreement.

126.     Under Section 1 of the Lockbox Account, ACT was obligated to instruct all Eligible Clients to make all payments to ACT into the Lockbox Agreement.

127.     ACT failed to do so and thereby breached the Lockbox Agreement.

128.     As a result, various Eligible Clients paid, on information and belief, approximately $500,000 to ACT directly instead of to the Lockbox Account.

129.     By reason of the foregoing, BridgePointe and CAMOFI suffered damages in an amount to be determined at trial.

## COUNT VI
### (Breach of the Notes)

130.     Plaintiffs BridgePointe and CAMOFI repeat and reallege each and every allegation contained in paragraphs 1-129.

131.    Plaintiffs BridgePointe and CAMOFI have complied with all of their obligations under the Notes.

132.    Section 7(c) of the Notes provides that ACT's breach of any of the terms of the Line of Credit Agreement and the Lockbox Agreement (among other agreements) constitutes an Event of Default under the Notes.

133.    Section 7(n) of the Notes provides that if ACT fails to pay any "indebtedness in excess of $175,000, such failure shall also be an Event of Default." (Ex. K, at p. 12.)

134.    As a result of ACT's breaches of the Line of Credit Agreement and the Lockbox Agreement, and its failure to pay indebtedness under the Debentures, ACT breached its obligations under the Notes, thereby entitling BridgePointe and CAMOFI to accelerate and make immediately due and payable the Notes and recover the Default Amount thereunder.

135.    By reason of the foregoing, as of October 31, 2008, BridgePointe is entitled to recover a Default Amount in excess of $1,267,449.50, plus any additional interest accrued at the maximum rate permitted by law thereafter and, as of October 31, 2008, CAMOFI is entitled to recover a Default Amount in excess of $1,267,449.50, plus any additional interest accrued at the maximum rate permitted by law thereafter.

## COUNT VII
### (Breach of the 2008 Security Agreement)

136.    Roswell, as agent for BridgePointe and CAMOFI, repeats and realleges each and every allegation contained in paragraphs 1-135.

137.    Plaintiffs Roswell, BridgePointe and CAMOFI have complied with all of their obligations under the 2008 Security Agreement.

138.    In accordance with their rights under Section 4(q), Plaintiffs Roswell, BridgePointe and CAMOFI sought to inspect and copy the books and records of ACT and the ACT Subsidiary Defendants pertaining to the Collateral.

139.    The ACT Defendants blocked, interfered with and failed to grant the Secured Lenders and their agents access to inspect and copy the books and records pertaining to the Collateral, save only for ACT's accounts payable and accounts receivable.

140.    Such failure constitutes a breach of the 2008 Security Agreement by the ACT Defendants.

141.    In addition, ACT also breached its obligations under the 2008 Security Agreement by failing, as required therein: (i) to provide Roswell with a copy of an additional or amended Deed of Trust, and with evidence of filing of Deed of Trust, granting a further lien on certain real property of ACT; and (ii) to file the Intellectual Property Security Agreement with the U.S. Patent and Trademark Office.

142.    By reason of the foregoing, Plaintiffs have suffered irreparable harm.

143.    Plaintiffs have no adequate remedy at law.

## COUNT VIII
### (Breach of the 2007 Subsidiary Guarantee)

144.    Plaintiffs BridgePointe, CAMOFI and CAMHZN repeat and reallege each and every allegation contained in paragraphs 1-143.

145.    Prosteel, ACT Corp., FOBI and Safe Rooms, four of the ACT Subsidiary Defendants, jointly and severally, unconditionally and irrevocably, guaranteed to the Secured Lenders all of ACT's obligations and undertakings under the Debentures, the 2007 Warrants and the 2007 Security Agreement, among other obligations.

146.    The foregoing ACT Subsidiary Defendants waived all rights for presentment, protest, demand, or notice, as more fully set forth in the 2007 Subsidiary Guarantee.

147.    Plaintiffs BridgePointe, CAMOFI and CAMHZN complied with all of the obligations under the 2007 Subsidiary Guarantee.

148.    By reason of the foregoing, Prosteel, ACT Corp. FOBI and Safe Room are liable as guarantors for all of the amounts due and owing to the Secured Lenders by ACT.

## COUNT IX
### (Breach of the 2008 Subsidiary Guarantee)

149.    Plaintiffs BridgePointe and CAMOFI repeat and reallege each and every allegation contained in paragraphs 1-148.

150.    Plaintiffs BridgePointe and CAMOFI complied with all of their obligations under the 2008 Subsidiary Guarantee.

151.    Each of the ACT Subsidiary Defendants, jointly and severally, unconditionally and irrevocably, guaranteed to the Secured Lenders all of ACT's obligations and undertakings under the Line of Credit Agreement, the Lockbox Agreement, the Notes, the 2008 Warrants and the 2008 Security Agreement, among other obligations.

152.    Each of the ACT Subsidiary Defendants waived all rights for presentment, protest, demand, or notice as set forth more fully in the 2008 Subsidiary Guarantee.

153.    By reason of the foregoing, each of the ACT Subsidiary Defendants are liable as guarantors for all of the amounts due and owing to BridgePointe and CAMOFI by ACT.

## COUNT X
### (Preliminary and Permanent Injunction)

154.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-153.

155.    Defendants have transferred, misappropriated and dissipated assets that are part of the Collateral and have expressed an intention in SEC documents and elsewhere that they will continue to do so.

