UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
ROSWELL CAPITAL PARTNERS, LLC, as Collateral :
Agent; BRIDGEPOINTE MASTER FUND LTD.; :
CAMHZN MASTER LDC; and CAMOFI MASTER :
LDC,                                              :                08 Civ. 10647 (DLC)
                                                  :
                    Plaintiffs,                   :
                                                  :
            v.                                    :
                                                  :
ALTERNATIVE CONSTRUCTION                          :
TECHNOLOGIES, INC. f/k/a ALTERNATIVE              :
CONSTRUCTION COMPANY, INC.;                       :
ALTERNATIVE CONSTRUCTION BY PROSTEEL              :
BUILDERS, INC. f/k/a PROSTEEL BUILDERS,           :
CORP.; ALTERNATIVE CONSTRUCTION                   :
TECHNOLOGIES CORPORATION; ALTERNATIVE             :
CONSTRUCTION MANUFACTURING OF                     :
TENNESSEE, INC. f/k/a ALTERNATIVE                 :
CONSTRUCTION TECHNOLOGIES                         :
CORPORATION; ALTERNATIVE                          :
CONSTRUCTION SAFE ROOMS, INC. f/k/a               :
UNIVERSAL SAFE STRUCTURES, INC.; FUTURE           :
OF BUILDING INSTITUTE, INC.; ALTERNATIVE          :
CONSTRUCTION MANUFACTURING OF                     :
FLORIDA, INC.; ALTERNATIVE CONSTRUCTION           :
BY IONIAN, INC. f/k/a IONIAN CONSTRUCTION,        :
INC.; ALTERNATIVE CONSTRUCTION BY                 :
REVELS, INC.; ALTERNATIVE CONSTRUCTION            :
CONSULTING SERVICES, INC.; ALTERNATIVE            :
CONSTRUCTION DESIGN INC.; SOLAR 18                :
ACTECH PANEL, INC.; MODULAR RENTAL &              :
LEASING CORPORATION; JOHN DOES 1-10,              :
                                                  :
                    Defendants.                   :
------------------------------------------------------------------ X

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**TABLE OF CONTENTS**

**Page**

FINDINGS OF FACT.................................................................................................. 2

    A.    Introduction.................................................................................................... 2

    B.    The Parties ..................................................................................................... 4

    C.    Plaintiffs' Loan Transactions With The ACT Defendants ..................................... 5

          1.     The 2007 Funding ................................................................................. 5

          2.     The 2008 Funding ................................................................................. 7

    D.    ACT Failed To Meet Its Payment Obligations Under The 2007 Funding
          Agreements ................................................................................................ 10

    E.    ACT Failed To Meet Other Obligations Under The 2007 Funding
          Agreements ................................................................................................ 11

    F.    ACT Failed To Meet Its Obligations Under The 2008 Funding
          Agreements ................................................................................................ 13

    G.    The Defendants' Admissions Of Default............................................................ 16

    H.    The Secured Lenders' Recourse In The Event Of Default ................................... 16

    I.    Defendants' Ongoing Dissipation Of Collateral.................................................. 18

          1.     Defendants' Misappropriation Of Funds Payable To The Lockbox........ 18

          2.     The Proposed Transfer Of ACT's Development Division ...................... 18

CONCLUSIONS OF LAW .......................................................................................... 19

    A.    Defendants Defaulted Under The 2007 Loan Agreements................................... 19

          1.     Defaults In Payment Of Principal And Interest ...................................... 19

          2.     Additional Defaults Under 2007 Loan Agreements ............................... 20

          3.     Cross-Default Of The 2007 Warrants And The 2007 Security
               Agreement............................................................................................ 21

          4.     Plaintiff Provided Notice Of Default And Accelerated The
               Debentures .......................................................................................... 21

    B.    Defendants Defaulted Under The 2008 Loan Agreements................................... 22

          1.     Defaults Under The Lockbox Agreement................................................ 22

          2.     Cross-Default Among The 2007 Agreements And 2008
               Agreements .......................................................................................... 23

          3.     Plaintiff Provided Notice Of Default And Accelerated The Notes.......... 23

    C.    Plaintiffs Are Entitled To A Permanent Injunction Directing Defendants
          To Turn Over All Assets Constituting Collateral ................................................ 24

# TABLE OF CONTENTS
(continued)

Page

D.   Plaintiffs Are Entitled To A Preliminary Injunction Order To Prevent Defendants From Misappropriating, Transferring Or Dissipating The Collateral ........................................................................................... 26

   1.   Absent Injunctive Relief, Plaintiffs Will Suffer Irreparable Harm From The Imminent Misappropriation And Dissipation Of The Collateral ................................................................................ 26

      a.   Plaintiffs Will Suffer Irreparable Harm If Not Allowed To Protect The Collateral Pursuant To The Loan Agreements ................................................... 26

      b.   ACT's Contractual Admissions Of Irreparable Harm In The Event Of Default Further Establish Plaintiffs' Right To Injunctive Relief .............................. 27

   2.   Plaintiffs Will Succeed On The Merits Given Defendants' Admitted And Undisputed Defaults Under The Loan Agreements ......... 28

   3.   The Balance Of Hardships Tips Decidedly In Plaintiffs' Favor ............. 29

E.   Defendants Waived The Assertion Of Legal Defenses Under The Debenture Absent Posting Of A Bond ................................................................. 29

F.   Defendants' Purported Defenses Are Legally Defective ..................................... 30

   1.   Defendants' "Unclean Hands" Defense Fails .......................................... 30

   2.   Defendants' Breach Of Contract Defenses Fail ...................................... 34

   3.   Defendants' Putative Usury Defense Is Defective As A Matter Of Law ....................................................................................................... 35

G.   Defendants' Purported Counterclaim Fails ........................................................ 35

GRANT OF RELIEF ......................................................................................................... 36

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
ROSWELL CAPITAL PARTNERS, LLC, as Collateral    :
Agent; BRIDGEPOINTE MASTER FUND LTD.;    :
CAMHZN MASTER LDC; and CAMOFI MASTER    :
LDC,    :        08 Civ. 10647 (DLC)
    :
            Plaintiffs,    :
    :
    :
        v.    :
    :
    :
ALTERNATIVE CONSTRUCTION    :
TECHNOLOGIES, INC. f/k/a  ALTERNATIVE    :
CONSTRUCTION COMPANY, INC.;    :
ALTERNATIVE CONSTRUCTION BY PROSTEEL    :
BUILDERS, INC. f/k/a PROSTEEL BUILDERS,    :
CORP.; ALTERNATIVE CONSTRUCTION    :
TECHNOLOGIES CORPORATION; ALTERNATIVE    :
CONSTRUCTION MANUFACTURING OF    :
TENNESSEE, INC. f/k/a ALTERNATIVE    :
CONSTRUCTION TECHNOLOGIES    :
CORPORATION; ALTERNATIVE    :
CONSTRUCTION SAFE ROOMS, INC. f/k/a    :
UNIVERSAL SAFE STRUCTURES, INC.; FUTURE    :
OF BUILDING INSTITUTE, INC.; ALTERNATIVE    :
CONSTRUCTION MANUFACTURING OF    :
FLORIDA, INC.; ALTERNATIVE CONSTRUCTION    :
BY IONIAN, INC. f/k/a IONIAN CONSTRUCTION,    :
INC.; ALTERNATIVE CONSTRUCTION BY    :
REVELS, INC.; ALTERNATIVE CONSTRUCTION    :
CONSULTING SERVICES, INC.; ALTERNATIVE    :
CONSTRUCTION DESIGN INC.; SOLAR 18    :
ACTECH PANEL, INC.; MODULAR RENTAL &    :
LEASING CORPORATION; JOHN DOES 1-10,    :
    :
            Defendants.    :
-------------------------------------------------------------------- X

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Roswell Capital Partners, LLC ("Roswell"), as Collateral Agent,

BridgePointe Master Fund Ltd. ("BridgePointe"), CAMHZN Master LDC ("CAMHZN"), and

CAMOFI Master LDC ("CAMOFI") (collectively, "Plaintiffs"), respectfully submit these proposed findings of fact and conclusions of law.

Defendants have admitted many of the operative facts through their Answer. For the convenience of the Court, we have provided a document entitled "Statement of Admitted Facts" comprised of all those paragraphs in Plaintiffs' Complaint admitted to by Defendants' Answer. Citations to the Statement of Admitted Facts are in the form "A ¶ __." Citations to Plaintiffs' trial exhibits are in the form "P. Ex. __." Citations to the direct testimony of Thomas Dawe are in the form "Dawe Aff., ¶ __," and citations to the direct testimony of Brad Hathorn are in the form of "Hathorn Aff., ¶ __." Citations to the depositions that have been taken in this case are in the form "[Deponent] Tr. at __-__." Plaintiffs have provided citations at the end of each numbered paragraph below for the factual information cited in the paragraph.

## FINDINGS OF FACT

### A.    Introduction

1.    Plaintiffs bring this action to foreclose upon their security interests in the ACT Defendants' collateral and for breach of various loan and related agreements.

