UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROSWELL CAPITAL PARTNERS LLC, et al.,

Plaintiffs,

-v-

ALTERNATIVE CONSTRUCTION TECHNOLOGIES, et al.,

Defendants.

08 Civ. 10647 (DLC)

OPINION & ORDER

Appearances:

For Plaintiffs:
Douglas A. Rappaport
Peter D. Sharp
DLA Piper US LLP
1251 Avenue of the Americas
New York, NY 10020

For Defendants:
Harry H. Wise, III
Law Offices of Thomas G. Amon
250 West 57th Street, Suite 1316
New York, NY 10107

DENISE COTE, District Judge:

Plaintiffs Roswell Capital Partners, LLC (“Roswell”), as “Collateral Agent,” BridgePointe Master Fund Ltd. (“BridgePointe”), CAMHZN Master LDC (“CAMHZN”), and CAMOFI Master LDC (“CAMOFI”) (collectively, “Plaintiffs”) bring this action to foreclose upon their security interests in Defendants’ collateral and for breach of various loan and related agreements. Roswell is a Georgia company acting as Collateral Agent for BridgePointe, CAMHZN, and CAMOFI (the “Lenders”),

three Cayman Islands companies. BridgePointe is an investment fund established and managed by Roswell. Counterparties to the transactions at issue are defendants Alternative Construction Technologies Inc., a Florida corporation (ACT), and twelve of its wholly or primarily owned subsidiaries, all incorporated in Florida, with two exceptions (collectively, "Defendants")[1]. The remaining defendants, John Doe 1-10, are individuals or entitles who may assert interests in the collateral at issue subordinate to Plaintiffs' security interests.

ACT and its subsidiaries manufacture "green" construction materials, specifically, interlocking panels consisting of plastic foam encased in coated steel. ACT was founded by Michael Hawkins, who served as CEO from January 2005 until September 2008. Hawkins remains a significant shareholder and a member of the Board of Directors. Defendants entered into the agreements giving rise to this lawsuit in 2007 and 2008 to obtain funding. In return, among other obligations, the agreements required ACT to make monthly repayments of the principal owed, with interest, and to direct its customers to make payments owed to ACT to a "lockbox account." Despite receiving over $6 million from Plaintiffs, ACT's balance sheet

[1] Defendant Alternative Construction Technologies Corporation is a Delaware corporation. Defendant Alternative Construction By Ionian, Inc. f/k/a Ionian Construction, Inc. is a Tennessee corporation.

has dwindled, and it now possesses nothing more than "a manufacturing plant located in Tennessee and the land on which it sits, several patents, good will [sic], and some accounts receivable."

Plaintiffs filed this action for breach of contract and foreclosure and brought an application for an Order to Show Cause with Temporary Restraining Order ("TRO") on December 9, 2008. Later that day, a hearing with both parties was held, the TRO was entered, and a preliminary injunction hearing was set for January 29, 2009.

In late December 2008, a dispute arose regarding whether the TRO permitted Defendants to pay rent, salaries, legal fees, and other business expenses. Following two conferences with the parties, a Supplemental Order in Furtherance of Temporary Restraining Order was entered on January 5, 2009 (the "Supplemental Order"). The Supplemental Order allowed Defendants to pay rent, electricity and utilities, legal fees, office supplies costing less than $1,000, internet fees, and other expenses of under $250, provided that they notified Plaintiffs within two days of making such payments. It required that Defendants provide Plaintiffs with notice of proposed payments concerning eight other categories of payments, including payroll, taxes, and business travel, before making the payments. Plaintiffs, in turn, were required to approve or

prohibit each proposed expenditure within two days. Despite the order, Defendants conceded in a conference on January 22 that they had made payroll expenditures without Plaintiffs' express consent, believing that giving Plaintiffs access to their books and records satisfied the terms of the Supplemental Order. A customer also paid $12,500 owed to ACT to an ACT materials supplier following the Supplemental Order. ACT did not attempt to obtain Plaintiffs' consent for this transaction.

On January 20, 2009, Plaintiffs requested consolidation of the preliminary injunction hearing with a trial on the merits pursuant to Rule 65(a)(2), Fed. R. Civ. P. Following a conference with both parties on January 23 and a January 26 submission from Defendants opposing consolidation, an Order of January 26 consolidated the preliminary injunction hearing with a trial on the merits for the issue of breach of contract only. While Defendants' affirmative defenses and counterclaim will necessarily be considered when deciding whether Plaintiffs have established entitlement to a preliminary injunction, a separate trial on the merits will determine whether Defendants will prevail on their defenses and counterclaim and whether permanent relief is warranted in this matter.

Defendants have conceded default on payments owed to the Plaintiffs and have admitted that they directed payments not to the lockbox, but their affirmative defenses and counterclaim

allege that Plaintiffs have unclean hands, frustrated Defendants' performance under the agreements, are demanding usurious payments, and breached the implied covenant of good faith and fair dealing. Among other accusations, they claim that Plaintiffs drove down ACT's stock price through short-selling, prevented them from securing additional capital, and concealed conflicts of interest.

The parties made their pre-hearing submissions on January 23 and filed memoranda in response to each other's submissions on January 27. With the consent of the parties, the direct testimony of the witnesses was submitted by affidavit on January 23, and the witnesses were cross-examined at the preliminary injunction hearing. The Plaintiffs' witnesses are P. Bradford Hathorn, in-house counsel to Roswell; and Thomas Dawe, a Senior Investment Officer with Roswell until October 2008 and a member of ACT's Board of Directors from June until September 2008. In addition to the declarations of their witnesses, Plaintiffs also offer as evidence seventy-five documentary exhibits and excerpts from the depositions of four individuals: Thomas Amon, a Director and corporate counsel for ACT; Bruce Harmon, an employee of ACT from January 2005 and May 2008, who, among other positions, was CFO from September 2006 until December 2007; Michael Hawkins, the founder of ACT and former Chair of its Board of Directors who served as CEO from April 2005 until

September 2008 and CFO from September 2008 until January 2009; and Dennis Towell, the manager of Nelson LC, a construction company and customer of ACT and its subsidiaries. The Defendants' witnesses are Hawkins and Anthony J. Francel, the current Chairman and CEO of ACT. The Defendants submitted no evidence apart from a brief declaration by each of their two witnesses.

