UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
ROSWELL CAPITAL PARTNERS LLC, et al.,   :
                                        :
                        Plaintiffs,     :    08 Civ. 10647 (DLC)
                                        :
            -v-                         :    OPINION & ORDER
                                        :
ALTERNATIVE CONSTRUCTION TECHNOLOGIES,  :
et al.,                                 :
                        Defendants.     :
----------------------------------------X

Appearances:

For plaintiffs:

Douglas A. Rappaport
Peter D. Sharp
DLA Piper US LLP
1251 Avenue of the Americas
New York, NY 10020

For defendants:

Harry H. Wise, III
Law Offices of Thomas G. Amon
250 West 57th Street, Suite 1316
New York, NY 10107

DENISE COTE, District Judge:

     Plaintiffs Roswell Capital Partners, LLC ("Roswell"), as

"Collateral Agent," BridgePointe Master Fund Ltd.

("BridgePointe"), CAMHZN Master LDC ("CAMHZN"), and CAMOFI

Master LDC ("CAMOFI") (collectively, "Plaintiffs") bring this

action to foreclose upon their security interests in the

collateral of Alternative Construction Technologies Inc. ("ACT")

and its affiliates, and for breach of various loan and related

agreements created in connection with two rounds of funding provided to ACT. Having received a final judgment in their favor concerning the agreements governing one round of funding, Plaintiffs have moved for summary judgment against affirmative defenses and a counterclaim interposed by Defendants regarding the agreements governing the other round. For the following reasons, the motion is granted.

BACKGROUND

Roswell, the collateral agent for BridgePointe, CAMHZN, and CAMOFI, entered into a series of contracts to provide rounds of funding to ACT, a manufacturer of "green" panels used in construction. Twelve ACT subsidiaries (collectively with ACT, "Defendants") joined ACT as counterparties to the transactions with Roswell.[1] Roswell provided two rounds of funding to ACT, in 2007 and 2008 (the "2007 Funding" and the "2008 Funding"). As part of the 2007 Funding, the parties entered into a Securities Purchase Agreement dated June 30, 2007 (the "2007 Security Agreement"), in which the Lenders agreed to purchase from ACT a total of $4 million in senior secured convertible debentures and received warrants to purchase ACT common stock. To effectuate

---

[1] Pursuant to a memorandum and order filed by Magistrate Judge Douglas F. Eaton on May 7, 2009, the complaint has been amended to add four junior creditors as defendants. These additional defendants are not involved in the summary judgment motion at issue here.

the 2008 Funding, ACT executed a Line of Credit Agreement with BridgePointe and CAMOFI on May 8, 2008.  BridgePointe and CAMOFI each agreed to provide up to $1.5 million in credit to ACT.  In exchange for the value received, ACT issued Senior Secured Grid Notes (the "Notes"), one payable to BridgePointe and the other to CAMOFI, in the amount advanced to ACT under the Line of Credit Agreement.

In return for the funding, among other obligations, the agreements required ACT to make monthly repayments of the principal owed, with interest, and to direct its customers to make payments owed to ACT to a "lockbox account."  The two rounds of funding were linked by, among other provisions, a cross-default provision.  The cross-default provision appeared in Section 7(n) of Notes.  Section 7(n) of the Notes provided that a default by ACT on "any indebtedness, individually or in the aggregate, in excess of $175,000" also constituted a default under the Notes.

1. This Lawsuit

After ACT failed to repay its obligation and to direct customer funds to the lockbox account, Plaintiffs brought an application for an Order to Show Cause with Temporary Restraining Order ("TRO") on December 9, 2008.  Later that day, a hearing with both parties was held, the TRO was entered, and a