156.    Absent injunctive relief from the Court, Plaintiffs will suffer irreparable harm, in that the value of the Collateral that they are entitled to foreclose upon pursuant to the Security Agreements shall be diminished, if not extinguished, by the ACT Defendants' wrongful conduct.

157.    Given Defendants' admitted and undisputed default on its obligations under its Loan Documents, Plaintiffs will succeed on the merits of their breach of contract and foreclosure claims in this litigation.

158.    The equities weigh in favor of protecting Plaintiffs' secured interest in the Collateral and rights under their various agreements with the ACT Defendants.

159.    Plaintiffs have no adequate remedy at law.

## COUNT XI
### (Foreclosure)

160.    Roswell, as Collateral Agent for BridgePointe, CAMOFI and CAMHZN, repeats and realleges each and every allegation contained in paragraphs 1-159.

161.    By reason of the above-mentioned Events of Default under the Debentures, the 2007 Warrants, the Line of Credit Agreement, the Lockbox Agreement and the Notes, there have been Events of Default under the 2007 Security Agreement, the 2008 Security Agreement, the Patent Security Agreement, the Intellectual Property Security Agreement and Collateral Agency and Intercreditor Agreement (collectively, the "Security Agreements").

162.    As a result of the Events of Default under the Security Agreements, the Secured Lenders and Roswell, as their Collateral Agent, have all the rights and remedies of a

secured party under the UCC including without limitation all of the rights and remedies provided in the Security Agreements with respect to the Collateral described and identified thereunder.

163.    Plaintiffs have duly perfected their security interests in the Collateral described and identified in the Security Agreements.

164.    No other action or proceeding for the recovery of the Collateral described and identified in the Security Agreements has been commenced by Plaintiffs.

165.    Plaintiffs are entitled to recover all of their fees, costs and expenses in connection with this proceeding and as otherwise provided in the Security Agreements.

166.    By reason of the foregoing, Roswell, as Collateral Agent for BridgePointe, CAMOFI and CAMHZN, seeks to foreclose on their interest in and to the Collateral described and identified in the Security Agreements (except to such real property located outside of this jurisdiction) in accordance with their rights under the Security Agreements.

**WHEREFORE,** Plaintiffs respectfully demand that this Court enter a judgment as follows:

(a)    Judgment against all of the ACT Defendants, jointly and severally, for the following amounts:

    i.    In favor of BridgePointe in an amount to be determined, but believed to be, as of October 31, 2008, in excess of $3,909,513.98;

    ii.    In favor of CAMOFI in an amount to be determined, but believed to be, as of October 31, 2008, in excess of $3,202,431.39;

    iii.    In favor of CAMHZN in an amount to be determined, but believed to be, as of October 31, 2008, in excess of $662,911.56; and

    iv.    Interest thereon at the maximum rate allowed by law;

(b)    Determining that the Secured Lenders hold valid liens and security interests in and to the Collateral;

(c)    Ordering that the liens and security interests held by the Secured Lenders be foreclosed against all Collateral (with the exception of real property located outside this jurisdiction); that all of the Defendants or any person or entity claiming by or through them be forever barred and foreclosed of all right, title, claim, lien and equity of redemption of the Collateral; awarding Plaintiffs possession of the Collateral (with the exception of real property located outside of this jurisdiction), and/or ordering the Collateral (with the exception of real property located outside of this jurisdiction) and proceeds subject thereto be sold, on terms to be approved by the Court, upon application by Plaintiffs after judgment is rendered, and that the proceeds of the sale be applied towards the satisfaction and payment of the expenses of sale, the costs of this action, and Plaintiffs' judgment, and that if the proceeds of the sale are insufficient to pay Plaintiffs' claims, that a deficiency judgment be entered for the sum remaining against the ACT Defendants jointly and severally;

(d)    Ordering the ACT Defendants to refrain from damaging, destroying, transferring, conveying, disposing of or further dissipating the value of the Collateral or the Collateral itself;

(e)    Entering a preliminary and permanent injunction:

       i.    To preserve the collateral and preclude defendants from transferring, misappropriating or dissipating the collateral; and

ii.    to enforce the requirements of the Debentures, Notes, the 2007 Security Agreements, the 2008 Security Agreement, the Patent Security Agreement, the Intellectual Property Security Agreement, the Lockbox Agreement, the Line of Credit Agreement, the 2007 Subsidiary Guarantee, the 2008 Subsidiary Guarantee, and the Collateral Agency and Intercreditor Agreement, including, but not limited to, the obligations to permit all books and records pertaining to the Collateral to be inspected and copied by Plaintiffs, to make the Collateral available for Plaintiffs' possession and disposition, and to deliver all stock certificates pledged to the Plaintiffs;

(f)    For Plaintiffs' costs, expenses and disbursements of and relating to this action and enforcement of their rights hereunder, including their attorneys' fees; and

(g)    For such other relief as this Court may deem just, equitable and proper.

December 8, 2008

DLA PIPER LLP (US)

By: _____
Douglas A. Rappaport
douglas.rappaport@dlapiper.com
Peter D. Sharp
peter.sharp@dlapiper.com
1251 Avenue of the Americas
New York, New York 10020-1104
Tel. (212) 335-4500
Fax. (212) 335-4501
Attorneys for Plaintiffs

EAST\42264304.7