2.    In June 2007, Plaintiffs BridgePointe, CAMHZN and CAMOFI (the "Secured Lenders") agreed to lend defendant Alternative Construction Technologies, Inc. ("ACT") $4,000,000 in exchange for certain Senior Secured Convertible Debentures and warrants to purchase shares of ACT stock (the "2007 Funding"). Under the terms of the Senior Secured Debentures (the "Debentures"), ACT agreed to make monthly interest and principal payments to the Secured Lenders starting in July 2008. (A ¶ 2; P. Ex. 2.)

3.    As further consideration for the June 2007 Funding, ACT and four of its subsidiaries entered into a Security Agreement (the "2007 Security Agreement"). In the 2007 Security Agreement, ACT and the four subsidiaries gave the Secured Lenders a perfected senior

security interest and liens upon all of the assets of ACT and the four subsidiaries. The four ACT subsidiaries also entered into a separate subsidiary guarantee, further guaranteeing the $4,000,000 loan. (A ¶ 3; P. Exs. 4, 9.)

4.     Thereafter, two of the Secured Lenders, BridgePointe and CAMOFI, entered into a Line of Credit Agreement with ACT dated May 8, 2008, providing ACT with a line of credit for up to $3,000,000 (the "2008 Funding"). In return, ACT provided both BridgePointe and CAMOFI with a Senior Secured Grid Note (collectively, the "Notes") in the principal sum of $1,500,000 or so much thereof as was advanced to ACT under the Line of Credit Agreement. (A ¶ 4; P. Exs. 10-11.)

5.     As further consideration for the Line of Credit Agreement, ACT entered into a Lockbox Agreement with Plaintiffs BridgePointe, CAMOFI and Roswell. The Lockbox Agreement required that all payments from various ACT customer contracts would be paid into a lockbox account, and those funds would automatically be disbursed to BridgePointe and CAMOFI as a credit against the outstanding principal and interest due on amounts advanced under the line of credit. (A ¶ 5; P. Ex. 12.)

6.     ACT's obligations under the Line of Credit Agreement, the Notes and related agreements were secured by a security agreement (the "2008 Security Agreement"). Like the 2007 Security Agreement, the 2008 Security Agreement granted BridgePointe and CAMOFI a senior security interest and lien upon all of Defendants' assets. (A ¶ 6; P. Ex. 13.)

7.     Defendants have failed to meet their payment obligations and other obligations under the agreements they entered into with the Secured Lenders. ACT has acknowledged these defaults repeatedly in its publicly filed SEC documents and in this litigation. (A ¶ 7; P. Exs. 19-21.)

8.    In light of these admitted defaults, Plaintiffs bring this action to take possession of and foreclose on their security interest in Defendants' assets, as well as seek other relief provided under their 2007 transaction documents (the "2007 Funding Agreements") and the 2008 transaction documents (the "2008 Funding Agreements"). Plaintiffs were also granted provisional relief to prevent Defendants from transferring, misappropriating or dissipating these assets pending a final judgment on the merits. (A ¶ 8.)

B.    **The Parties**

9.    Plaintiff Roswell is a Georgia limited liability company located in Alpharetta, Georgia, and all of its members reside in the State of Georgia. Roswell is a plaintiff in this action acting in its capacity as Collateral Agent for BridgePointe, CAMHZN and CAMOFI. (A ¶ 9.)

10.    Plaintiff BridgePointe is a Cayman Islands Exempted Company with its principal place of business in the Cayman Islands. (A ¶ 10.)

11.    Plaintiff CAMHZN is a Cayman Islands Limited Duration Company with its principal place of business in the Cayman Islands. Plaintiff CAMOFI is a Cayman Islands Limited Duration Company with its principal place of business in the Cayman Islands. (A ¶¶ 11-12.)

12.    Defendant ACT is a Florida corporation with its principal place of business in Florida. ACT's primary business involves the sale of construction panels used in commercial, residential, and industrial buildings. ACT is also engaged in the construction industry through various subsidiary companies. (A ¶ 14; P. Exs. 19-21; Hathorn Aff., ¶ 8.)

13.    Defendants Alternative Construction By Prosteel Builders, Inc., f/k/a Prosteel Builders Corp. ("Prosteel"); Alternative Construction Manufacturing Of Tennessee, Inc.; Alternative Construction Safe Rooms, Inc. f/k/a Universal Safe Structures, Inc.; Future Of

4

Building Institute, Inc. ("FOBI"); Alternative Construction Manufacturing Of Florida, Inc.;

Alternative Construction By Revels, Inc. ("Revels"); Alternative Construction Consulting

Services, Inc.; Alternative Construction Design Inc.; Solar 18 Actech Panel, Inc., and Modular

Rental & Leasing Corporation are all subsidiaries owned entirely or primarily by ACT and are

Florida corporations located in Florida.  Defendant Alternative Construction Technologies

Corporation ("Alternative Corp.") is a subsidiary owned entirely or primarily by ACT and is a

Delaware corporation located in Florida.  Defendant Alternative Construction By Ionian, Inc.

f/k/a Ionian Construction, Inc. ("Ionian") is a subsidiary owned entirely or primarily by ACT and

is a Tennessee corporation located in Florida (all ACT subsidiary parties are defined as the

"ACT Subsidiary Defendants").  (A ¶¶ 15-26.)

## C.    Plaintiffs' Loan Transactions With The ACT Defendants

### 1.    The 2007 Funding

14.    ACT, on the one hand, and the Secured Lenders, on the other hand,

entered into a Securities Purchase Agreement dated June 30, 2007 (the "2007 Purchase

Agreement").  Under the 2007 Purchase Agreement, the Secured Lenders purchased the

Debentures, as well as warrants to purchase shares of common stock in ACT (the "2007

Warrants").  ACT's common stock (the "Common Stock") is traded on the OTC Bulletin Board

under the stock symbol "ACCY."  (A ¶ 31; P. Exs. 1-3.)

15.    Pursuant to the terms of the 2007 Purchase Agreement and related

agreements, the Secured Lenders lent ACT $4,000,000.  In this transaction, BridgePointe paid

ACT $2,000,000 for a Senior Secured Convertible Debenture with an aggregate principal amount

of $2,173,913 and warrants entitling BridgePointe to acquire 815,217 shares of Common Stock.

CAMOFI paid ACT $1,500,000 for a Senior Secured Convertible Debenture with an aggregate

principal amount of $1,630,434.70 and warrants entitling CAMOFI to acquire 611,413 shares of

Common Stock. CAMHZN paid ACT $500,000 for a Senior Secured Convertible Debenture with an aggregate principal amount of $543,478.26 and warrants entitling CAMHZN to acquire 203,804 shares of Common Stock. (A ¶ 32; P. Exs. 1-3; Hathorn Aff., ¶ 11.)

16.     Pursuant to the terms of the Debentures, ACT agreed to pay interest to the Secured Lenders on a monthly basis at the rate of 10% per year. In addition, pursuant to Section 9 of the Debentures, starting on the first business day of each month beginning on July 1, 2008, ACT agreed to pay the Secured Lenders 1/24[th] of the "Original Principal Amount" of the Debentures. (A ¶ 35; P. Ex. 2, § 9; Hathorn Aff., ¶ 13.)

17.     To induce the Secured Lenders to loan ACT the $4,000,000, ACT and four ACT Subsidiary Defendants entered into the 2007 Security Agreement. Under the 2007 Security Agreement, ACT and the four ACT Subsidiary Defendants "unconditionally and irrevocably pledge[d], grant[ed], and hypothecate[d] to the Secured [Lenders] a continuing and perfected security interest in and to, a lien upon and a right of set-off against all of their respective right, title and interest of whatsoever kind and nature in and to, the Collateral." The Collateral comprised all of the property and assets of ACT and the ACT Subsidiary Defendants. (A ¶ 36; P. Ex. 4, § 2; Hathorn Aff., ¶ 14-15.)

18.     Pursuant to the 2007 Security Agreement, the pledged Collateral securing the 2007 Funding includes all property then existing or subsequently acquired by ACT and/or its four subsidiaries. This Collateral includes: (i) all goods; (ii) all contract rights and other general intangibles; (iii) all accounts and receivables; (iv) all documents, letter-of-credit rights, instruments and chattel paper; (v) all commercial tort claims; (vi) all deposit accounts and cash; (vii) all investment property; (viii) all supporting obligations; (ix) all files, records, books of account, business papers, and computer programs; (x) the products and proceeds of all of the

foregoing; and (xi) all ownership and/or equity interest in the ACT Subsidiary Defendants and/or other direct or indirect subsidiaries. (A ¶ 37; P. Ex. 4, § 1(a); Hathorn Aff., ¶ 15.)

19.    In addition, ACT entered into a Patent Security Agreement dated June 30, 2007 (the "Patent Security Agreement"). Under the Patent Security Agreement, ACT granted a security interest in ACT's three patents: U.S. Patent registration nos. 5,373,678; 5,827,458 and 6,438,906 (the "Patents"). (A ¶ 40; P. Ex. 6; Hathorn Aff., 17.)