## FINDINGS OF FACT

### 1. The 2007 Funding

Through a Securities Purchase Agreement dated June 30, 2007 (the "2007 Purchase Agreement"), the Lenders agreed to purchase from ACT a total of $4 million in senior secured convertible debentures (the "Debentures") and received warrants to purchase ACT common stock (the "2007 Warrants"). The Debentures specified that payment of the principal, plus 10% interest per year, was due by June 30, 2009. The Lenders also had the right to convert the Debentures into ACT common stock at a price of $4.00 per share. Repayment of the principal with interest was to occur in monthly installments, with payments of 1/24 of the principal and one month's interest beginning on July 1, 2008. Other provisions of the 2007 Purchase Agreement at issue include Section 3(g), a representation that ACT had timely made its required SEC filings, and Section 3(n), which includes

a representation that ACT had disclosed all material events to the Lenders. Section 4(d) places restrictions on ACT's use of proceeds from the funding, such as a restriction against using any of the proceeds to "repay any of its corporate debt" or "any debt or obligation to any officer, director or manager," and a requirement that $250,000 of the proceeds be segregated into a bank account dedicated for investor relations. Further, ACT was to devote $150,000 per year to investor relations purposes. The restrictions on the use of proceeds were designed to ensure that the Funding would be used to provide working capital to allow ACT to operate going forward. ACT also acknowledged that a breach of its obligations under the 2007 Purchase Agreement would "cause irreparable harm."

The Debentures provide instructions upon default under the agreements comprising the 2007 Funding. Section 7 of the Debentures lists the events considered to be "Events of Default." Such events include, inter alia, failure to make payments, breach of covenants or representations, including those made in the 2007 Purchase Agreement, and default under the 2007 Purchase Agreement. Should there be an Event of Default, Section 8(a) of the Debentures entitles the Lenders to deliver a Default Notice making the entire amount of the debenture payable within ten business days. If ACT fails to pay the full amount, interest will accrue at 18% or at the maximum amount allowed by

law. The Debentures also provide that, in the event of an Event of Default, Defendants may not raise in a lawsuit a “defense” or “justification” that the Lenders have “been engaged in any violation of law” without posting a surety bond in the amount of the obligation owed under the Debentures and Warrants. Section 11(a)(v) of the 2007 Warrants provides that a default under the Debentures constitutes an Event of Default under the 2007 Warrants. Section 6 of the 2007 Security Agreement also contains a cross-default provision, providing that a default under the Debentures is an Event of Default under the 2007 Security Agreement.

To secure the Lenders’ loans, ACT and four of its subsidiaries –- Prosteel Builders Corporation, Universal Safe Structures, Inc., Alternative Construction Techologies Corporation, and Future of Building Institute, Inc. (the “Guarantors”) -- simultaneously entered into a Security Agreement (the “2007 Security Agreement”). In the 2007 Security Agreement, ACT and its four subsidiaries granted the Lenders “a continuing and perfected security interest in and to, a lien upon and right of set-off against all of their respective right, title and interest of whatsoever kind and nature in and to, the Collateral.” The “Collateral” was defined to include “all goods,” including machinery, equipment, vehicles, and “documents of title” to the same; “all contract rights and other general

intangibles," including stock, distribution agreements, software, and intellectual property; "all accounts . . . all documents of title representing any of the foregoing, all rights in any merchandising, goods, equipment," and the "security and guarantees with respect to each account"; "all documents"; "all commercial tort claims"; "all deposit accounts and all cash"; "all investment property," including "shares of capital stock and other equity interests" in ACT and its subsidiaries; "all files, records, books of account, business papers, and computer programs"; and the "products and proceeds" of items designated as Collateral. Should an Event of Default occur, the 2007 Security Agreement gives the Lenders the rights and remedies of a secured party under the Uniform Commercial Code ("UCC"). Rights and remedies in the event of a default under the 2007 Security Agreement include the rights to 1) "take possession of the Collateral"; 2) "operate the business of each Debtor using the Collateral"[2]; 3) "assign, sell, lease or otherwise dispose of and deliver all or any part of the Collateral"; 4) notify any debtors and obligors to "make payments directly to the [Lenders] and to enforce the Debtors' rights against" such debtors and obligors ; 5) "direct any financial intermediary or any other person or entity holding any investment property to transfer the

[2] The 2007 Security Agreement defines ACT and its subsidiaries as the "Debtors."

same" to the Lenders; and 6) "transfer any or all Intellectual Property registered in the name of any Debtor at the United States Patent and Trademark Office and/or Copyright Office" into the name of the Lenders or any purchaser of the Collateral.

Pursuant to the 2007 Security Agreement's grant of interest in its intellectual property as part of the Collateral, ACT also entered into a Patent Security Agreement with BridgePointe on June 30, 2007, granting BridgePointe an interest in ACT's three patents. Additionally, the four ACT subsidiaries who signed the 2007 Security Agreement signed a Security Guarantee, also dated June 30, 2007, in which they guaranteed the "prompt and complete" performance of ACT's obligations under the Debentures, the 2007 Purchase Agreement, the 2007 Security Agreement, the warrants, and other "future agreement or obligations undertaken" by ACT.

2. The 2008 Funding

ACT procured more funding from BridgePointe and CAMOFI on May 8, 2008, executing a Line of Credit Agreement. BridgePointe and CAMOFI each agreed to provide up to $1.5 million in credit to ACT. In exchange for the value received, ACT issued Senior Secured Grid Notes (the "Notes"), one payable to BridgePointe and the other to CAMOFI, in the amount advanced to ACT under the Line of Credit Agreement. The Notes constituted the senior debt

of ACT, and all future debt issued by the Company was to be subordinate to them. They required monthly interest payments at the rate of 13% per year. BridgePointe and CAMOFI each advanced ACT $1,007,246. Section 7(n) of the Notes declares that a default by ACT on "any indebtedness, individually or in the aggregate, in excess of $175,000" is an Event of Default under the Notes. Breaching any term of the Note or any transaction document involved in the 2008 Funding also creates an Event of Default under Section 7(c) of the Notes. In the event of an Event of Default, BridgePointe and CAMOFI are entitled to demand the immediate payment of 120% of the unpaid principal, plus interest.

On May 8, ACT, BridgePointe, CAMOFI, and Roswell also entered into an Agreement Re Blocked Deposit Accounts (the "Lockbox Agreement"). The Lockbox Agreement was provided to protect BridgePointe and CAMOFI by providing for continuous repayment of principal with interest borrowed by ACT under the Line of Credit Agreement. The Lockbox Agreement provides that "Eligible Clients," defined as a client listed in a schedule to the Line of Credit Agreement, would be sent instructions by ACT "requiring that payments on the Eligible Contract be remitted directly to the Lockbox Account."[3] ACT granted "the Lenders,"

[3] "Eligible Contract" is defined as a "bona fide contract or purchase order" between ACT and an Eligible Client.