preliminary injunction hearing was set for January 29, 2009,
following a period of fact discovery.  On January 20, 2009,
Plaintiffs requested consolidation of the preliminary injunction
hearing with a trial on the merits pursuant to Rule 65(a)(2),
Fed. R. Civ. P.  Following a conference with both parties on
January 23 and a January 26 submission from Defendants opposing
consolidation, an Order of January 26 consolidated the
preliminary injunction hearing with a trial on the merits for
the issue of Defendants' breaches of contract only.  The Order
declined to consolidate a preliminary injunction hearing with a
trial on the merits with regard to the affirmative defenses and
counterclaim that the defendants asserted to excuse any finding
of a breach.[2]  While the affirmative defenses and counterclaim
were addressed at the preliminary injunction hearing as
necessary to assess whether preliminary relief was warranted,
final judgment was reserved on these issues.  On January 30, an
Opinion and Order found that Defendants had defaulted on the
2007 and 2008 Funding.  Roswell Capital Partners LLC v.
Alternative Const. Technologies, No. 08 Civ. 10647 (DLC), 2009
WL 222348 (S.D.N.Y. Jan. 30, 2009) (the "January 30 Opinion").
The finding of default was premised on, inter alia, the
Defendants' failure to meet their payment obligations under the
2007 Funding, which caused a cross-default under the terms of

---

[2] The affirmative defenses and counterclaim are described below.

the Notes that comprised part of the 2008 Funding, Defendants'
failure to pay principal and interest due under the 2008
Funding, and ACT's failure to direct its clients to make
payments directly to a "lockbox account" to which Plaintiffs had
access, rather than to ACT directly.  Familiarity with the
January 30 Opinion, which sets forth the applicable provisions
in the rounds of funding in detail and describes the evidence
presented in advance of and at the hearing, is assumed.

2. The Affirmative Defenses and Counterclaim

        Defendants answered the complaint on January 12, 2009.[3]
Their answer included affirmative defenses, one of which is also
styled as a counterclaim.  At the time of the January 30
Opinion, the allegations supporting the defenses and
counterclaims were that

        Plaintiffs 1) manipulated ACT's stock price
        in June 2007 to make it drop; 2) frustrated
        Defendants' ability to seek additional
        funding from other investors so that they
        could foreclose on Defendants' businesses;
        3) delayed delivery of information required
        to obtain an effective registration
        statement and then demanded additional
        warrants from Defendants as a result; 4)
        removed more revenues from the lockbox than
        they were owed, forcing Defendants to
        default; and 5) intentionally delayed
        funding Eligible Contracts to "starve"
        Defendants for cash and create a default.

_____

[3] While Defendants filed twelve separate answers, each is
identical, and the filings will together be referred to as "the
answer."

January 30 Opinion, at *11.[4]  Defendants pleaded these factual allegations in support of affirmative defenses of unclean hands, frustration of performance, breach of the covenant of good faith and fair dealing (also a counterclaim) and usury.  Id. at *11-*15.  In their preliminary injunction papers, Plaintiffs argued that Defendants were contractually required to post a bond before raising any affirmative defense or counterclaim to a default alleging that Plaintiffs had engaged in a "violation of law."  Plaintiffs contended that this requirement applied to all of the affirmative defenses and the counterclaim.  After the parties made submissions on the applicability of the bond requirement, an Opinion and Order issued on February 27, 2009, required Defendants to post a bond before arguing usury and criminal stock-price manipulation, but not before raising the remainder of the affirmative defenses, as they did not involve allegations that Plaintiffs had committed a "violation of law."  Roswell Capital Partners LLC v. Alternative Const. Technologies, No. 08 Civ. 10647 (DLC), 2009 WL 497578, at *5 (S.D.N.Y. Feb. 27, 2009).  Defendants declined to post such a bond and abandoned those arguments to which the bond requirement applied.

---

[4] "Eligible Contracts" are contracts between ACT and certain clients listed in the documents comprising the 2008 Funding.

3. Plaintiffs' Motions for Summary Judgment

In a conference held on the record on March 6, 2009, Plaintiffs announced their intention to bring two summary judgment motions, one seeking final judgment in their favor on Defendants' defaults under the 2007 Funding, and another seeking a final judgment in their favor based on Defendants' breaches of the 2008 Funding. Defendants made a submission on March 9 conceding that they had no colorable defenses to a judgment in Plaintiffs' favor regarding Defendants' breach of the 2007 Funding, and a final judgment pursuant to Federal Rule of Civil Procedure 54(b) was entered on March 26, 2009, giving Plaintiffs the right to foreclose upon and possess the collateral enumerated in the 2007 Funding.[5] On March 20, Plaintiffs moved for summary judgment against Defendants' remaining defenses and counterclaims that sought to excuse the default under the 2008 Funding.