20.    In addition, the four ACT Subsidiary Defendants who signed the 2007 Security Agreement – namely, Prosteel, ACT Corp., FOBI and Safe Rooms – entered into a Subsidiary Guarantee dated June 30, 2007 (the "2007 Subsidiary Guarantee"). Under the 2007 Subsidiary Guarantee, each of the four subsidiaries "jointly and severally, unconditionally and irrevocably" guaranteed to the Secured Lenders "all obligations and undertakings of [ACT] of whatever nature, monetary or otherwise," under the Debentures, the 2007 Purchase Agreement, the 2007 Security Agreement, the 2007 Warrants, related agreements and "any other future agreement or obligations undertaken" by ACT. (A ¶ 43; P. Ex. 9, §§ 1, 2; Hathorn Aff., ¶ 20.)

## 2.    The 2008 Funding

21.    ACT entered into a Line of Credit Agreement, dated May 8, 2008 (the "Line of Credit Agreement"), with two of the three Secured Lenders, BridgePointe and CAMOFI. Under the Line of Credit Agreement, BridgePointe and CAMOFI agreed to provide a line of credit to ACT up to a maximum amount of $1,500,000 each, for an aggregate maximum loan amount of $3,000,000. (A ¶ 44; P. Ex. 10; Hathorn Aff., ¶ 22.)

22.    ACT evidenced its obligation to repay any monies borrowed under the Line of Credit Agreement with the Senior Secured Grid Notes, each dated May 8, 2008. One of the Notes is payable to BridgePointe and the other Note is payable to CAMOFI. ACT issued the

Notes in the principal sum of $1,500,000 or so much thereof as was advanced to ACT under the Line of Credit Agreement. (A ¶ 45; P. Ex. 11; Hathorn Aff., ¶ 23.)

        23.     The Notes constituted senior debt in right of payment of ACT. ACT agreed that all future debt it incurred would be subordinated to the Notes. Interest was payable monthly under the Notes at a rate of 13% per annum. (A ¶ 46; P. Ex. 11, § 2; Hathorn Aff., ¶ 24.)

        24.     ACT, BridgePointe, CAMOFI and Roswell also entered into a lockbox arrangement, denominated as an Agreement Re Blocked Deposit Accounts, dated May 8, 2008 (the "Lockbox Agreement"). Under the Lockbox Agreement and the Line of Credit Agreement, all payments from various "Eligible Contracts" would be paid into a lockbox account to which only Roswell, as Collateral Agent, would have access. BridgePointe and CAMOFI have a continuing lien and security interest in the lockbox account. (A ¶ 47; P. Ex. 12; Hathorn Aff., ¶ 25.)

        25.     Pursuant to the terms of the Line of Credit Agreement, BridgePointe and CAMOFI each advanced and loaned to ACT $1,007,246, for a total aggregate loan of $2,014,492. (A ¶ 48; P. Ex. 10; Hathorn Aff., ¶ 26.)

        26.     ACT's obligations under the Notes, Line of Credit Agreement and related agreements were secured by a 2008 Security Agreement and an Intellectual Property Security Agreement, each dated May 8, 2008. Under the 2008 Security Agreement, ACT and each ACT Subsidiary Defendant "unconditionally and irrevocably pledge[d], grant[ed] and hypothecate[d]" to BridgePointe and CAMOFI a "security interest in and to, a lien upon and a right of set-off against all of their respective right, title and interest of whatsoever kind and nature in and to, the Collateral." (A ¶ 49; P. Ex. 13, § 2; P. Ex. 14; Hathorn Aff., ¶ 27.)

27.     Like the 2007 Security Agreement, the pledged Collateral under the 2008

Security Agreement includes all property then existing or subsequently acquired by ACT and/or

each of its subsidiaries.  This Collateral includes:  (i) all goods; (ii) all contract rights and other

general intangibles; (iii) all accounts and receivables; (iv) all documents, letter-of-credit rights,

instruments and chattel paper; (v) all commercial tort claims; (vi) all deposit accounts and cash;

(vii) all investment property; (viii) all supporting obligations; (ix) all files, records, books of

account, business papers, and computer programs; (x) the products and proceeds of all of the

foregoing; and (xi) all ownership and/or equity interest in the ACT Subsidiary Defendants and/or

other direct or indirect subsidiaries.  (A ¶ 49; P. Ex. 13, § 1(a); Hathorn Aff., ¶ 28.)

28.     As further consideration for BridgePointe's and CAMOFI's loan under the

Line of Credit Agreement, ACT issued warrants (the "2008 Warrants") to BridgePointe and

CAMOFI to permit each of them to purchase 900,000 shares of Common Stock.  (A ¶ 52;

P. Ex. 16; Hathorn Aff., ¶ 30.)

29.     ACT, the Secured Lenders and Roswell also entered into a Collateral

Agency and Intercreditor Agreement dated May 8, 2008 (the "Agency Agreement").  Under the

Agency Agreement, the Secured Lenders appointed Roswell to be Collateral Agent under the

2007 Security Agreement, the 2008 Security Agreement, the Intellectual Property Security

Agreement and related agreements.  (A ¶ 53; P. Ex. 17; Hathorn Aff., ¶ 31.)

30.     Each of the ACT Subsidiary Defendants also entered into a Subsidiary

Guarantee, dated May 8, 2008 (the "2008 Subsidiary Guarantee").  Under the 2008 Subsidiary

Guarantee, each of the ACT Subsidiary Defendants "jointly and severally, unconditionally and

irrevocably" guaranteed to BridgePointe and CAMOFI "all obligations of [ACT]" under the

Notes, the Line of Credit Agreement, the 2008 Security Agreement, the 2008 Warrants, related

9

agreements and "any other future agreement or obligations undertaken" by ACT to BridgePointe and CAMOFI. (A ¶ 54; P. Ex. 18, §§ 1, 2; Hathorn Aff., ¶ 32.)

**D.** **ACT Failed To Meet Its Payment Obligations Under The 2007 Funding Agreements**

31.    ACT failed to meet its obligations to pay principal and interest under the 2007 Funding Agreements.  ACT does not contest these non-payments, and, to the contrary, has admitted them repeatedly in SEC documents, in their Answer, and elsewhere. (A ¶¶ 56-59; P. Exs. 19-21; Hathorn  ¶¶ 34-35.)

32.    Specifically, ACT failed to pay BridgePointe the "Required Principal Payment" of $90,579.71 when due and payable on July 1, 2008 as required by Section 9(a) of the Debentures.  ACT likewise failed to pay BridgePointe the required interest payment of $17,867.78 when due and payable on July 1, 2008 as required by the Debentures. (A ¶¶ 56-57; P. Ex. 2, § 9; Hathorn Aff., ¶¶ 36-37.)

33.    ACT also failed to pay CAMOFI and CAMHZN the "Required Principal Payment" of $67,934.78 and $22,644.93, respectively, when due on July 1, 2008 as required by the Debentures.  ACT likewise failed to pay CAMOFI and CAMHZN the required interest payments in amounts totaling $24,574.39 and $8,414.29, respectively, when due on June 1, 2008 and July 1, 2008 as required by the Debentures. (A ¶¶ 58-59; P. Ex. 2; Hathorn Aff., ¶¶ 38-39.)

34.    Pursuant to Section 8(a) of the Debentures, counsel for BridgePointe delivered a Default Notice to ACT, dated July 31, 2008.  Pursuant to Section 8(a) of the Debentures, counsel for CAMOFI and CAMHZN delivered a Default Notice to ACT dated October 21, 2008. (A ¶¶ 61-62; P. Exs. 23-24; Hathorn Aff., ¶¶ 41-42.)

35.    Pursuant to Section 8(a) of the Debentures, the Secured Lenders accelerated all of ACT's payment obligations under the Debentures and demanded a "Mandatory

Redemption" of all amounts due and payable by ACT under the Debentures.  (A ¶ 63; P. Ex. 2, § 8(a); Hathorn Aff., ¶ 43.)

36.    Section 8(a) of the Debentures provides that if ACT fails to pay the Default Amount within 10 business days of demand, interest accrues at a rate of 18% (compounded monthly) or at the maximum amount allowed by law.  (A ¶ 64; P. Ex. 2, § 8(a); Hathorn Aff., ¶ 48.)

37.    At no time did ACT ever pay the amounts due or otherwise cure the non-payment of its obligations under the 2007 Funding Agreements.  (A ¶ 65; Hathorn Aff., ¶ 44.)

38.    ACT also failed to make all Required Principal Payments and related interest payments to the Secured Lenders as due and required by Section 9 of the Debentures for August 1, 2008, September 1, 2008 and October 1, 2008, or for any month thereafter.  (A ¶ 67; P. Ex. 2, § 9; Hathorn Aff., ¶ 46.)

39.    Section 11(a)(v) of the 2007 Warrants provides that a default under the Debentures constitutes an Event of Default under the 2007 Warrants.  (A ¶ 69; P. Ex. 3, § 11(a)(v); Hathorn Aff., ¶ 49.)

40.    Similarly, Section 6 of the 2007 Security Agreement provides that an Event of Default under the Debentures constitutes an Event of Default under the 2007 Security Agreement.  (A ¶ 71; P. Ex. 4, § 6; Hathorn Aff., ¶ 50.)

**E.    ACT Failed To Meet Other Obligations Under The 2007 Funding Agreements**

41.    In addition to defaulting on its payment obligations, ACT also failed to meet other obligations under the 2007 Funding.  (Hathorn Aff., ¶ 51.)