CAMOFI and BridgePointe, a lien on the Lockbox Account. Section 6(c) of the Lockbox Agreement, entitled "Sweep of Funds from Lockbox," provided that

> 100% of the funds out of the Lockbox Account shall be disbursed to the Lenders (pro rata to each Lender, based upon the amount of each Lender's Note then outstanding), and such funds shall be applied first toward interest due on the Notes, next toward reduction of the principal amount of the Notes, until paid in full, and any remaining amounts shall be disbursed to the Company [ACT].

Roswell, acting as Collateral Agent for CAMOFI and BridgePointe, was to control disbursements from the Lockbox Account, was authorized to issue instructions with respect to the account, and would receive account statements and other information concerning the account.[4] Section 1 of the Lockbox Agreement provides that Eligible Clients would be instructed "to remit i) all envelopes containing Items . . . to be processed through the Lockbox and ii) all electronic funds transfer payments to the appropriate address." In addition to promising to deliver lockbox payment instructions to applicable customers, ACT agreed to provide the instructions and lockbox payment invoices to CAMOFI and BridgePointe. Before the close of the 2008 Funding, Dawe explained the functioning of the lockbox to Hawkins.

---

[4] ACT, the Lenders, and Roswell also executed a Collateral Agency and Intercreditor Agreement on May 8 that appointed Roswell to be Collateral Agent under the 2007 and 2008 Security Agreements (the "Agency Agreement").

As in 2007, a Security Agreement (the "2008 Security Agreement") and an Intellectual Property Security Agreement, both dated May 8, 2008, each secured ACT's obligations under the Notes. An Event of Default under the Notes constitutes an Event of Default under the 2008 Security Agreement. In the 2008 Security Agreement, ACT and each of its subsidiaries "unconditionally and irrevocably" granted BridgePointe and CAMOFI a "security interest in and to, a lien upon and a right of set-off against all of their respective rights, title, and interest . . . [in] the Collateral." The "Collateral" in the 2008 Security Agreement includes the same items defined as "Collateral" in the 2007 Security Agreement, with the addition of ACT's real property. With regard to the real property, Section 3(b) of the Security Agreement required Defendants to deliver Deeds of Trust granting CAMOFI and BridgePointe a lien on their real property for recording in the appropriate governmental office. The Intellectual Property Security Agreement recognizes that the Security Agreement grants BridgePointe an interest in ACT's patents and trademarks.

Upon the occurrence of an Event of Default under the 2008 Security Agreement, BridgePointe and CAMOFI have certain rights, including the rights and remedies of a secured party under the UCC. The 2008 Security Agreement and the Agency Agreement give Roswell the following rights as Collateral Agent for

BridgePointe and CAMOFI: "the right to take possession of the Collateral" and "exercise all rights with respect to the Collateral as it were the sole and absolute owner thereof"; "the right to operate the business of each [of the Defendants] using the Collateral"; the right to "assign, sell, lease or otherwise dispose of and deliver all or any part of the Collateral,"; "the right to notify any account debtors and obligors . . . to make payments directly to the Agent"[5]; and the right to "transfer any or all Intellectual Property registered in the name of any Debtor with the United States Patent and Trademark Office and/or Copyright Office into the name of the Secured Parties [BridgePointe and CAMOFI]."

ACT also issued warrants to BridgePointe and CAMOFI to purchase 900,000 shares of its stock each (the "2008 Warrants").[6] Each ACT subsidiary defendant entered a Subsidiary Guarantee on May 8 guaranteeing ACT's obligations under the Notes, the Line of Credit Agreement, the 2008 Security Agreement, the 2008 Warrants, and future obligations undertaken by ACT to BridgePointe and CAMOFI.

Pursuant to agreements comprising parts of both the 2007 and 2008 Funding, Plaintiffs may also seek injunctive relief, damages, fees, and costs. For example, Section 10(b)(ix) of the

---

[5] Section 18 of the 2008 Security Agreement appoints Roswell as the Agent.

[6] The 2008 Warrants do not contain a cross-default provision.

Line of Credit Agreement acknowledges that a breach of the transaction documents would "cause irreparable harm." These remedies are in addition to Plaintiffs' right to foreclose upon the Collateral. The 2007 Purchase Agreement and the Debentures acknowledge the same.

Following the close of the 2008 Funding, in June 2008, Dawe joined ACT's Board of Directors as the Lenders' nominee. Dawe, who was at that time Senior Investment Office with Roswell, explained in highly credible testimony that his affiliation with Plaintiffs was no secret. That affiliation was limited to his employment and his nomination by Plaintiffs. He did not have any investments of his own in Plaintiffs' funds.

3. Performance of 2007 Funding Agreements

ACT breached Section 4(d) of the 2007 Purchase Agreement, which restricts the use of investment proceeds, as soon as it received the $4 million investment from the Plaintiffs. On May 29, 2007, ACT had issued a press release announcing the retirement of 4,020,000 shares of Preferred Class B stock. Hawkins and/or GAMI and Avante, two entities he controlled, owned these shares. In early July 2007, within weeks of the closing of the 2007 Funding, ACT paid Avante $800,000 in cash, and Hawkins or entities controlled by him also received $1.2 million in houses owned by ACT and other non-cash compensation

in return for the stock. The schedule listing ACT's indebtedness that was attached to the 2007 Purchase Agreement did not disclose any debt owed to Avante or Hawkins as a result of the retirement of Class B Preferred Stock. ACT did not submit an 8-K filing to the SEC reflecting a change in its capital structure at the time of the retirement. The Plaintiffs did not discover that the proceeds from the 2007 Funding had been used to make the $800,000 cash payment to Avante until Harmon informed Dawe in mid-2008 that it had occurred.

Another breach occurred when, as acknowledged in its August 19, 2008 10-Q filing, ACT was unable to make its required payment of $90,579.51 to BridgePointe, representing the payment against the principal amount of the Debenture due on July 1, 2008, as required by Section 9(a) of the Debentures. ACT also failed to make the required interest payment of $17,867.78 to BridgePointe, also due on July 1. Neither did ACT make the required principal and interest payments to CAMOFI and CAMHZN, which were due on the same date. A July 29, 2008 letter from Hawkins to ACT Board of Directors admitted that over $259,000 was past due on the Debentures. On July 31, BridgePointe delivered a notice of default, stating that ACT had defaulted under the Debenture and defaulted under the 2007 Warrants, pursuant to a cross-default provision, and giving ACT five days to cure its breach. CAMOFI and CAMHZN submitted a Default

Notice to ACT on October 21, 2008, which stated that ACT had failed to make the required payments due on July 1, August 1, September 1, and October 1, 2008. ACT also did not make the payments due to BridgePointe on those dates. Pursuant to Section 8(a) of the Debentures, the Lenders accelerated all of ACT's payment obligations under the Debentures.