---

[5] The 2007 Security Agreement defined the "Collateral" to include "all goods," including machinery, equipment, vehicles, and "documents of title" to the same; "all contract rights and other general intangibles," including stock, distribution agreements, software, and intellectual property; "all accounts ... all documents of title representing any of the foregoing, all rights in any merchandising, goods, equipment," and the "security and guarantees with respect to each account"; "all documents"; "all commercial tort claims"; "all deposit accounts and all cash"; "all investment property," including "shares of capital stock and other equity interests" in ACT and its subsidiaries; "all files, records, books of account, business papers, and computer programs"; and the "products and proceeds" of the Collateral.

4. Additional Evidence Offered by Defendants in Opposition to
   Summary Judgment

     The January 30 Opinion made final findings of fact

regarding the contracts' formation and various defaults

committed by Defendants, which are incorporated here.

Plaintiffs offer no additional evidence beyond the evidence

submitted in advance of the preliminary injunction hearing, the

findings of the January 30 Opinion, and the transcript of the

preliminary injunction hearing.  Defendants, meanwhile, offer an

affidavit from former ACT CEO Michael Hawkins, to which several

emails and various other documents are attached.  Hawkins'

affidavit establishes the facts outlined below.

     ACT sought further investment several times, both from

Plaintiffs and other investors.  When ACT sought additional

funding in September 2007, Roswell refused to provide more

capital until the SEC declared ACT's Registration Statement

effective.  Roswell then "refused or neglected" to supply

certain unspecified information that ACT needed to respond to

the SEC to complete the Registration Statement process.  Roswell

also voiced disapproval of ACT's effort to obtain a listing on

the Frankfurt stock exchange, and ACT acceded to Roswell's

request.  In early January 2008, ACT accepted $300,000 in

financing from an investment fund.  Roswell informed ACT that

its fundraising violated the 2007 Funding, and demanded

additional warrants for ACT stock to resolve the problem.  Over the next several months, Roswell refused to allow various other attempts by ACT to obtain additional outside funding.

Many of the Defendants' arguments arise from their allegations that Roswell declined to exercise the "green shoe" provision of the 2007 Funding, despite requests from ACT beginning in August 2007 that they do so.[6]  The green shoe provision allowed Roswell to invest an additional $3 to $4 million for a specified time period or waive it in order to allow ACT to obtain outside funding.  Roswell introduced the green shoe provision during the negotiation of the 2007 Funding after ACT made clear that the initial funding received from Plaintiffs was insufficient to keep ACT afloat for any longer than six months.

In April 2008, ACT was in the midst of talks with Ardour Capital ("Ardour"), a potential source of further funding.  On May 27, Ardour told ACT that it had five investors interested in

---

[6] Several provisions in the 2007 Security Agreement allowed Plaintiffs to control ACT's future access to funding.  Section 4(e) of the 2007 Security Agreement, entitled "Capital Raising Limitations; Right of Participation," requires the prior written approval of the Plaintiffs before ACT may sell certain securities and protects the Plaintiffs' right to participate in future financings.  Section 1(c) of the Securities Purchase Agreement also gives the Plaintiffs an option to purchase additional debentures at a price equal to the purchase price under the 2007 Funding.  The financing arrangement with Ardour Capital, described below, involved an attempt to negotiate Plaintiffs' waiver of Section 1(c) of the 2007 Security Agreement.

investing $1-$2 million each.  Completing the deal required
either Roswell's participation or its waiver of the green shoe
provision.  The Senior Vice President of Ardour, Michael
Stosser, reported in an email of April 17 that Roswell was
reluctant to invest further in the company and characterized
ACT's agreements with Roswell as "onerous."  On April 17, 2008,
Roswell agreed to waive the green shoe provision by the end of
the month in exchange for warrants to purchase 1,000,000 shares
of ACT stock at $2.00 per share.  By April 24, 2008 Roswell had
increased its demand to 2,000,000 shares to waive the green shoe
provision.  ACT stock then fell below the $2.00 conversion price
for the warrants, at which point Roswell demanded that the price
be reduced to $1.00 per share.  The negotiations foundered.