42.    The Use of Proceeds in Section 4(d) of the 2007 Purchase Agreement reflected a negotiated agreement between the parties as to how ACT would use the funds loaned

by the Secured Lenders. ACT violated this provision immediately following consummation of the 2007 Funding. (P. Ex. 1, § 4(d); Hathorn Aff., ¶ 52.)

43.     The first sentence of the Use Of Proceeds section requires ACT to "segregate at least $250,000 of the Offering proceeds into a separate designated bank account . . . for carrying out investor relations services." This segregation for investor relations services never took place. (P. Ex. 1, § 4(d); Hathorn Aff., ¶ 53; Amon Tr. at 135:10-136:15, 137:5-137:17.)

44.     The second sentence of the Use Of Proceeds section states that "[t]he Company shall use at least $150,000 of the proceeds of the Offering for IR [investor relations] purposes during each of the first two (2) calendar years after the Closing Date." These required investor relations expenditures did not take place. (P. Ex. 1, § 4(d); Hathorn ¶ 54; Amon Tr. at 135:10-136:15, 137:20-138:4.)

45.     The Use of Proceeds section and related Schedule 4D of the 2007 Securities Agreement also sets out permitted uses of the proceeds. This section precludes ACT from using the proceeds to: "(i) repay any of its corporate debt or other Indebtedness; (ii) to redeem any common stock or stock equivalents; . . . or (iv) to repay any debt or obligation to any officer, director or manager of the Company, including but not limited to the Company's president, chief executive officer, chief financial officer, and any of their affiliates or family members." (P. Ex. 1; Hathorn Aff., ¶ 55.)

46.     Within a few days of the closing of the 2007 Funding, Avante Holdings Group, Inc. ("Avante"), an entity owned almost entirely by Michael Hawkins, ACT's then chairman and CEO, was paid $800,000 by ACT. Plaintiffs were never told by Defendants, and never agreed, that $800,000 of the $4,000,000 that comprised the 2007 Funding would

immediately go into the coffers of a company owned by ACT's chairman and CEO, rather than to the working capital of ACT itself. Absent the 2007 Funding, ACT would not have had the funds to make this $800,000 payment to Avante. (Hathorn Aff., ¶ 56; Amon Tr. at 138:5-138:15, 164:6-167:12; Harmon Tr. at 196:18-197:14.)

47.    Section 3(g) of the 2007 Purchase Agreement also requires ACT to have "timely filed" all of its required SEC filings. ACT issued a press release in May 2007 regarding the purported "retirement" of its Class B Preferred Stock. This Class B Preferred stock was owned by Avante. In connection with this supposed "retirement," ACT issued a $2 million note to Avante. No 8-K was filed with the SEC in connection with the retirement of this Class B Preferred stock and issuance of the note to Avante. (P. Ex. 1, § 3(g), P. Ex. 26; Hathorn Aff., ¶ 57.)

48.    Section 3(mm) of the 2007 Purchase Agreement likewise contains a representation and related schedule that purports to list ACT's indebtedness. This list fails to disclose any debt owed to Mr. Hawkins or his company Avante as a result of the purported retirement of the Class B Preferred Stock. (P. Ex. 1, § 3(mm); Hathorn Aff., ¶ 58.)

49.    Section 3(n) of the 2007 Purchase Agreement also contains a representation that ACT has disclosed all material events to the Secured Lenders. This representation is false in light of the failure to disclose that Mr. Hawkins' company was to receive $800,000 out of the proceeds of the transaction. (P. Ex. 1, § 3(n); Hathorn Aff., ¶ 59.)

**F.    ACT Failed To Meet Its Obligations Under The 2008 Funding Agreements**

50.    ACT has also failed to comply with the terms, conditions and obligations of the Line of Credit Agreement, Lockbox Agreement, Notes and related 2008 Funding Agreements. (A. ¶ 73; Hathorn Aff., ¶ 61.)

51.    ACT breached its obligations under the foregoing agreements by having Eligible Clients make payments directly to ACT's operating bank account rather than the lockbox account.  Several hundred thousand dollars in payments by Eligible Clients were deposited in ACT's operating account instead of being paid directly to the lockbox as required. This diversion of funds violated the terms of the Line of Credit Agreement, the Lockbox Agreement and other applicable agreements.  (A ¶ 93; P. Exs. 10, 12, 19-21, 28; Hathorn Aff., ¶ 62, 64.)

52.    All told, exactly one payment was made into the lockbox account since the parties consummated the 2008 Funding.  That payment was for approximately $44,899. Contrary to its obligations under the governing agreements, ACT allowed the lockbox account to be closed by refusing to pay the fees required to keep it open.  (P. Ex. 29; Hathorn Aff., ¶ 65.)

53.    ACT also failed to provide one or more of the Eligible Clients with Lockbox Payment Instructions and a Lockbox Invoice when required under the foregoing agreements, and failed to provide BridgePointe and CAMOFI with copies of such Lockbox Payment Instructions and Lockbox Invoices as required under the 2008 Funding Agreements. (A ¶ 76.)

54.    Section 6(b) of the Line of Credit Agreement provides as follows:

> [ACT] agrees that, promptly upon closing of the Line of Credit Agreement . . . and promptly upon entering into any new Eligible Contract . . . [ACT] will send instructions (each, "Lockbox Payment Instructions") to the customer requiring that payments on the Eligible Contract be remitted directly to the Lockbox Account . . . [ACT] shall promptly provide each of the Lenders with a copy of each Lockbox Payment Instructions and each Lockbox Invoice, together with evidence that each has been delivered to the applicable customer.

(A ¶ 74; P. Ex. 10, § 6(b).)

55.    Section 1 of the Lockbox Agreement provides that:

> The Eligible Clients . . . of the Borrower have been, or will be instructed irrevocably to remit (i) all envelopes containing Items . . . to be processed through the Lockbox and (ii) all electronic funds transfer payments to the appropriate address set forth on the [Private Bank Lockbox Services Agreement].

(A ¶ 75; P. Ex. 12 § 1.)

56.    ACT also defaulted on the terms of the Notes by defaulting on the Debentures. Section 7(n) of the Notes declares that it shall be an "Event of Default" if ACT "defaults in the payment when due on any indebtedness, individually or in the aggregate, in excess of $175,000." ACT's default in the payment of indebtedness to the Secured Lenders in excess of $175,000 under the Debentures therefore constitutes an "Event of Default" under the Notes. (A ¶¶ 78, 80, 81; P. Ex. 11, § 7(n); Hathorn Aff., ¶ 69.)

57.    On August 1, 2008, BridgePointe's counsel gave a Default Notice to ACT of the foregoing defaults under the Line of Credit Agreement, the Lockbox Agreement and the Notes. On October 21, 2008, CAMOFI's counsel gave a Default Notice to ACT of the foregoing defaults under the Line of Credit Agreement, the Lockbox Agreement and Notes. (A ¶¶ 62, 82-83; P. Exs. 24, 30; Hathorn ¶¶ 70, 71.)

58.    After receiving these Notices of Default, ACT failed to pay to either BridgePointe or CAMOFI any monies due under the Notes. (A ¶ 86.)

59.    Under Section 6(a) of the 2008 Security Agreement, an Event of Default on the Notes constitutes an Event of Default under the 2008 Security Agreement. (A ¶ 87; P. Ex. 13, § 6(a); Hathorn Aff., ¶ 75.)

60.    At no time has ACT cured any of the Events of Default under any of the above-referenced 2008 Funding Agreements with BridgePointe, CAMOFI and Roswell. (A ¶ 92.)

**G.**    <u>The Defendants' Admissions Of Default</u>

                61.    Defendants have admitted numerous instances of default in their Answer

to this litigation.  (A ¶¶ 7, 55, 60, 65, 66, 68, 70, 71, 81, 87, 90, 93, 161; P. Ex. 22.)

                62.    Defendants have also admitted in their 10-Q filings with the Securities and

Exchange Commission ("SEC") that "[t]he Company is in default on its current indebtedness and

if it fails to provide a work-out solution the lenders may foreclose on the Company." This

admission was provided in ACT's Form 10-Qs that were filed with the SEC on August 19, 2008

and November 20, 2008. Most recently, in an amended 10-Q filed on December 23, 2008,

Defendants stated again that "[t]he Company is in default on its current indebtedness and its

lenders are attempting to foreclose on the Company."  ACT's various representatives did not

contest the accuracy of these statements.  (A ¶ 93; P. Ex. 19, p. 43; P. Ex. 20, p. 45; P. Ex. 21, p.

34; Hathorn Aff., ¶ 34; Hawkins Tr. at 235:7-235:16, 235:17-236:3, 237:18-238:5; Amon

Tr. at 223:4-224:18, 225:14-226:8.)

                63.    Defendants have likewise admitted in SEC filings that they have breached

their obligations under the 2008 Funding.  Specifically, Defendants have admitted no less than

three times in these 10-Q filings with the SEC that:  "The company erroneously deposited certain

checks into its general account without going through the Lock Box and erroneously overstated

the amounts of contracts available for the initial funding."  The 10-Q filings go on to concede

that "these matters constituted breaches of the Agreements."  (A ¶ 93; P. Exs. 19-21; Hathorn

Aff., ¶ 62.)