In addition to failing to make payments, ACT did not segregate $250,000 of the loan proceeds into a separate bank account for investor relations services, as required by Section 4(d) of the 2007 Purchase Agreement. It also did not pay the full $150,000 per year that it was required to devote to investor relations purposes.

4. Performance of 2008 Funding Agreements

ACT has admitted nonpayment of the obligations owed under the 2008 Funding to BridgePointe and CAMOFI. In its 10-Qs filed with the SEC on August 19, 2008, November 20, 2008, and December 23, 2008, ACT acknowledged that it was "in default on its current indebtedness." As also acknowledged in its 10-Q submissions, ACT directed certain Eligible Clients to make payments directly to ACT's account, rather than to the lockbox account. Only one payment to the lockbox, in the amount of $44,899, was ever made. ACT also failed to provide one or more of the Eligible Clients with lockbox payment instructions and a

lockbox invoice. As of August 12, 2008, BridgePointe had not received any copies of the lockbox payment instructions provided to the Eligible Clients. The lockbox account was closed on September 26, 2008 because ACT had not paid the fees to the bank to maintain the account.

One Eligible Client is Nelson LC, a manufacturer of mobile office sites that purchased structurally insulated panels from ACT. Nelson did not always pay ACT directly for materials purchased; on January 8, 2009, it paid a power bill to Bolivar Electric and made a payment of $12,500 to Precoat Metals on January 6, 2009 on ACT's behalf.[7] Previously, on July 29, 2008, Nelson wired $75,000 to Bernhardt Manufacturing, rather than to ACT or the lockbox. On August 28, 2008, Hawkins instructed Dennis Towell, a manager of Nelson, to remit $100,000 owed to ACT to Avante instead and treat the sum as a "loan."

On August 1, 2008, BridgePointe's counsel sent a Default Notice to ACT, alleging defaults under the Line of Credit Agreement, the Lockbox Agreement, and the Notes. In September, 2008, Dawe resigned from ACT's Board of Directors, citing the Board's domination by Hawkins, the lack of internal controls, and ACT's default on its obligations under the 2007 and 2008 Fundings.

[7] In January 2009, Nelson wired $15,000 directly to ACT.

The following month, CAMOFI's letter of October 21, in addition to providing notice of default under the 2007 Funding, also gave a Default Notice regarding the 2008 Funding. Like BridgePointe's notice, its Notice accelerated the Note and demanded that ACT immediately pay 120% of the principal, plus interest and a late payment fee, less any interest that had been paid from the lockbox account. ACT has also not provided Roswell with a copy of an additional or amended Deed of Trust granting BridgePointe and CAMOFI a lien on the real property of ACT or with evidence that a Deed of Trust was filed with the appropriate governmental office.

ACT also described in its November 10-Q a plan to divest an operating division of ACT, the Development Division, which consists of three ACT Subsidiary Defendants, Prosteel Builders, Alternative Construction by Ionian, and Alternative Construction by Revels, Inc. For the three-month period ending September 30, 2008, the Development Division was responsible for over 90% of ACT's revenue. Prosteel Builders now has no assets and is in the process of ceasing operations. As of the end of September, Revels and Ionian, which were acquired by ACT in exchange for stock, were being reacquired by their original owners, as ACT is in default on its obligations to the sellers of each. The original owner of the Ionian shares acquired by ACT is James Hawkins, the brother of Michael Hawkins.

Defendants' businesses have continued to decline, hastened by actions taken by Hawkins-controlled entities. GAMI, which served as ACT's landlord, terminated ACT's lease on January 6, 2009 for non-payment of rent in the amount of $53,080.89 and attached an invoice charging ACT for the balance of the term of the lease, a total of $173,840. Avante, which had provided consulting, administrative, compliance, accounting, and other services to ACT as the result of a contract negotiated with Hawkins acting on both sides of the transaction, sent a notice of termination to ACT the same day. The termination letter cited nonpayment of a debt, and, pursuant to the consulting agreement, charged ACT the outstanding balance for the remainder of 2009, $366,000. ACT's files were packed up and shipped from Melbourne, Florida, to a location in Osprey, Florida, 200 miles away on Florida's Gulf Coast.

## CONCLUSIONS OF LAW

Plaintiffs assert that Defendants have breached the Debentures, the Warrants, the 2007 and 2008 Security Agreements, the Line of Credit Agreement, the Lockbox Agreement, the Notes, and the 2007 and 2008 Subsidiary Guarantees. They request a preliminary and permanent injunction to preserve the collateral and preclude Defendants from "transferring, misappropriating, or dissipating the collateral" and making the Collateral available

for Plaintiffs' possession and disposition. They seek through Roswell, the Collateral Agent for the Lenders, to foreclose on their interest in the Collateral. Finally, they demand judgment against the Defendants in the amount of payments outstanding, plus interest, fees, and costs.

Pursuant to Rule 65(a)(2), Fed. R. Civ. P., consolidation of the preliminary injunction hearing with a trial on the merits has been ordered with regard to the issue of whether Defendants have breached their obligations to Plaintiffs. There has been no consolidation of a trial and the application for preliminary injunction for Defendants' affirmative defenses to breach of contract and their counterclaim. Consequently, no final determination on liability will occur at this time. After determining whether default has occurred, analysis will proceed to the issue of whether a preliminary injunction shall issue in Plaintiffs' favor, considering the defenses to breach of contract.

1. Breach of Contract

The elements of a breach of contract claim under New York law[8] are as follows: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3)

---

[8] Both parties rely on New York law in arguing this case, and in doing so have adopted it for the determination of these issues. See Photopaint Technologies, LLC v. Smartlens, Corp., 335 F.3d 152, 160 n.8 (2d Cir. 2003).

breach of contract by the defendant; and (4) damages. See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 177 (2d Cir. 2004). See also Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996).

The validity of the agreements at issue is uncontested. Neither is it contested that Plaintiffs performed their obligations by providing funding to ACT under the Debentures and the Line of Credit Agreement to Defendants. And the presence of damages in the form of outstanding obligations is clear. To satisfy the requirement of breach, Plaintiffs rely principally on Defendants' multiple admissions of default under both the 2007 and 2008 Funding streams.

ACT defaulted under the Debentures when it failed to make required principal and interest payments. Defaults under the Debentures constituted cross-defaults under the 2007 Security Agreement and the 2007 Warrants. ACT also defaulted under the 2007 Purchase Agreement when it 1) failed to segregate $250,000 into a designated bank account, 2) did not use $150,000 per year for investor relations purposes, and 3) immediately used the proceeds to pay $800,000 cash to the Hawkins-controlled entity Avante, despite a prohibition against using the funds to repay corporate debt or repay an obligation to an officer of ACT or its affiliates.