In August 2008, with ACT in default on its payments owed to
Plaintiffs, Roswell again refused to consent to a new financing
scheme, this time between ACT and a regional brokerage firm, JP
Turner.  Roswell had demanded Hawkins' resignation from ACT's
board of directors in exchange for its support of the financing.
Hawkins did not resign.

Hawkins also describes how ACT was surprised by certain
features of the Line of Credit Agreement beginning in June of
2008.  Specifically, Plaintiffs informed Hawkins that they would
not provide additional funding under the 2008 Funding until ACT
caught up with its obligations under the 2007 Funding, and

applied funding from the Line of Credit Agreement to pay down
Defendants' obligations under the 2007 Funding.  Hawkins
responded by requesting that the parties unwind the Line of
Credit Agreement because of Plaintiffs' "misrepresentations."

On July 31, 2008, ACT notified Roswell that it needed
additional capital immediately, and that such capital was due
under the Line of Credit.  Having received no funding, one day
later, ACT told Roswell that it had lost $100,000 in contracts
that week and that a $2.4 million contract was jeopardized.
Section 4(b) of the Line of Credit Agreement, however, required
ACT to certify that there were no uncured defaults under the
Notes or the 2007 Funding before ACT could receive additional
funding.  As found in the January 30 Opinion, ACT was in default
on its obligations under the 2007 Funding at the time that it
made this request.  January 30 Opinion, at *6.

## DISCUSSION

Summary judgment may not be granted unless all of the
submissions taken together "show that there is no genuine issue
as to any material fact and that the moving party is entitled to
a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The
moving party bears the burden of demonstrating the absence of a
material factual question, and in making this determination, the
court must view all facts in the light most favorable to the

non-moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986); Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d
Cir. 2006).  When the moving party has asserted facts showing
that the non-movant's claims cannot be sustained, the opposing
party must "set forth specific facts showing that there is a
genuine issue for trial," and cannot rest on the "mere
allegations or denials" contained in the pleadings.  Fed. R.
Civ. P. 56(e); accord Sista, 445 F.3d at 169.  That is, the non-
moving party "must do more than simply show that there is some
metaphysical doubt as to the material facts."  Matsushita
Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586
(1986).  Only disputes over material facts -- facts that might
affect the outcome of the suit under the governing law -- will
properly preclude the entry of summary judgment.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

     Hawkins' affidavit, in summary, attempts to tell a story of
the Plaintiffs' intentional efforts to thwart Defendants'
ability to obtain additional funding and repay their obligations
to Plaintiffs.  Hawkins alleges that Plaintiffs used their
superior financial position to "operate ACT according to their
plan" and concealed their desire to usurp control of the
company.

     Given the finding of default already in place, Defendants
must present evidence of an affirmative defense or counterclaim

to a breach of contract claim to survive Plaintiffs' motion.
Defendants' opposition argues that Plaintiffs acted in bad
faith, cloaking this defense in three different legal theories.
First, Defendants' opposition argues a novel defense, previously
raised only in a telephone conference, that Plaintiffs, as
creditors, owed a fiduciary duty to Defendants, which Plaintiffs
violated.  Defendants also present affirmative defenses of
unclean hands and frustration of performance and a counterclaim
for breach of good faith and fair dealing.[7]

1. Cross-Default

Final judgment has been entered for the Plaintiffs on the
issue of default under the terms of the 2007 Funding.  Pursuant
to the Notes, a default of over $175,000 on the 2007 Funding
also constitutes a default under the 2008 Funding.  It is
undisputed that Defendants' default exceeded $175,000, and the
final judgment entered awarded far in excess of that amount in
damages comprising principal and interest due.[8]  January 30
Opinion, 2009 WL 222348 at *6.  Hawkins' affidavit includes

---

[7] Defendants also present a one-paragraph argument that any
breaches related to the failure to direct funds to the lockbox
account were minor and cured.  They provide no legal or factual
support for this argument, nor do they attempt to explain how it
excuses their default.