**H.**    <u>The Secured Lenders' Recourse In The Event Of Default</u>

                64.    Section 8(a) of the 2007 Security Agreement provides that if an Event of

Default occurs, the Secured Lenders have certain rights and remedies, including all the rights and

remedies of a secured party under the UCC.  (A ¶ 72; P. Ex. 1, § 8(a). Hathorn Aff., ¶ 80.)

65.     The rights and remedies under the 2007 Security Agreement include the right: (1) to take possession of and foreclose on the Collateral; (2) to operate the business of each of the Defendants; (3) to assign, sell, lease or otherwise dispose of and deliver all or any part of the Collateral; (4) to notify any account debtors and any obligors under instruments or accounts to make payments directly to the Secured Lenders; and (5) to transfer any or all intellectual property registered in the name of any Defendant at the United States Patent and Trademark Office and/or Copyright Office into the name of the Secured Lenders.  (Id.)

66.     Under Sections 8(a-c) of the 2008 Security Agreement, BridgePointe and CAMOFI have certain rights and remedies upon the occurrence of any Event of Default under that agreement, including all the rights and remedies of a secured party under the UCC.  (A ¶ 88; P. Ex. 13, § 8(a-c).)

67.     Under the 2008 Security Agreement and Agency Agreement, Roswell's rights as the Collateral Agent for BridgePointe and CAMOFI include the right:  (1) to take possession of and foreclose on the Collateral; (2) to operate the business of each of the Defendants; (3) to assign, sell, lease or otherwise dispose of and deliver all or any part of the Collateral; (4) to notify any account debtors and any obligors under instruments or accounts to make payments directly to the Secured Lenders; and (5) to transfer any or all intellectual property registered in the name of any Defendant at the United States Patent and Trademark Office and/or Copyright Office into the name of the Secured Lenders.  (A ¶ 88; P. Exs. 13, 17.)

68.     Plaintiffs repeatedly advised ACT of its continuing breach of its contractual obligations and that ACT failed to cure the various above-mentioned Events of Default.  (A ¶ 94.)

17

69.     The Defendants presently own and are in possession of the Collateral described above.  (A ¶ 98.)

70.     Under the governing 2007 and 2008 Funding Agreements, Plaintiffs are entitled to seek injunctive relief, damages, fees and costs and other relief in addition to attempting to take possession and foreclose on their Collateral.  (P. Ex. 10, § 10(b)(ix).)

## I.     Defendants' Ongoing Dissipation Of Collateral

### 1.     Defendants' Misappropriation Of Funds Payable To The Lockbox

71.     As mentioned previously, ACT has admitted repeatedly that it breached the 2008 Funding Agreements because it "erroneously deposited certain checks into its general account without going through the Lock Box."  (A. ¶ 93; P. Ex. 19, p. 23; P. Ex. 20, p. 20.)

72.     The Eligible Clients listed in the Lockbox Agreement include a company called Nelson LC ("Nelson"), a manufacturer of mobile office sites.  Dennis Towell, a representative of Nelson, testified that on multiple occasions, including occasions as recent as January 2009, Defendants instructed Nelson to make payment of amounts owed to ACT directly to third parties, purportedly to pay for items including materials and utilities.  In August 2008, Mr. Hawkins insisted that Nelson remit a $100,000 receivable of ACT to Avante, a company Mr. Hawkins owns and controls, rather than to ACT itself.  Mr. Hawkins told Nelson to treat the payment as a "loan."  (P. Ex. 12, Schedule 4(a); Towell Tr. at 36:23-38:21, 39:3-41:20, 42:20-42:12, 45:18-47:21, 47:17-48:10, 77:2-77:21.)

### 2.     The Proposed Transfer Of ACT's Development Division

73.     In its SEC filings, Defendants previously announced a plan to divest an entire operating division of ACT, its Development Division, for virtually no consideration.  The Development Division consists of three ACT Subsidiary Defendants, who are each party to the 2008 Subsidiary Guarantee and the 2008 Security Agreement, and their property, assets and

stock constitute Collateral under the Loan Agreements. As part of this plan, ACT publicly announced plans to transfer one part of the division to an entity controlled by Mr. Hawkins' brother, James Hawkins. This proposed transfer would violate the 2007 and 2008 Funding Agreements. (P. Exs. 13, 18; P. Ex. 20, p. 30.)

74.    Although Defendants have suggested that they no longer intend to consummate these transactions, their previously announced intention reflects disregard for their obligations under the Funding Agreements.

## CONCLUSIONS OF LAW

A.    **Defendants Defaulted Under The 2007 Loan Agreements**

75.    The 2007 Loan Agreements constitute valid contracts governing the rights and obligations among the parties. (A ¶ 55.)

1.    **Defaults In Payment Of Principal And Interest**

76.    ACT defaulted under the Debentures when it failed to pay BridgePointe the "Required Principal Payment" of $90,579.71 on July 1, 2008 as required by Section 9(a) of the Debentures. (A ¶ 56; P. Ex. 2, § 9(a).)

77.    ACT defaulted under the Debentures when it failed to pay BridgePointe the required interest payment of $17,867.78 on July 1, 2008 as required by the Debentures. (A ¶ 57; P. Ex. 2.)

78.    ACT defaulted under the Debentures when it failed to pay CAMOFI the "Required Principal Payment" of $67,934.78 on July 1, 2008 as required by Section 9(a) of the Debentures. ( A ¶ 58; P. Ex. 2, § 9(a).)

79.    ACT defaulted under the Debentures when it failed to pay CAMOFI the required interest payment of $24,574.39 on June 1, 2008 as required by the Debentures. (A ¶ 59; P. Ex. 2.)

80.     ACT defaulted under the Debentures when it failed to pay CAMHZN the "Required Principal Payment" of $22,644.93 on July 1, 2008 as required by Section 9(a) of the Debentures.  (A ¶ 58; P. Ex. 2, § 9(a).)

81.     ACT defaulted under the Debentures when it failed to pay CAMHZN the required interest payment of $8,414.29 on July 1, 2008 as required by the Debentures.  (A ¶ 59; P. Ex. 2.)

**2.     Additional Defaults Under 2007 Loan Agreements**

82.     ACT further defaulted under Section 4(d) of the 2007 Purchase Agreement.  Section 4(d) sets forth a negotiated Use of Proceeds from the 2007 Financing.  ACT defaulted on this Use of Proceeds section in at least three respects:

a.     ACT defaulted by failing to "segregate at least $250,000 of the Offering proceeds into a separate designated bank account . . . for carrying out investor relations";

b.     ACT defaulted by failing to "use at least $150,000 of the proceeds of the Offering for IR [investor relations] purposes during each of the first two (2) calendar years after the Closing Date"; and

c.     ACT defaulted by transferring $800,000 of the proceeds, within days of the closing, to an entity owned almost entirely by Michael Hawkins, ACT's then chairman and CEO, thus violating the prohibition against the use of proceeds to "(i) repay any of [ACT's] corporate debt or other Indebtedness; (ii) to redeem any common stock or stock equivalents; . . . or (iv) to repay any debt or obligation to any officer, director or manager of [ACT], including but not limited to [ACT's] president, chief executive officer . . . and any of their affiliates or family members."

As with the admissions of default contained in ACT's 10-Q filings, ACT's various representatives did not contest the accuracy of these statements.  (P. Ex. 1, § 4(d); Amon Tr. at 135:10-136:3, 137:5-138:15; Harmon Tr. at 176:16-177:7, 192:17-194:24, 196:2-200:25; Hawkins Tr. at 198:13-199:17.)

83.    Each of these defaults confirm that ACT was in breach of the 2007
Funding Agreements immediately following their closing.

### 3.    Cross-Default Of The 2007 Warrants And The 2007 Security Agreement

84.    ACT's defaults under the Debentures constitute a default under the 2007
Warrants pursuant to Section 11(a)(v) of the Warrants.  (A ¶ 69; P. Ex. 3, § 11(a)(v).)

85.    ACT's defaults under the Debentures constitute a default under the 2007
Security Agreement pursuant to Section 6 of the 2007 Security Agreements.  (A ¶ 71; P. Ex. 4,
§ 6.)

### 4.    Plaintiff Provided Notice Of Default And Accelerated The Debentures

86.    Counsel for BridgePointe delivered a valid notice of default and
acceleration of the Debentures dated July 31, 2008, thereby accelerating payment of the
Debentures.  (A ¶ 61; P. Exs. 2, 23.)  See also George H. Nutman, Inc. v. Aetna Bus. Credit, Inc.,
115 Misc. 2d 168, 169 (N.Y. Sup. Queens Co. 1982) ("acceleration clauses exist solely for the
benefit of the mortgagee and are enforced according to their terms").

87.    Counsel for CAMOFI and CAMHZN delivered a valid notice of default
and acceleration of the Debentures dated October 21, 2008, thereby accelerating payment of the
Debentures.  (A ¶ 62; P. Exs. 2, 24.)

88.    As a result of these defaults and acceleration of the Debentures,
Defendants owe a Default Amount or Mandatory Redemption Amount under the Debentures to
BridgePointe in excess of $2,642,064.48 plus interest thereon, as of October 31, 2008.  (P. Ex. 2,
§ 8(a); Hathorn Aff., ¶ 47.)