As authorized by the Debentures, the Lenders delivered notices of default accelerating payment of the Debentures. ACT did not cure its default. The 2007 Security Agreement obliged four of ACT's subsidiaries to guarantee ACT's obligations, but they did not cure its default either.

With regard to the agreements comprising the 2008 Funding, ACT acknowledged that it failed to direct its clients to make payments to the lockbox as required by the Lockbox Agreement. Hawkins has testified that ACT stopped using the lockbox because the Plaintiffs sought to use funds in the lockbox to satisfy 2007 obligations, not just 2008 obligations. But Defendants do not offer any evidence that this is the case. Additionally, ACT does not contest that it did not provide BridgePointe and CAMOFI with copies of lockbox payment instructions and lockbox invoices, as required in the Lockbox Agreement. Breaching the Lockbox Agreement created an Event of Default under Section 7(c) of the Notes. ACT also defaulted under the Notes by defaulting under the Debentures, owing to the provision in Section 7(n) in the Notes creating an Event of Default should ACT default on $175,000 or greater of indebtedness. These Events of Default under the Notes, in turn, caused a default under the 2008 Security Agreement. ACT also defaulted under the Security Agreement when it failed to deliver Deeds of Trust granting liens on its real property for recording at the appropriate

government office, as it was required to do by Section 3(b) of the Security Agreement.

When BridgePointe and CAMOFI accelerated payment on the Notes, as they were authorized to do, ACT was unable to repay its obligations. Despite guaranteeing ACT's obligations under the 2008 Subsidiary Guarantee, ACT's subsidiaries were also unable to repay ACT's debt. Unpaid principal and interest thus remains outstanding.

Defendants do not contest any of these breaches. Instead, they interpose explanations for their actions, in the case of the failure to direct payments to the lockbox, or they offer affirmative defenses and counterclaims in an attempt to excuse their nonperformance under the contracts or otherwise dispute a finding of breach. The evidence thus supports the conclusion that Defendants have breached their obligations in the 2007 Purchase Agreement, the Debentures, the 2007 Security Agreement, the 2007 Warrants, the Lockbox Agreement, the Notes, the 2008 Security Agreement, and the 2008 Subsidiary Guarantee.[9]

---

[9] It is unnecessary to rely on the additional breaches of the agreements that the Plaintiffs describe, such as 1) the failure to file an SEC Form 8-K following the retirement of its Class B Preferred Stock, in breach of Section 3(g) of the 2007 Purchase Agreement, 2) the failure to disclose any debts owed to Avante in Schedule 3(MM) of the 2007 Purchase Agreement, in breach of Section 3(mm) of the same agreement, and 3) the potential sale of the Development Division, in breach of the 2008 Security Agreement and the Subsidiary Guarantee. Defendants do not contest the first two breaches above. Defendants contest

2. Preliminary Injunction Standard

Having made a final determination of breach, the next issue is Plaintiffs' entitlement to a preliminary injunction. "The purpose of a preliminary injunction is to preserve the status quo between parties pending a final determination of the merits." Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A., 143 F.3d 688, 692 (2d Cir. 1998). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997). To obtain a preliminary injunction, a party must ordinarily show "(1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor." Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008). Injunctive relief "is not the conventional remedy for breach of contract, but there is certainly no ironclad rule

---

whether the last constitutes a breach, arguing that the proposed divestiture was proper because ACT was in default on obligations it undertook in exchange for its possession of two of the entities involved, and the other entity in the Development Division, Prosteel Builders, was "effectively out of business". It is not clear whether a final decision to divest has been made.

against its use" if the standard for obtaining such relief is met. Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004).

The parties agree that Plaintiffs must meet the more demanding standard that applies when a party seeks a mandatory injunction, because Plaintiffs seek the court to order the affirmative act of a transfer of the Collateral to Plaintiffs' control.[10] "[A]n injunction altering, rather than maintaining, the status quo, . . . must meet the more rigorous standard of demonstrating a clear or substantial showing of a likelihood of success on the merits." Almontaser v. New York City Dep't of Educ., 519 F.3d 505, 508 (2d Cir. 2008) (citation omitted); see also Sunward Electronics, Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004) (the "party seeking the injunction must show a clear

---

[10] "The distinction between mandatory and prohibitory injunctions is not without ambiguities or critics." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114 (2d Cir. 2006) (quoting Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995)).

> A preliminary injunction is usually prohibitory and seeks generally only to maintain the status quo pending a trial on the merits. A prohibitory injunction is one that forbids or restrains an act. . . . A mandatory injunction, in contrast, orders an affirmative act or mandates a specified course of conduct . . . .

Id. (citation omitted); see also Mastrovincenzo v. City of New York, 435 F.3d 78, 89 (2d Cir. 2006) (mandatory injunction "is said to alter the status quo by commanding some positive act" (citation omitted)).

or substantial likelihood of success where the injunction sought is mandatory -- i.e., it will alter, rather than maintain, the status quo" (citation omitted)). The "heightened substantial likelihood standard may also be required when the requested injunction (1) would provide the plaintiff with all the relief that is sought and (2) could not be undone by a judgment favorable to defendants on the merits at trial." Mastrovincenzo v. City of New York, 435 F.3d 78, 90 (2d Cir. 2006) (citation omitted).

3. Affirmative Defenses

As a threshold matter, Plaintiffs argue that, pursuant to Section 8(b) of the Debentures, Defendants must first post a bond before defending against breach of contract liability by arguing that Plaintiffs "engaged in any violation of law". Defendants have not introduced any evidence that they have posted a bond nor addressed this argument. Several of the defenses would appear to be implicated by the bond requirement, including the usury charge and stock manipulation claim underlying the unclean hands defense. Before they can raise an affirmative defense at trial, the Defendants will need to either post a bond or successfully assert that the contract provision does not apply to the defense.

Defendants have, at various points throughout the litigation, offered four separate affirmative defenses, one of which is also styled as a counterclaim. Underlying Defendants' arguments is their general theory of the case that Plaintiffs manipulated the 2007 and 2008 Funding and the execution of the agreements to enable them to foreclose and take over Defendants' businesses. In their Answer, Defendants offer a set of identical factual allegations in support of each affirmative defense and one counterclaim: that Plaintiffs 1) manipulated ACT's stock price in June 2007 to make it drop; 2) frustrated Defendants' ability to seek additional funding from other investors so that they could foreclose on Defendants' businesses; 3) delayed delivery of information required to obtain an effective registration statement and then demanded additional warrants from Defendants as a result; 4) removed more revenues from the lockbox than they were owed, forcing Defendants to default; and 5) intentionally delayed funding Eligible Contracts to "starve" Defendants for cash and create a default. Defendants also allege that two board members, Thomas Dawe and Carlton Johnson, employees of Plaintiffs, concealed their own investments in Plaintiffs and breached fiduciary duties to Defendants by offering financial compensation to other board members "to get them to betray" Defendants. Defendants' pre-hearing Memorandum of Law did nothing to amplify or further

explain these allegations, simply quoting the Answer and declining to link these allegations to any specific affirmative defense. And their summation at the close of the preliminary injunction hearing pursued only one of their theories: that Plaintiffs had in bad faith impeded Defendants' efforts to obtain additional funding. The allegations, and the evidence supporting them, are addressed with the affirmative defense to which they appear most relevant, although Defendants may later establish their importance to one of the other defenses.