[8] The final judgment awarded $2,833,629.32 in principal and
interest owed to BridgePointe, $709,953.99 to CAMHZN, and
$2,072,294.71 to CAMOFI.

several untimely and unpersuasive attempts to excuse the earlier default.  For example, Hawkins states "upon information and belief" that Plaintiffs sought to "buy insider information concerning ACT" to aid Plaintiffs to make allegations regarding, inter alia, the payments made by ACT to a Hawkins-controlled entity, Avante, evidence of which Plaintiffs later introduced to support their allegations of breach of the 2007 Funding. January 30 Opinion, 2009 WL 222348 at *17.  This approach is flawed in several respects.  Information-and-belief allegations are insufficient to defeat a summary judgment motion -- admissible evidence is required.  Moreover, final judgment has been entered on the breach of the 2007 Funding, which Defendants did not oppose and which is now the law of the case.  See Johnson v. Holder, 564 F.3d 95, 99 (2d Cir. 2009).

Indeed, as Defendants agreed to the entry of final judgment and forwent their affirmative defenses to breach of the 2007 Funding, the judgment of breach compels a finding of breach of the 2008 Funding, unless Defendants can show that the cross-default provision is invalid.  Hawkins summarily argues that ACT was "duped" by Plaintiffs in the Line of Credit Agreement, but does not submit evidence of the contract's invalidity, nor does he make any argument regarding the cross-default provision.

Defendants instead seek to excuse payment on other grounds and argue that Plaintiffs' breaches of an alleged fiduciary duty

14

to Defendants occurred before payment on the 2007 Funding became
due.  As described below, the fiduciary duty claims are legally
infirm.  In addition, the entry of final judgment precludes them
from contesting the default of the 2007 Funding.  By defaulting
on their obligations to repay 2007 Funding, the Defendants have
thus defaulted under the 2008 Funding as well.  Their efforts to
defend against the cross-default by attacking their default on
the 2008 Funding are futile, because even a successful effort
would not disturb the cross-default.  Plaintiffs are therefore
entitled to judgment in their favor on the 2008 Funding because
of the cross-default.  Regardless, Defendants' affirmative
defenses to a breach of the 2008 Funding will be briefly
examined.

2. Fiduciary Duty

     While recognizing that a lender is ordinarily not a
borrower's fiduciary, Defendants argue that Plaintiffs'
acquisition of shares in ACT created a fiduciary relationship
because it "resulted in a situation where plaintiffs were
clearly more interested in profiting as ACT stockholders
or . . . by taking over the company, than just as mere lenders
[sic]."  According to Defendants, Plaintiffs' shareholder status
gave them influence over Defendants, which they used to thwart
ACT's efforts to obtain additional funding, spread false rumors

regarding ACT's wrongdoing to its best customer, install ACT board members who acted on Plaintiffs' behalf, rather than ACT's, and otherwise plot to induce a default that would allow them to takeover ACT.

This newly interposed affirmative defense is untimely. When Defendants first raised the possibility of arguing a breach of fiduciary duty defense, they were informed that they would need to amend their answer to do so, as their answer wholly lacks any reference to fiduciary duty.  Defendants have not amended, nor do they request leave to amend or include a suggested amendment in their summary judgment opposition, despite specific direction from the Court.  The opposition to a summary judgment motion is not an accepted means by which Defendants may amend their pleading.  See Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998) ("a party is not entitled to amend its complaint through statements made in motion papers").

The argument also fails on its merits.  "[A]n arm's length borrower-lender relationship is not of a confidential or fiduciary nature."  River Glen Assocs., Ltd. v. Merrill Lynch Credit Corp., 743 N.Y.S.2d 870, 871 (1st Dep't 2002).[9]

---

[9] Section 14(a) of the Line of Credit Agreement specifies that New York law shall govern disputes concerning the 2008 Funding. The parties do not dispute that New York law applies.