89.    As a result of these defaults and acceleration of the Debentures,
Defendants owe a Default Amount or Mandatory Redemption Amount under the Debentures to

CAMOFI in excess of $1,943,981.89 plus interest thereon, as of October 31, 2008. (P. Ex. 2, § 8(a); Hathorn Aff., ¶ 47.)

90.    As a result of these defaults and acceleration of the Debentures, Defendants owe a Default Amount or Mandatory Redemption Amount under the Debentures to CAMHZN in excess of $662,911.56 plus interest thereon, as of October 31, 2008. (P. Ex. 2, § 8(a); Hathorn Aff., ¶ 47.)

91.    In the 2007 Security Agreement, four of the ACT Subsidiary Defendants, Prosteel, ACT Corp., FOBI, and Safe Rooms, each "jointly and severally, unconditionally and irrevocably" guaranteed to the Secured Lenders "all obligations and undertakings of [ACT] of whatever nature, monetary or otherwise." (P. Ex. 4.)

92.    Neither ACT nor any ACT Subsidiary Defendant cured any default or paid any amount due and owing pursuant to the defaults and acceleration of the Debentures. (A ¶ 92.)

93.    Accordingly, the Secured Lenders are entitled to entry of judgment against Defendants in the foregoing amounts.

## B.    Defendants Defaulted Under The 2008 Loan Agreements

94.    The 2008 Loan Agreements constitute valid contracts governing the rights and obligations among the parties thereto.

### 1.    Defaults Under The Lockbox Agreement

95.    ACT defaulted under the Lockbox Agreement by:

   a.    Failing to provide BridgePointe and CAMOFI with copies of Lockbox Payment Instruction and Lockbox Invoices; and

   b.    Diverting payments due to be made into the Lockbox Account (and thus towards repayment of loans made to ACT in the 2008 Financing) either directly to ACT or to third parties.

(A ¶ 93; P. Exs. 12, 19-21; Hathorn Aff., ¶¶ 63-64.)

96.     These defaults further constitute defaults under the Notes. Section 7(c) of

the Notes states that it shall constitute an Event of Default if ACT:

> breaches any representation, warranty, covenant or other term of
> condition of this Note, or any of the Transaction Documents in any
> respect, and such breach is not cured . . .

(A ¶ 78.)

97.     ACT knew that payments due to be paid into the lockbox account were

being diverted into its own account and at no time cured this breach.  (A ¶¶ 92, 93.)

### 2.     Cross-Default Among The 2007 Agreements And 2008 Agreements

98.     ACT's defaults in the payments of indebtedness to the Secured Lenders

under the Debentures further constituted a default under the Notes. Section 7(n) of the Notes

states that it shall be an "Event of Default" if ACT "defaults in the payment when due of any

indebtedness, individually or in the aggregate, in excess of $175,000."  (A ¶ 80.)

### 3.     Plaintiff Provided Notice Of Default And Accelerated The Notes

99.     Counsel for BridgePointe delivered a valid notice of the foregoing defaults

and acceleration to ACT, dated August 1, 2008, thereby accelerating payment of the Notes.

(A ¶ 82; P. Ex. 30.)

100.     Counsel for CAMOFI delivered a valid notice of the foregoing defaults

and acceleration to ACT, dated October 21, 2008, thereby accelerating payment of the Notes.

(A ¶ 83; P. Ex. 24.)

101.     As a result of the defaults and acceleration of the Notes, as of October 31,

2008, Defendants owe a Default Amount under the Notes to BridgePointe in excess of

$1,267,499.50 plus interest thereon at 18% per annum. (Hathorn Aff., ¶ 74.)

102.    As a result of the defaults and acceleration of the Notes, as of October 31, 2008, Defendants owe a Default Amount under the Notes to CAMOFI in excess of $1,267,499.50 plus interest thereon at 18% per anum.  (Hathorn Aff., ¶ 74.)

103.    In the 2008 Subsidiary Guarantee, each ACT Subsidiary Defendant "jointly and severally, unconditionally and irrevocably" guaranteed to the Secured Lenders "all obligations and undertakings of [ACT] of whatever nature, monetary or otherwise."  (A ¶ 54; P. Ex. 18.)

104.    Neither ACT nor any ACT Subsidiary Defendant cured any default or paid any amount due and owing pursuant to the defaults under and acceleration of the Notes. (A ¶ 86.)

105.    Accordingly, BridgePointe and CAMOFI are entitled to entry of judgment against Defendants in the foregoing amounts.

**C.    Plaintiffs Are Entitled to a Permanent Injunction Directing Defendants To Turn Over All Assets Constituting Collateral**

106.    The Secured Creditors have a valid and subsisting senior security interest in the Collateral as evidenced and established by the following agreements:

   a.    the 2007 Security Agreement;

   b.    the Patent Security Agreement;

   c.    the 2008 Security Agreement; and

   d.    the Intellectual Property Security Agreement.

(P. Exs. 4, 6, 13, 14.)

107.    "When a debtor whose obligation is . . . secured defaults, the secured party has the right to 'reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure.'"  Fundex Capital Corp. v. Reichard, 172 A.D.2d 420, 421

(1st Dep't 1991) (quoting N.Y. UCC § 9-501(1), as amended, N.Y. UCC § 9-601(a)(1))

(McKinney's 2008).

   108. The right of a secured creditor to foreclose and/or reduce its claims to

judgment "are cumulative and may be exercised simultaneously." N.Y. UCC § 9-601(c).

Similarly, the rights upon default provided under the UCC are cumulative and in addition to

"those provided by agreement of the parties." N.Y. UCC § 9-601(a).

   109. "After default, a secured party:  (1) may take possession of the collateral,"

either pursuant to judicial process or without judicial process, and "[i]f so agreed . . . may require

the debtor to assemble the collateral and make it available to the secured party at a place

designated by the secured party. . . ." N.Y. UCC § 9-609 (a)-(c).

   110. Defendants agreed to assemble and make available the Collateral to

Plaintiffs upon default.  Section 8(a)(i) of the 2007 Security Agreement states that, upon default:

> The Secured Parties shall have the right to take possession of the
> Collateral and, for that purpose, enter, with the aid and assistance
> of any person, any premises where the Collateral, or any part
> thereof, is or may be placed and remove the same, and each Debtor
> shall assemble the Collateral and make it available to the Secured
> Parties at places which the Secured Parties shall reasonably select,
> whether at such Debtor's premises or elsewhere, and make
> available to the Secured Parties, without rent, all of the such
> Debtor's respective premises and facilities for the purpose of the
> Secured Parties taking possession of, removing or putting the
> Collateral in saleable or disposable form.

(A ¶ 72.)

   111. Section 8(a)(i) of the 2008 Security Agreement states that, upon default:

> The Agent shall have the right to take possession of the Collateral
> and, for that purpose, enter, with the aid and assistance of any
> person, any premises where the Collateral, or any part thereof, is or
> may be placed and remove the same, and each Debtor shall
> assemble the Collateral and make it available to the Agent at
> places which the Agent shall reasonably select, whether at such
> Debtor's premises or elsewhere, and make available to the Agent,

without rent, all of the such Debtor's respective premises and
facilities for the purpose of the Agent taking possession of,
removing or putting the Collateral in saleable or disposable form.

(A ¶ 88.)

112.    Defendants' numerous defaults entitle Plaintiffs to entry of a permanent

injunction directing Defendant to assemble and make available to Plaintiffs all assets constituting

Collateral for the purpose of lawful disposition or foreclosure sale.

**D.    Plaintiffs Are Entitled To A Preliminary Injunction
Order To Prevent Defendants From Misappropriating,
Transferring Or Dissipating The Collateral**

113.    In a hearing before the Court on January 22, 2009, the Court

presumptively ordered the hearing on January 29, 2009 to be consolidated with a hearing on the

merits.  Given the Court's presumptive order of consolidation, we provide this discussion of the

requisite elements for preliminary injunctive relief in the event the Court withdraws its

consolidation order.

114.    In order to obtain a preliminary injunction, the Second Circuit requires the

moving party to demonstrate: "(a) irreparable harm and (b) either (1) likelihood of success on the

merits or (2) sufficiently serious questions going to the merits to make them a fair ground for

litigation and a balance of hardships tipping decidedly toward the party requesting the

preliminary relief."  Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 73 (2d Cir. 1988).  Plaintiffs

readily satisfy each of the requisite elements for grant of a preliminary injunction.

**1.    Absent Injunctive Relief, Plaintiffs Will Suffer Irreparable Harm From
The Imminent Misappropriation And Dissipation Of The Collateral**

**a.    Plaintiffs Will Suffer Irreparable Harm If Not Allowed To
Protect The Collateral Pursuant To The Loan Agreements**

115.    "A party can show irreparable harm by demonstrating that without the

preliminary injunction, there is a substantial likelihood that the judgment will be

26

uncollectible...." SEC v. Princeton Econ. Int'l. Ltd., 73 F. Supp. 2d 420, 425 (S.D.N.Y. 1999);

see also Republic of the Philippines v. Marcos, 806 F.2d 344, 356 (2d Cir. 1986) ("preliminary

injunctions are proper to prevent a defendant from making a judgment uncollectible"); Gelfand

v. Stone, 727 F. Supp. 98, 100 (S.D.N.Y. 1989) ("intent to frustrate a judgment will satisfy the

requirement . . . of irreparable harm").