As noted, at this point, Defendants have not presented sufficient evidence to show a likelihood of success of prevailing on any of their defenses. The Findings of Fact Defendants submitted in advance of the hearing contained no citations to record evidence. Support for their allegations consists solely of the Hawkins Declaration which, as will be explained more fully below, does not include admissible evidence of any of the defenses and counterclaim.[11] Defendants will have the opportunity to develop their defenses and counterclaims more fully in advance of the trial on the merits.

---

[11] The Hawkins Declaration addresses all of Defendants' allegations in support of their affirmative defenses and counterclaim except for the allegations that Plaintiffs delayed delivery of information required for a registration statement and subsequently demanded additional warrants from Defendants and that Dawe and Johnson attempted to induce other Board members to violate their fiduciary duties to ACT.

a. Unclean Hands

Defendants' first affirmative defense is that Plaintiffs are not entitled to the equitable relief they seek because they have "unclean hands." Their allegations that Plaintiffs manipulated ACT's stock price and that Plaintiffs' representatives to the Board of Directors concealed conflicts of interest and attempted to sow disloyalty among other members of the Board appear to be offered in support of this defense.

In New York, courts in equity "apply the maxim requiring clean hands where the party asking for the invocation of an equitable doctrine has committed some unconscionable act that is directly related to the subject matter in litigation and has injured the party attempting to invoke the doctrine." PenneCom, B.V. v. Merrill Lynch & Co., 372 F.3d 488, 493 (2d Cir. 2004) (citation omitted). Defendants have not provided evidence to show a likelihood of succeeding on this defense at trial.

Hawkins has stated that he "believe[s]" that Plaintiffs made "improper trades in ACT stock, both to gain an advantage in our negotiations with them and to thwart our efforts to bring other new money into ACT." He also states that after he told Dawe, a Roswell representative, that he would instigate a legal battle against anyone short-selling ACT's stock, the stock price rebounded by the close of business that day. Hawkins' statements represent mere speculation. In his deposition, and

again during cross-examination, he admitted that has no evidence of the identity of the seller of ACT stock on the day in question.

The stock-price-manipulation allegation is also legally infirm support for the unclean hands defense. ACT agreed to the 2007 and 2008 Funding after the trading at issue occurred. There is no allegation that Plaintiffs manipulated the stock price once the agreements were in effect. It is unclear how manipulation of the stock before the close of the Funding would have led Defendants to agree to terms that they could not later satisfy because, when they agreed to those terms, they had full knowledge of their current, post-alleged-manipulation stock price. As unclean hands requires a nexus between the immoral act and the subject of the litigation, an act that did not impact Defendants' ability to satisfy the terms of the Funding would appear to fail to meet the demanding standard required to show unclean hands.

The evidence of conflicts of interest from Dawe's alleged investments in Plaintiffs and from Johnson's efforts to induce "betrayal" among board members is even weaker. Defendants submit no evidence of attempts to foster betrayal and provide only a general accusation. Hawkins attests to his belief that Dawe concealed investments in Plaintiffs while on ACT's Board, but this belief is unfounded, and was rebutted in Dawe's highly

credible testimony at the preliminary injunction hearing. Moreover, given that Dawe was on ACT's Board as the Plaintiffs' representative, and that Hawkins was aware of Dawe's affiliation with Plaintiffs, any conflicting loyalties were clear. Defendants have not explained why having investments in the Plaintiffs, as opposed being employed by the Plaintiffs, creates any more of a conflict of interest. Moreover, as with the stock-manipulation allegation, the nexus between any conflict of interest and the agreements or performance under the agreements giving rise to this lawsuit is as of yet unexplained.

Should Defendants try to marshal additional allegations in support of the unclean hands defense, such as Plaintiffs' delay in providing information regarding the registration statement or refusal to waive contractual provisions which they were entitled to enforce (and therefore blocking Defendants' access to additional funding), it should be noted that they must establish that Plaintiffs' conduct in these situations was "unconscionable."[12] Id. As it stands now, the unclean hands

[12] It should also be noted that Defendants invoke unclean hands in opposition only to Plaintiffs' claims for equitable relief, ostensibly because "[t]he doctrine of unclean hands is an equitable defense that is unavailable in an action exclusively for damages." Manshion Joho Center Co., Ltd. v. Manshion Joho Center, Inc., 806 N.Y.S.2d 480, 482 (1st Dep't 2005). See also Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 607 (2d Cir. 2005) ("Because [defendant-counter claimant] seeks damages in an action at law, [plaintiff] cannot avail itself of unclean hands as a defense") (citations omitted). An

defense does not defeat the imposition of a preliminary injunction.

b. Frustration of Performance

Second, Defendants assert in their Answer that "Plaintiffs cannot assert a breach of contract that they themselves have created." In their pre-hearing memorandum, Defendants explain that Plaintiffs intentionally injured Defendants "in ways that would prevent defendants from performing their contractual obligations" so that Plaintiffs could take control of Defendants –- in other words, that Plaintiffs frustrated and prevented Defendants' performance of the contract, so performance should be excused. "In the case of every contract there is an implied undertaking on the part of each party that he or she will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his or her part." Syracuse Orthopedic Specialists, P.C. v. Hootnick, 42 A.D.3d 890, 892 (4th Dep't 2007) (citation omitted).

Defendants have offered no evidence that Plaintiffs prevented them from repaying their obligations, caused the Defendants to direct Eligible Customers to make payments to

---

action to enforce a contract through a preliminary injunction, such as the instant case, is equitable. See Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 425-26 (2d Cir. 2004). Some New York courts have allowed the unclean hands defense in actions both at law and at equity. See Smith v. Long, 723 N.Y.S.2d 584, 586-87 (4th Dep't 2001) (allowing unclean hands defense against actions for specific performance and for damages).

destinations other than the lockbox, or are responsible for other types of default under the agreements. Defendants' allegation that Plaintiffs delayed providing information required for the filing of the registration statement, which caused Defendants to be unable to timely file, and then demanded additional warrants from Defendants could possibly be intended to exemplify frustration of performance. Defendants have offered no support, however, for the allegation that such a delay occurred (Hawkins does not discuss the delay in his declaration), that Plaintiffs were responsible for the delay, and that such a delay meets the applicable legal standards.