Ordinarily, "[a] debtor-creditor relationship is not by itself a fiduciary relationship[,] although the addition of a relationship of confidence, trust, or superior knowledge or control may indicate that such a relationship exists." Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield, 276 F.3d 123, 130 (2d Cir. 2002) (citation omitted).   A lender-borrower relationship may give rise to fiduciary duty under New York law where there exists "a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding, or an assumption of control and responsibility." Manufacturers Hanover Trust Co. v. Yanakas, 7 F.3d 310, 318 (2d Cir. 1993) (citation omitted).

ACT has not made the requisite showing of a special relationship to overcome the standard rule that no fiduciary relationship exists in this situation.  ACT's actual evidence of a relationship of trust or of control (as opposed to its allegations) is comprised of the fact that Plaintiffs received ownership of shares through the 2008 Funding, appointed two members to the Board of Directors, and hampered ACT's efforts to obtain additional funding through exercise of the green-shoe provision.  None of these indicates "superior knowledge or control" over ACT.  They are simply Plaintiffs' exercise of contractual rights achieved through a bargain conducted at arms' length.  The green-shoe provision comes closest to suggesting

17

control, but Defendants have submitted no evidence that
Plaintiffs' used this provision to control ACT's conduct of its
business, rather than simply enforcing their rights as
creditors.  Deciding that the issuance of stock rendered a
lender a fiduciary would dramatically expand the doctrine of
investors' fiduciary liability to every transaction where some
payment occurred in the form of stock.

Moreover, the basic premise of Defendants' claims is that
Plaintiffs desired to obtain control over ACT.  The law requires
present control, not simply an aspiration of control, to support
an inference of a fiduciary relationship.

As Defendants have failed to cite evidence supporting a
fiduciary relationship, it is unnecessary to address Plaintiffs'
other arguments that the 2008 Funding expressly disclaimed a
fiduciary relationship, and that, even if such a relationship
existed, Defendants have no evidence of its violation.

3. Frustration of Performance and Unclean Hands

Defendants next attempt to defeat a finding of breach by
invoking frustration of performance and unclean hands defenses,
arguing that Plaintiffs intended to use the "leverage" provided
by their contractual position to "set in motion events" that
would allow Plaintiffs to take control of ACT.  By allegedly
"financially squeezing defendants" in refusing to provide

further funding, preventing ACT from obtaining funding from other sources, and delaying delivery of funds, among other methods, ACT argues that Plaintiffs' hands are tainted, and they should not be able to recover against Defendants.

The frustration of performance defense is based on the rule that "[i]n the case of every contract there is an implied undertaking on the part of each party that he or she will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his or her part." Syracuse Orthopedic Specialists, P.C. v. Hootnick, 42 A.D.3d 890, 892 (4th Dep't 2007) (citation omitted).  As for unclean hands, in New York, courts in equity "apply the maxim requiring clean hands where the party asking for the invocation of an equitable doctrine has committed some unconscionable act that is directly related to the subject matter in litigation and has injured the party attempting to invoke the doctrine."  PenneCom, B.V. v. Merrill Lynch & Co., 372 F.3d 488, 493 (2d Cir. 2004) (citation omitted).

Defendants' affirmative defenses fail because they can point to no evidence that Plaintiffs took any "unconscionable" action or prevented Defendants from executing their obligations. Rather, the evidence shows simply that Plaintiffs exercised their contractual rights.  Hawkins' additional speculation regarding Plaintiffs' motive to acquire control of ACT,

unsupported by evidence, does not establish otherwise.  With regard to the alleged delay in providing funding, the evidence shows that ACT had not satisfied the prerequisite to receiving funding set forth in Section 4(b) of the Line of Credit Agreement, which required Defendants to certify that they were not in default under the 2007 Funding.  Any delay was therefore not "unconscionable" and does not support a finding of unclean hands.  The terms of the 2007 and 2008 Funding may have placed ACT in a precarious position once it fell behind on its payments, but that was the parties' bargain.