116.    Courts have held that secured lenders, such as Plaintiffs, are entitled to

injunctive relief in order to protect their rights to assets guaranteed under a security agreement.

See Computerland Corp. v. Batac, Inc., 1988 WL 140816, at *3 (S.D.N.Y. Dec. 16, 1988)

(granting plaintiff injunctive to protect "its security interest and to prevent dissipation in the

value of its collateral"); Am. Sav. Bank, F.S.B., v. Cheshire Mgmt. Co., 693 F. Supp. 42, 49

(S.D.N.Y. 1988) (enjoining disposition of assets "in which the plaintiff has a secured interest").

117.    In accordance with this authority, Plaintiffs are entitled to injunctive relief

to prevent the transfer or dissipation of the Collateral.  As described previously, the Funding

Agreements provide Plaintiffs with comprehensive rights to possess, operate  and foreclose upon

all of Defendants' assets and business in the event of default.  Absent the grant of an injunction

to preserve these assets and this business, Plaintiffs may very well have no assets to possess and

foreclose.  The Court record reflects that Defendants have disposed of assets before in

contravention of the parties' Funding Agreements, including Defendants' admitted diversion of

funds that it was obligated to have deposited in the lockbox pursuant to the Lockbox Agreement

and the Line of Credit Agreement.  (A ¶ 93; P. Ex. 12; Hathorn Aff., ¶¶ 62, 64.)

> **b.    ACT's Contractual Admissions Of Irreparable Harm In The Event Of Default Further Establish Plaintiffs' Right To Injunctive Relief**

118.    The Funding Agreements are replete with concessions by Defendants that

their default will result in irreparable harm and thereby warrant the granting of injunctive relief.

Contractual acknowledgements of irreparable harm in the event of breach "might arguably be viewed as an admission" by a defendant that "plaintiff will suffer irreparable harm." <u>Ticor Title Ins. Co. v. Cohen</u>, 173 F.3d 63, 69 (2d Cir. 1999) (granting injunction); <u>see also</u> <u>Estee Lauder Cos. v. Batra</u>, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (same); <u>Nat'l Elevator Cab & Door Corp. v. H & B, Inc.</u>, 2008 WL 207843, at *6 (E.D.N.Y. Jan. 24, 2008) (defendant "expressly admitted that 'money damages would not be a sufficient remedy'").

119.    At minimum, such admissions are given "great weight," even if they are not dispositive. <u>Alpha Capital Aktiengesellschaft v. Advanced Viral Research</u>, 2003 WL 328302, at *5 (S.D.N.Y. Feb. 11, 2003); <u>see also</u> <u>N. Atlantic Instruments, Inc. v. Haber</u>, 188 F.3d 38, 49 (2d Cir. 1999) (finding irreparable harm based, in part, on concession in parties' contract); <u>Netherby Ltd. v. Jones Apparel Group, Inc.</u>, 2007 WL 1041648, at *20 (S.D.N.Y. Apr. 5, 2007) (finding concession of irreparable harm "weighs in favor of plaintiff").

120.    In the present case, the loan agreements collectively contain multiple contractual concessions that in the event of Defendants' default, Plaintiffs will suffer irreparable harm. For example, the Line of Credit Agreement provides: "The Company acknowledges that a breach . . . will cause irreparable harm to each Buyer . . . [and] that each Buyer shall be entitled . . . to an injunction or injunctions to prevent or cure any breaches." These repeated contractual admissions, as well as the relevant evidence, warrant a finding of irreparable harm. (P. Ex. 10, § 10(b)(ix); <u>see also, e.g.</u>, P. Ex. 10, § 14(p); P. Ex. 1, § 9(p).)

**2.    Plaintiffs Will Succeed On The Merits Given Defendants' Admitted And Undisputed Defaults Under The Loan Agreements**

121.    In addition to irreparable harm, Plaintiffs can readily establish a likelihood of success on the merits. To establish entitlement to possess and foreclose on the Collateral, Plaintiffs need only demonstrate a default. Defendants repeated defaults are not in dispute.

Pursuant to the terms of the Funding Agreements, Plaintiffs have the right to possess and foreclose on the Collateral upon an Event of Default. Plaintiffs can demonstrate not just a likelihood, but a virtual certainty, that they will ultimately prevail on the merits of this case.

### 3.     The Balance Of Hardships Tips Decidedly In Plaintiffs' Favor

122.     The balance of hardships in this case further mandates injunctive relief. Defendants' admitted and apparent defaults, and the risk to Plaintiffs' Collateral absent relief, clearly tip the balance in Plaintiffs' favor.

### E.     Defendants Waived The Assertion Of Legal Defenses Under The Debenture Absent Posting Of A Bond

123.     Section 8(b) of the Debentures states that Defendants must post a surety bond in order to assert defenses that Plaintiffs violated the law. Specifically, Section 8(b) of the Debentures states that:

> In the event that any Event of Default occurs hereunder or any Event of Default occurs under any of the Transaction Documents (as defined in the Securities Purchase Agreement), then the Company may not raise as a legal defense . . . or justification to such Event of Default any claim that such Holder or anyone associated or affiliated with such Holder has been engaged in any violation of law, unless the Company has posted a surety bond (a "SURETY BOND") for the benefit of such Holder in an amount equal to the aggregate Surety Bond Value (as defined below) of all of the Holder's Debenture and Warrants (the "BOND AMOUNT"), which Surety Bond shall remain in effect until the completion of the dispute and the proceeds of which shall be payable to such Holder to the extent Holder obtains judgment.

(P. Ex. 2, § 8(b).)

124.     Defendants have posted no such surety bond in connection with the affirmative defenses or counterclaim asserted here.

125.     It is axiomatic that "the Court will not disturb the contractual relationship where, as here, a contract has been negotiated between sophisticated parties and its terms are

clear and unambiguous." Ursa Minor Ltd. v. AON Financial Products, Inc., 2000 WL 1010278, at *6 (S.D.N.Y. July 21, 2000).

126.    Courts construing New York law routinely enforce waivers of defenses and determinations allocating risk between parties to written instruments and guarantees. Id. (collecting cases); see also Compagnie Financiere de CIC et de l'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 188 F.3d 31, 35 (2d Cir. 1999) (unconditional waiver of defenses in guarantee enforceable); Woodward & Dickerson v. Kahn, 767 F. Supp. 530 (S.D.N.Y. 1991) (same).

127.    Here, the waiver of defenses, while not unconditional, is predicated on a condition precedent – the posting of a bond to ensure payment in the event Plaintiffs prevail on their claims. Defendants have posted no bond. Accordingly, Defendants cannot assert their purported defenses to their numerous admitted breaches of the 2007 Funding Agreements.

## F.    Defendants' Purported Defenses Are Legally Defective

128.    As a threshold matter, courts will summarily dismiss "[a]ffirmative defenses which amount to nothing more than mere conclusions of law and are not warranted by any asserted facts." Schecter v. Comptroller of the City of New York, 79 F.3d 265, 270 (2d Cir. 1996); see also Rathnam v. Chauhan, 2008 WL 2369758, at *6 (N.Y. Sup., Suffolk Co. June 3, 2008) (affirmative defenses "dismissed as without merit as they are really merely conclusory denials of plaintiff's claims disguised as affirmative defenses").

129.    Each of Defendants' four putative affirmative defenses are vague, conclusory, factually unsupported and legally unsustainable.

### 1.    Defendants' "Unclean Hands" Defense Fails

130.    The doctrine of unclean hands "is never used unless the plaintiff is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly

30

related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct." Nat'l Distillers & Chem. Corp. v. Seyopp Corp., 17 N.Y.2d 12, 15-16 (1966); see also Prudential Sec. Credit Corp v. Tevee Toons, Inc., 5 A.D.3d 226, 227 (1st Dep't 2004) (rejecting unclean hands defense in foreclosure action where bad faith allegations, "show nothing more than commercially reasonable conduct on the part of a lender seeking to recover as much of its loan as possible"); 4 Hour Wireless v. Smith, 2002 WL 31654963, at *2 (S.D.N.Y. Nov. 22, 2002) ("exercising contract rights does not constitute bad faith" as a matter of law); Sec. Pac. Mortgage & Real Estate Serv., Inc. v. Canadian Land Company of America, N.V., 690 F. Supp. 1214, 1224 (S.D.N.Y. 1988) (rejecting unclean hands defense to foreclosure as a matter of law where defendant failed to demonstrate connection between defendant's failure to perform and the challenged conduct); Connecticut Nat'l Bank v. Peach Lake Plaza, 204 A.D.2d 909, 910-11 (3d Dep't 1994) (rejecting unclean hands defense in foreclosure action in absence of "admissible evidence showing that plaintiff's conduct was immoral or unconscionable").

131.    Here, Defendants' putative unclean hands defense merely recites a vague and conclusory list of alleged and imagined wrongs. To the extent the substance of these allegations is discernable, however, they entirely fail to meet the legal requirements of sustaining the defense.