Defendants' allegation that Plaintiffs delayed funding of Eligible Contracts to induce default also could possibly support a finding of frustration of performance. Again, though, Hawkins' bald assertion that he "believe[s]" that Plaintiffs delayed funding a contract with Nelson, LC does not suffice as admissible evidence of this fact.

Similar problems affect the assertion that Defendants obstructed Plaintiffs' attempts to obtain the additional funding they needed to repay their debts to Plaintiffs. Hawkins states that ACT attempted to secure additional funding from Ardour Capital, but Plaintiffs had not allowed the negotiations to proceed. His only evidence in this regard is that Plaintiffs refused to waive their contractual rights as Ardour Capital

demanded. Standing on one's rights under a contract does not constitute improper frustration of another's performance. The frustration-of-performance defense does not, therefore, preclude entry of a preliminary injunction.

c. Implied Covenant of Good Faith and Fair Dealing

Third, and also as a counterclaim, Defendants assert in their Answer and pre-hearing memorandum that their defaults are excused because Plaintiffs have violated the implied covenant of good faith and fair dealing. They do not say how Plaintiffs did so, relying on the general allegations of wrongdoing described above.

Under New York law, "[i]mplicit in every contract is a promise of good faith and fair dealing that is breached when a party acts in a manner that -- although not expressly forbidden by any contractual provision -- would deprive the other party of receiving the benefits under their agreement." Sorenson v. Bridge Capital Corp., 861 N.Y.S. 2d 280, 282 (1st Dep't 2008) (citation omitted). Breach of the implied duty of good faith and fair dealing "is merely a breach of the underlying contract." National Market Share, Inc. v. Sterling Nat. Bank, 392 F.3d 520, 525 (2d Cir. 2004) (citation omitted). That is because the implied covenant of good faith and fair dealing "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the

other party to receive the fruits of the contract." Moran v. Erk, 11 N.Y. 3d 452, 456 (N.Y. 2008) (citation omitted). The duties "encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included." 511 West 232 Owners Corp., et al. v. Jennifer Realty Co., et al., 98 N.Y. 2d 144, 154 (N.Y. 2002). Because the duty to act in good faith under a contract derives from the contract itself, "breach of an implied covenant of good faith and fair dealing is intrinsically tied to the damages allegedly resulting from a breach of the contract." Canstar v. J.A. Jones Constr. Co., 622 N.Y.S. 2d 730, 731 (1st Dep't 1995). Exercising contract rights to protect an investment, however, does not constitute bad faith. See, e.g., Red Tulip, LLC v. Neiva, 842 N.Y.S. 2d 1, 7 (1st Dep't 2007).

To prevail on this defense, Defendants must therefore demonstrate that Plaintiffs breached the 2007 or 2008 Funding or a promise "which a reasonable person in the position of the promisee would be justified in understanding were included." Moran, 11 N.Y. 3d at 457. Among Defendants' allegations, the claim that Plaintiffs intended to remove more funds from the lockbox than those to which they were entitled could apply to this affirmative defense and counterclaim. Hawkins asserts that ACT stopped directing payments to the lockbox because Plaintiffs "took the position that they could take that money and pay off

not just the 2008 line of credit debt but the 2008 borrowing as well. This was I believe a violation of the lock box agreement and would have resulted in ACT receiving no revenue at all from the contracts funded at all." Again, though, Defendants offer no evidence that this was Plaintiffs' position.

To the extent that the defense is intended to encompass as well Plaintiffs' purported interference with Defendants' attempt to court Ardour Capital or other efforts to secure additional funding, or Plaintiffs' unwillingness timely to fund contracts with Nelson or other customers, Defendants have failed to provide evidence of these actions, or show how Plaintiffs' actions represent breaches of promises between the parties. The implied covenant of good faith and fair dealing does not present an obstacle to entry of a preliminary injunction.

d. Usury

Finally, in their Answer but not in their pre-hearing memorandum, Defendants also assert that the agreements between Plaintiffs and Defendants are usurious and therefore unenforceable. In their pre-hearing memorandum, Plaintiffs respond that corporations are forbidden from interposing a usury defense.

There is "a strong presumption against a finding of usury, and, at trial, the [party] will be required to establish usury by clear and convincing evidence." Ujueta v. Euro-Quest Corp.,

814 N.Y.S. 2d 551, 552 (2d Dep't 2006). Moreover, usury does not apply where the loan imposes an interest rate greater than the statutory maximum only after a default. Urban Communications PCS Ltd. Partnership v. Gabriel Capital, L.P., 394 B.R. 325, 341 (S.D.N.Y. 2008) (citing Manfra, Tordella & Brookes, Inc. v. Bunge, 794 F.2d 61, 63 n.3 (2d Cir. 1986)); Hicki v. Choice Capital Corp., 694 N.Y.S. 2d 750, 751 (2d Dep't 1999).

As Plaintiffs point out, corporations are prohibited from employing a civil usury defense, that is, from alleging usury when a plaintiff attempts to collect on a loan or forbearance with interest payments exceeding 16% per year. N.Y. Gen. Obl. Law, §§ 5-501(1), 5-521(1) (McKinney 2008); Tower Funding v. David Berry Realty, Inc., 755 N.Y.S. 2d 413, 415 (2d Dep't 2003). Civil usury is also inapplicable when the loan or forbearance at issue exceeds $250,000. N.Y. Gen. Oblig. Law. § 5-501(6) (McKinney 2008).

Corporations may, however, use the defense that a loan is criminally usurious when more than 25% interest per year is charged. N.Y. Gen. Oblig. Law § 5-521(3) (McKinney 2008); N.Y. Penal Law § 190.40 (McKinney 2008); Tower Funding, 755 N.Y.S. 2d at 415. But the criminal usury provision, Section 190.40 of New York's Penal Code, does not apply to loans or forbearances of

$2.5 million or more. N.Y. Gen. Oblig. Law § 5-501(6)(b).

Where individual loans do not exceed $2.5 million,

> loans or forbearances aggregating two million five hundred thousand dollars or more which are to be made or advanced to any one borrower in one or more installments pursuant to a written agreement by one or more lenders shall be deemed to be a single loan or forbearance for the total amount which the lender or lenders have agreed to advance or make pursuant to such agreement on the terms and conditions provided therein.

N.Y. Gen. Oblig. Law § 5-501(6)(b) (McKinney 2008).