As explained above, the exercise of contractual rights to protect an investment does not constitute bad faith.  Nor can it be the bad faith on which a frustration-of-performance claim rests.  See e.g., Red Tulip, LLC, 842 N.Y.S.2d at 7; Chrysler Credit Corp., 596 N.Y.S. 2d at 231-32.[10]

---

[10] The doctrine of frustration of performance has its basis in the implied covenant of good faith.  International Firearms Co. v. Kingston Trust Co., 6 N.Y.2d 406, 410 (1959) (citing "the familiar principle that there is an implied obligation of good faith binding parties to contracts, that they will not deliberately frustrate their performance").  The Second Circuit, applying New York law, has specifically recognized that New York's closely related "prevention doctrine," which provides that "a party may not avoid performance of a contractual duty by preventing the occurrence of a condition precedent," creates an "implied contractual obligation, similar to -- and perhaps rooted in -- the covenant of good faith and fair dealing." Consolidated Edison, Inc. v. Northeast Utilities, 426 F.3d 524, 528-29 (2d Cir. 2005).  "The doctrine therefore exists to serve the intent of the parties, and does not operate at cross-purposes to that intent." Id. at 529.  Consequently, it cannot

Additionally, Defendants' opposition also argues that
Plaintiffs' desire to use their investment in ACT as "leverage"
supports a finding of frustration of performance and unclean
hands, relying on a statement made my Thomas Dawe, a Roswell
employee and ACT board member, to ACT CEO Michael Hawkins.  This
invocation of "leverage" is a vague assertion insufficient to
permit a reasonable jury to find that Plaintiffs did anything
aimed at bringing about Defendants' default and does not clearly
indicate any improper activity.  Owning shares in a company, for
example, gives any shareholder "leverage," which he or she may
permissibly use to influence the company in which the
shareholder has invested.

4. Breach of Good Faith/Fair Dealing

     Defendants' final argument is an affirmative defense and
counterclaim for breach of good faith and fair dealing.  As
outlined in the January 30 Opinion, breach of the implied duty

---

be used to imply an obligation inconsistent with the terms of
the contract.  Id.  To invoke the doctrine to bar a party from
exercising its contractual rights would be to "nullify other
express terms of a contract." Id. (citation omitted).  New York
courts have cited the same New York Court of Appeals precedent,
Kooleraire Serv. & Installation Corp. v. Board of Educ. of City
of N.Y., 28 N.Y.2d 101, 106 (1971), when explaining both the
prevention doctrine and a frustration of performance affirmative
defense.  See, e.g., HGCD Retail Services, LLC v. 44-45 Broadway
Realty Co., 826 N.Y.S.2d 190, 198 (1st Dep't 2006) (prevention
doctrine); A-1 General Contracting Inc. v. River Market
Commodities Inc., 622 N.Y.S. 2d 378, 381 (3d Dep't 1995)
(frustration of performance).

of good faith and fair dealing "is merely a breach of the underlying contract." National Market Share, Inc. v. Sterling Nat. Bank, 392 F.3d 520, 525 (2d Cir. 2004) (citation omitted). To prevail, Defendants must offer evidence that Plaintiffs breached the 2007 or 2008 Funding or a promise "which a reasonable person in the position of the promisee would be justified in understanding were included." Moran v. Erk, 11 N.Y.3d 452, 457 (2008) (citation omitted).  Again, exercising contract rights to protect an investment does not constitute bad faith.  See, e.g., Red Tulip, LLC, 842 N.Y.S.2d at 7.

As was the case at the preliminary injunction hearing/trial on the merits, Defendants have not shown that Plaintiffs took any action beyond exercising their contractual rights, which is insufficient to support a finding of a breach of the duty of good faith.  For example, Hawkins accuses Plaintiffs of using the green shoe provision "as a lever."  Hawkins' allegation simply describes reliance on a bargained-for contractual provision.  This describes an ordinary contractual arrangement, not a breach or lack of good faith.