132.    First, Defendants allege on information and belief that Plaintiffs, or others, at some point prior to the 2007 Funding, traded in ACT's stock with the intent of lowering the price. Mr. Hawkins, however, admitted during his deposition that he is aware of no evidence to support this allegation. Even if supported by credible evidence, Defendants allege no conceivable connection between this conduct and Defendants' defaults under the Funding Agreements. (P. Ex. 22, ¶¶ 9-11; Hawkins Tr. at 270:25-271:25.)

133.    Second, Defendants allege that the 2007 Funding Agreements provide the Secured Lenders the right to make additional investments and that, when Defendants sought to obtaining financing from third parties, the Secured Lenders declined to waive their contractual rights.  A secured lender, of course, is "fully within his rights in refusing to consent to refinancing upon terms he [finds] unacceptable."  Red Tulip, LLC v. Neiva, 44 A.D.3d 204, 212 (1st Dep't 2007).  "In fact, a lender may exercise any contractual right without breaching some duty of 'good faith.'"  Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp., 83 F. Supp. 2d 384, 391 (S.D.N.Y. 2000).  Defendants' allegations to the contrary are legally unsustainable.  (P. Ex. 22, ¶¶ 12-16.)

134.    Third, Defendants allege that Plaintiffs' delay in providing information delayed Defendants' filing of a registration statement with the SEC.  Even if this allegation were supported by credible evidence, or for that matter immoral or unconscionable, Defendants allege no conceivable connection between this conduct and Defendants' defaults under the Funding Agreements.  (P. Ex. 22, ¶ 17.)

135.    Fourth, Defendants allege that:  (a) Mr. Dawe had a purportedly undisclosed conflict of interest; and (b) that Messrs. Dawe and Johnson took various unidentified actions allegedly "detrimental" to Defendants and communicated with other ACT board members concerning the governance of ACT.  Sworn testimony will demonstrate that Mr. Dawe had no such conflict.  Far from unconscionable or immoral conduct, Mr. Hawkins admitted during his deposition that communications among board members regarding company affairs is entirely proper.  Further, Defendants allege no conceivable connection between this conduct and Defendants' defaults under the Funding Agreements.  (P. Ex. 22, ¶¶ 18-25; Dawe. Aff., ¶ 15; Hawkins Tr. at 242:23-244:8, 245:18-246:8.)

136.    Fifth, Defendants allege, on information and belief, that Plaintiffs delayed additional funding under the 2008 Funding in order to force Defendants' default.  Defendants, however, admit that Defendants' misrepresentations artificially inflated the amount of initial funding pursuant to the 2008 Funding and that Defendants were in breach of the Lockbox Agreement.  Under these admitted circumstances, any "delay" in <u>additional</u> funding  following these defaults would have been not only justified, but contractually mandated.  (A ¶ 93; P. Ex. 22, ¶¶ 26-27.)

137.    The contention that Plaintiffs intended to force a default under the 2007 Funding by loaning Defendants an additional $2 million under the 2008 Funding defies all common sense.  If Plaintiffs wanted Defendants to default, they would have simply declined to provide the 2008 Funding.  (Hathorn Aff., ¶ 83.)

138.    Finally, Defendants alleged that Plaintiffs breached the Lockbox Agreement by withdrawing 100% of the sole payment deposited therein.  Section 2(b) of the Lockbox Agreement states, however, that:

> The Lenders and the Borrower hereby instruct the Bank, and the Bank agrees, on each Business Day to transfer, via federal wire transfer or ACH, the total of (A) all deposits received in the Lockbox Account for the prior Business Day, minus (B) the sum of all outstanding and unpaid Charges (as hereinafter defined) or Chargebacks (as hereinafter defined) which the Bank is permitted to debit or offset against deposits . . . .

(P. Ex. 12; P. Ex. 22, ¶ 28.)

139.    The Line of Credit Agreement, Section 6(c), further states:

> Sweep of Funds from Lockbox. . . .  The Company agrees that 100% of the funds out of the Lockbox Account shall be disbursed to the Lenders . . .and such funds shall be applied first toward interest due on the Notes, next toward reduction of the principal amount of the Notes, until paid in full, and any remaining amounts shall be disbursed to the Company.

33

(P. Ex. 10.)

  140. Defendants' allegation that Plaintiffs' compliance with these unambiguous terms of the parties' agreements constituted "unclean hands" is legally and factually insufficient.

  141. In sum, Defendants' affirmative defense styled as "unclean hands" is wholly and entirely unsustainable.

  **2. Defendants' Breach Of Contract Defenses Fail**

  142. Defendants' second and third putative affirmative defenses assert breach of contract by Plaintiffs and violation of the covenant of good faith and fair dealing, each allegedly excusing the admitted defaults by Defendants.  Defendants, however, "do not specify what provisions were breached, leaving only a claim predicated on a breach of the alleged obligation of good faith and fair dealing that supposedly inheres in every contract." Lazar's Auto Sales, 83 F. Supp. 2d at 391.

  143. Any implied covenant of good faith and fair dealing, however, "does not extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." Red Rock Commodities, Ltd. v. ABN-AMRO Bank, N.A., 1995 WL 714349, at *3 (S.D.N.Y. Dec. 5 1995) (quoting M/A-COM Sec. Corp. v. Galese, 904 F.2d 134, 136 (2d Cir. 1990)).

  144. "No implied covenant may conflict with the express terms of a contract." Id.; see also Lazar's Auto Sales, 83 F. Supp. 2d at 391 ("a lender may exercise any contractual right without breaching some duty of 'good faith'").  In particular, a "financing institution does not act in bad faith when it exercises its contractual right to terminate financing." Chrysler Credit Corp. v. Dioguardi Jeep Eagle, Inc., 192 A.D.2d 1066, 1067 (4th Dep't 1993); see also In re Teletronics Servs., Inc., 29 B.R. 139, 170 (Bankr. E.D.N.Y. 1983) ("a creditor normally has an

unqualified right to call a loan when due, to refuse to extend a loan for any cause or no cause at all, and to lawfully enforce collection").

145.    As neither of Defendants affirmative defenses purporting to sound in breach of contract identify any alleged breach by Plaintiffs of any of the Funding Agreements, they are legally defective.  See Schecter v. Comptroller of the City of New York, 79 F.3d 265, 270 (2d Cir. 1996).

146.    To the extent that these defenses purport to incorporate the allegations set forth in Defendants' "unclean hands" defense, they fail for the same reasons discussed above.

### 3.    Defendants' Putative Usury Defense Is Defective As A Matter Of Law

147.    Under unambiguous New York law: "No corporation shall hereafter interpose the defense of usury in any action." N.Y. GOL § 5-521(1); see also FDIC v. Julius Richman, Inc., 666 F.2d 780, 781 (2d Cir. 1981) ("Corporations, however, may not assert a usury defense."); McNellis v. Merchs. Nat'l Bank & Trust Co. of Syracuse N.Y., 390 F.2d 239, 241 (2d Cir. 1968) ("for many years corporations in New York have been barred from claiming usury").

148.    Defendants, who are all corporate entities, therefore cannot assert a usury defense.

### G.    Defendants' Purported Counterclaim Fails

149.    Defendants' counterclaim states, in its entirety, as follows:

Thirty-fourth: Plaintiffs' action breached the covenant of good faith and fair dealing in both the 2007 Loan Agreement and the 2008 Line of Credit Agreement.

Thirty-fifth: Plaintiffs' breach of contract has caused defendants damages.

Thirty-sixth: Plaintiffs conspired with each other in the matters set forth in paragraphs ninth through twenty-eighth.

(P. Ex. 22, ¶¶ 34-36.)

150.    Like Defendants' putative affirmative defenses asserting breach of contract, this putative counterclaim: (1) entirely fails to identify any breach of contract; (2) is wholly insufficient to state any claim as a matter of law; and (3) to the extent it purports to incorporate any of the allegations set forth in Defendants' "unclean hands" affirmative defense, fails for the same reasons of law and fact discussed above.

## GRANT OF RELIEF

Based on the aforementioned findings of fact and conclusions of law, the Court grants Plaintiffs the following relief:

A declaration and preliminary and permanent injunction: (a) directing Defendants to marshal all assets defined as Collateral under the 2007 and 2008 Funding Agreements and turn those assets over to Plaintiffs; (b) allowing Plaintiffs to take all steps to sell or otherwise dispose of or foreclose on their Collateral in accordance with their rights as secured lenders under the Uniform Commercial Code and other governing law; (c) allowing Plaintiffs to operate Defendants' business and exercise all other rights provided under the 2007 and 2008 Funding Agreements; and (d) enjoining Defendants from transferring, pledging, hypothecating, encumbering, licensing, selling or otherwise disposing of "Collateral";

Damages in the amounts due under the Debentures, Notes, and other transaction documents, together with interest, costs and attorneys' fees, as provided for by the 2007 and 2008 Funding Agreements; and

All reasonable attorney fees, costs, expenses and interest, in accordance with their rights under the 2007 and 2008 Funding Agreements.

January 23, 2009

DLA PIPER LLP (US)

By: _____

Douglas A. Rappaport
douglas.rappaport@dlapiper.com
Peter D. Sharp
peter.sharp@dlapiper.com
1251 Avenue of the Americas
New York, New York  10020-1104
Tel. (212) 335-4500
Fax. (212) 335-4501
Attorneys for Plaintiffs