The Second Circuit noted in 2002 that an open question exists "whether a loan is void if it violates New York's criminal usury statute without violating New York's civil usury statute." In re Venture Mortgage Fund, L.P., 282 F.3d 185, 189 (2d Cir. 2002). More recently, the New York Supreme Court noted that "there is no specific statutory authority for voiding a loan that violates the criminal usury statute." Funding Group, Inc. v. Water Chef, Inc., 852 N.Y.S. 2d 736, 743 (N.Y. Sup. 2008) (citing In re Venture Mortgage Fund). Civil usury is doubly unavailable here: in addition to being unavailable to corporations, the Debentures and the Line of Credit each far exceed the $250,000 civil usury ceiling. N.Y. Gen. Oblig. Law. § 5-501(6) (McKinney 2008).[13]

[13] While the Debentures and the Notes contain "usury avoidance" language (stating that, for example, interest shall accrue on an

The amounts advanced to Defendants appear to take the transactions at issue beyond the scope of usury. Section 5-501(6)(b), quoted above, permits aggregation of loans from multiple lenders when assessing whether they surpass the $2.5 million limit. The loan under the Debentures totaled $4 million -- $2 million from BridgePointe, $1.5 million from CAMOFI, and $500,000 from CAMHZN. The Notes provided for a $3 million advance. Thus, even if the defense of criminal usury remained available to the Defendants, as corporations, the 2007 and 2008 Funding appear too large to allow the Defendants to claim usury in this case.

A final legal infirmity is that the interest rate charged for on-time payments is well below 25%. The interest rate rises upon default to 18%, but there cannot be a finding of usury based on an interest rate that occurs in a situation of default. Defendants will therefore have to demonstrate that the interest charged during the normal course –- when the obligations are not in default –- exceeds 25%. The Defendants have not shown a likelihood of succeeding at trial on their usury defense.

---

payment upon which defendant has default at "eighteen (18) percent per annum . . . or the maximum amount allowed by applicable law,"), "language therein purporting to reduce the interest rate to the legal rate in the event of a finding of usury, do not make the subject agreements nonusurious." Simsbury Fund, Inc. v. New St. Louis Associates, 611 N.Y.S.2d 557, 558 (1st Dep't 1994).

4. Likelihood of Success on the Merits

Plaintiffs have met the mandatory injunction's higher standard by presenting undisputed evidence of default. Defendants, meanwhile, have not shown a likelihood of succeeding at trial on any of their affirmative defenses proffered to excuse their breaches. Plaintiffs have therefore made a clear and substantial showing that they are likely to succeed on the merits of their breach of contract and foreclosure claims, and have carried their burden under the mandatory preliminary injunction standard.

5. Irreparable Harm

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction." Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002) (citation omitted). To establish irreparable harm, a party must show that "there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation". Id. (citation omitted). Put otherwise, irreparable harm is found where "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." Brenntag Int'l Chemicals, Inc. v. Bank of India, 175

F.3d 245, 249 (2d Cir. 1999). Irreparable harm must be shown to be “actual and imminent, not remote or speculative.” Kamerling, 295 F.3d at 214.

Proof of a monetary loss will ordinarily not suffice. The movant must show “evidence of damage that cannot be rectified by financial compensation.” Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989). “[A]lthough injuries compensable by monetary damages ordinarily do not give rise to irreparable harm, a preliminary injunction may issue to preserve assets as security for a potential monetary judgment where the evidence shows that a party intends to frustrate any judgment on the merits by making it uncollectible." Pashaian v. Eccelston Properties, Ltd., 88 F.3d 77, 86-87 (2d Cir. 1996) (citations omitted).

Defendants have essentially conceded Plaintiffs’ likelihood of success on the merits of their breach of contract claim and focus their opposition to the preliminary injunction on the irreparable harm prong. They claim that Plaintiffs have failed to show that a dissipation of the Collateral risks rendering any eventual judgment against Defendants uncollectible. Plaintiffs have met this challenge, and the standard outlined in Pashaian, demonstrating that they do in fact face irreparable harm caused by the dissipation of assets in contravention of the terms of the 2007 and 2008 Funding. First, they have shown that

Defendants continue to direct payments to third parties or to ACT directly, rather than to the lockbox. This ongoing violation demonstrates the need to transfer control over assets and preliminary power to dispose of those assets to the Plaintiffs. While Defendants may argue that payments diverted from the lockbox are instead going to pay ordinary business expenses and are therefore supporting Plaintiffs' interest in the Collateral by keeping ACT's doors open, their willingness to defy contractual terms, even in the weeks leading up to the preliminary injunction hearing, evinces the continuing risk of disposition of assets contrary to the terms of the 2008 Funding.

Second, the payment of $800,000 to the Hawkins-controlled Avante shortly after the closing of the 2007 Funding in violation of the use of proceeds provision forbidding the 2007 Funding to be used to repay corporate debts, as well as the $100,000 "loan" payment that went from Nelson to Avante instead of to the lockbox, represent examples of unauthorized dissipation of assets.

Third, Hawkins' decision to evict ACT and terminate the consulting arrangements while demanding that ACT pay 2009 fees for services not yet performed gives weight to Plaintiffs' fears that the Collateral may continue to shrink, migrating off the books of ACT to Hawkins-controlled entities. The Plaintiffs have shown, therefore, that their contractual right to control

the Collateral after an Event of Default may be critical to its preservation.

In addition, terms throughout the contracts at issue specify that a default constitutes irreparable harm entitling Plaintiffs to injunctive relief to cure breaches. Plaintiffs assert that these provisions, such those found in Section 9(p) of the 2007 Purchase Agreement and Section 10(b)(ix) of the Line of Credit Agreement, warrant a finding of irreparable harm. While not dispositive, courts may view this as evidence of an admission that irreparable harm has occurred. See North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38, 49 (2d Cir. 1999); Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999); but see Baker's Aid, Div. of M. Raubvogel Co. v. Hussmann Foodservice Co., 830 F.2d 13, 16 (2d Cir. 1987) ("contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate."). Together with the evidence of ongoing defiance of the terms of the 2008 Funding, these provisions support the finding of irreparable harm.

## CONCLUSION

Plaintiffs having demonstrated that they are entitled to a preliminary injunction to protect their interests under the 2007 and 2008 Funding, a preliminary injunction shall issue 1)

preserving Defendants' assets comprising the Collateral (as defined in the transaction documents), and 2) enforcing Plaintiffs' rights to control and possess the Collateral in accordance with the terms of the agreements comprising the 2007 and 2008 Funding. The parties will have an opportunity to address the extent to which the Plaintiffs shall have the authority, prior to entry of a final judgment, to dispose of the Collateral. Separate Orders will issue to outline the protocol by which Plaintiffs will exercise control over the Collateral and the schedule for preparations for a trial to determine permanent relief in this matter.

SO ORDERED:

Dated: New York, New York
January 30, 2009

DENISE COTE
United States District Judge