5. Rule 56(f) Request

Defendants have also requested that a decision on Plaintiffs' motion be deferred pursuant to Rule 56(f) of the Federal Rules of Civil Procedure until the Defendants have

completed depositions.  These depositions, Defendants argue, may
help them to prove Plaintiffs' lack of good faith or show
Plaintiffs' knowledge of and waiver of Defendants' breaches.  As
for the latter, Defendants' answer and counterclaim have not yet
mentioned a defense of waiver, and their attempt to invoke this
defense at this stage in the litigation is untimely.

When a party opposing a summary judgment motion cannot
present facts "essential" to justify its opposition, "the court
may refuse the application for [summary] judgment."  Rule 56(f),
Fed. R. Civ. P.  A party responding to a summary judgment motion
with a request for further discovery under Rule 56(f) must file
an affidavit describing: (1) what facts are sought and how they
are to be obtained; (2) how these facts are reasonably expected
to raise a genuine issue of material fact; (3) what efforts the
affiant has made to obtain them; and (4) why the affiant's
efforts were unsuccessful.  Gualandi v. Adams, 385 F.3d 236, 244
(2d Cir. 2004).  "The failure to file an affidavit under Rule
56(f) is itself sufficient grounds to reject a claim that the
opportunity for discovery was inadequate."  Di Benedetto v. Pan
Am World Service, Inc., 359 F. 3d 627, 630 (2d Cir. 2004)
(citation omitted).  "A reference to Rule 56(f) and to the need
for additional discovery in a memorandum of law in opposition to
a motion for summary judgment is not an adequate substitute for
a Rule 56(f) affidavit."  Paddington Partners v. Bouchard, 34

F.3d 1132, 1137 (2d Cir. 1994).  Even if a proper affidavit is
filed, a court can reject a request for further discovery "if it
deems the request to be based on speculation as to what
potentially could be discovered."  Id. at 1138; see also
National Union Fire Ins. Co. of Pittsburgh, PA. v. Stroh
Companies, Inc., 265 F.3d 97, 117 (2d Cir. 2001).  "[A] bare
assertion that the evidence supporting a plaintiff's allegation
is in the hands of the defendant is insufficient to justify a
denial of a motion for summary judgment under Rule 56(f)."
Paddington, 34 F.3d at 1138 (citation omitted).

    Defendants were given an opportunity to conduct discovery
and a forum to raise any complaints about the Plaintiffs'
responses to discovery requests.[11]  Defendants' request for
additional discovery fails to follow the procedure outlined by
Rule 56(f) as explained in Gualandi.  The affidavit of Michael
Hawkins explains that Defendants' fact discovery has been
limited because "plaintiffs witnesses [sic] . . . refused to
come to New York for their depositions," because Defendants'
request for a discovery extension was denied, and because they
have "had difficulty reviewing the 30,000 pages of documents
produced by plaintiffs because of the electronic format in which
they were produced."  This affidavit entirely fails to mention

---

[11] Both Magistrate Judge Douglas F. Eaton and this Court heard
and rejected Defendants' complaints about discovery.

"what facts are sought and how they are to be obtained" and "how these facts are reasonably expected to raise a genuine issue of material fact." <u>Gualandi</u>, 385 F.3d at 244.

A court is not required to withhold consideration of a summary judgment motion based on mere speculation.  The desire to unearth a lack of good faith is an entirely vague request, unsupported by the evidence or even by Defendants' arguments, which as a matter of law simply demonstrate that Plaintiffs exercised their contractual rights.  Defendants have not pointed to specific incidents which, if the facts are as they say, would support the breach of good faith and fair dealing.  This speculative and incomplete request is insufficient to satisfy the requirements of the rule.

CONCLUSION

Plaintiffs' March 20 motion for summary judgment on claims associated with the 2008 Funding is granted.  In accordance with the findings in the Opinion, the plaintiff shall submit a

proposed final judgment pursuant to Rule 54(b), Fed. R. Civ. P.

by July 31, 2009.

    SO ORDERED:

Dated:    New York, New York
            July 20, 2009

                               DENISE COTE
                        United States District Judge