UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
ROSWELL CAPITAL PARTNERS LLC, et al.,   :
                         Plaintiffs,    :
                                        :   08 Civ. 10647 (DLC)
            -v-                         :
                                        :   OPINION & ORDER
ALTERNATIVE CONSTRUCTION TECHNOLOGIES,  :
et al.,                                 :
                         Defendants.    :
----------------------------------------X

APPEARANCES:

For Plaintiffs:

Douglas A. Rappaport
Brian T. Carney
Akin Gump Strauss Hauer & Feld, LLP
One Bryant Park
New York, NY 10036

For Defendants JMB Associates of Ohio, LLC, JMB Associates, and
James Beshara:

Mark J. Lawless
250 W. 57th Street, #1316
New York, NY 10107

Edward Bearman
Martin Grusin
780 Ridge Lake Blvd, Suite 202
Memphis, TN 38120


DENISE COTE, District Judge:

     Plaintiffs BridgePointe Master Fund Ltd., CAMHZN Master

LDC, and CAMOFI Master LDC (collectively, the "Lenders"), and

Roswell Capital Partners, LLC, as Collateral Agent for the

Lenders ("Roswell," and together with the Lenders, the

"Plaintiffs") bring this action to foreclose on the assets of defendant Alternative Construction Technology, Inc. ("ACT"), a Florida-based manufacturer of "green" construction materials. Defendants James Beshara ("Beshara") and his sole proprietorship, JMB Associates (collectively, "JMB"), claim to have a perfected security interest in ACT's assets senior to that of the Plaintiffs.  Plaintiffs contend that JMB has no valid security interest in ACT's assets.  On May 12, 2010, the Plaintiffs moved for summary judgment.  For the following reasons, the motion is granted.

BACKGROUND

Much of the factual background concerning this litigation is set forth in the January 30, 2009 Opinion granting Plaintiffs' application for preliminary injunctive relief, see Roswell Capital Partners, LLC v. Alt. Constr. Techs., Inc., No. 08 Civ. 10647(DLC), 2009 WL 222348 (S.D.N.Y. Jan. 30, 2009) ("Roswell I"), and the July 20, 2009 Opinion granting final judgment in favor of Plaintiffs.  See Roswell Capital Partners, LLC v. Alt. Constr. Techs., Inc., 638 F. Supp. 2d 360 (S.D.N.Y. 2009) ("Roswell II").  The following facts are relevant to the instant matter and are not in dispute unless otherwise indicated.

1.   JMB's Security Interest

JMB's purported security interest in ACT's assets is predicated on two loans that JMB made to ACT in 2005.  As described below, these two loans resulted in the issuance of notes, which were ultimately converted into ACT common stock issued to JMB.

The 2005 loans were documented by two "Secured Convertible Promissory Notes" dated February 22 and June 30, 2005 (the "2005 Notes").  The 2005 Notes cumulatively reflect a principal debt of $630,000, due and payable on July 1, 2006, and bear interest at 18% per year.  Each of the 2005 Notes indicates that its obligations are secured by collateral described in a Uniform Commercial Code ("UCC") financing statement ("UCC-1") attached as an exhibit to the note.  Although there is no UCC-1 attached to the 2005 Notes, it is undisputed that a UCC-1 financing statement in favor of JMB was filed on July 8, 2005.

In 2006, the 2005 Notes were "cancelled and void[ed]" and "replace[d]" by an "Amended and Restated Convertible Promissory Note" dated June 1, 2006 (the "2006 Note").[1]  The 2006 Note has a

---

[1] The 2006 Note actually states that it "replaces and amends the Amended and Restated Convertible Promissory Notes ($380,000 and $250,000) dated March 14, 2006 originally delivered by [ACT] to [JMB] (the 'First Amended Note').  The First Amended Note is now cancelled and void."  While this purported "First Amended Note" has not been introduced into evidence, a letter dated March 14, 2006, from Gina Bennett, ACT's Chief Compliance Officer ("Bennett"), to Beshara, indicates that Beshara agreed to "grant

principal amount of $630,000, due and payable on December 31, 2006.[2]  Section 3 of the 2006 Note, entitled "Securities," states in full:  "It is understood that JMB Associates has filed a UCC-1 against the assets of [ACT] as identified in the Exhibit B. [ACT] shall be required to seek the endorsement of JMB Associates prior to the removal of the UCC-1 upon payment."[3]  Although there is no Exhibit B attached to the 2006 Note, it is undisputed that a UCC-1 financing statement in favor of JMB was filed on May 8, 2006.[4]

Section 1.2 of the 2006 Note provides that the Note could be paid by check or wire, "or converted into equity of the Company at the option of the Payee [JMB]."  Section 1.4 contains a mandatory conversion provision that states that the note "will

---

extensions" to payments due on the 2005 Notes to June 1, 2006. The fact that the 2005 Notes were extinguished, however, is confirmed by ACT's December 31, 2006 Form 10-KSB filing.  In "Note 6" of the 10-KSB, a schedule listing all of ACT's outstanding notes payable, the two Notes due July 1, 2006 and bearing interest at 18% per year are listed as having a balance of "zero" as of December 31, 2006.

[2] The 2006 Note originally named "JMB Associates" as Payee, but contains a handwritten notation substituting "James Beshara" individually.

[3] The earlier March 14, 2006 letter from Bennett to Beshara had provided that "[u]pon payment of all outstanding monies (interest and principal) to Mr. Beshara et al the UCC-1 filings will be canceled."  (Emphasis added.)

[4] The May 8, 2006 UCC-1 financing statement indicates that it documents a "[f]irst lien on Pentane Bulk Storage and Meter Pentane Metering Machine" and a "[s]econd lien" on other assets of ACT.  This is the same collateral covered by the earlier July 8, 2005 UCC-1 financing statement.

be converted into [315,000] Shares of Common Stock [of ACT] at any time, but no later than the company's active trading on the OTC Bulletin Board ('Next Round'), plus an additional amount for interest conversion."  (Emphasis added.)

Despite the mandatory conversion requirement, JMB contends that it had the right to return the shares and reinstate the debt obligation, a right that it exercised in 2008.  The right to unwind the conversion from debt to equity is addressed in § 1.4, which provides:

> It is understood by both parties in the event the Payee [JMB] elects to convert into equity stock prior to the selling of shares by the Payee [JMB], in order to breakeven [sic] with this convertible promissory note, the stock price falls below $2.00 per share, the Payee [JMB] has the right at its sole discretion to unwind the transaction.

The 2006 Note provides that Florida law shall govern without regard to choice of law principles.

2.   The 2006 Note is Converted into ACT Common Stock

The entirety of ACT's debt to JMB represented by the 2006 Note was converted to stock.  On September 22, 2006 ACT filed a Form SB-2 (the "2006 SB-2") to publicly register its common stock with the Securities and Exchange Commission ("SEC").  The 2006 SB-2 acknowledged $630,000 in principal and $136,933 in

accrued interest owed to JMB pursuant to the 2006 Note.[5]  The 2006 SB-2 states that JMB's debt and accumulated interest "will be converted into common stock of [ACT] during an initial SB-2 filing process." (Emphasis added.)  The amounts owed by ACT to JMB are also included in a chart listing all of ACT's outstanding convertible debt as of June 30, 2006, that "is being converted to equity as part of this registration." (Emphasis added.)

JMB's intention to convert the 2006 Note into shares of ACT common stock is documented in a letter dated September 27, 2006, from Beshara to Michael Hawkins, the chief executive officer of ACT ("Hawkins").  The letter states:

> This letter is to officially notify [ACT] of my desire to convert, as provided for in the loan documents, [$630,000] and [$136,993] in interest that [ACT] owes to JMB & Associates, as of June 30, 2006, to common shares of [ACT] at the stated conversion rate of $2.00 per share.

In response, Hawkins wrote a letter to Beshara dated October 1, 2006, confirming the conversion.

In accordance with the terms of the 2006 Note, the 2006 SB-2 filing, and the September 27, 2006 letter from Beshara to Hawkins, JMB's debt was converted into ACT common stock.  ACT issued a stock certificate, dated September 26, 2006, for

---

[5] The 2006 SB-2 does not refer specifically to the 2006 Note, but rather describes JMB's debt as being secured by the 2005 Notes. As discussed above, however, the 2005 Notes were extinguished and replaced by the 2006 Note as of June 1, 2006.

396,761 shares to JMB, representing principal and interest owed under the 2006 Note.  The stock certificate was received by Beshara's stockbroker on JMB's behalf.  On April 2, 2007, the day before ACT stock began trading publicly,[6] ACT issued JMB an additional 31,632 shares, representing additional accrued interest on JBM's loan.[7]

Thus, as of April 3, 2007, the first day ACT's stock traded publicly, JMB's debt had been converted into approximately 428,393 shares of ACT common stock.  Based on that day's closing price of $5.30 per share, JMB's shares were worth approximately $2,270,483.  After ACT's stock began trading publicly in April 2007, JMB, through Beshara's stockbroker, sold approximately 115,000 shares of ACT stock.  It is unclear at what prices JMB sold these shares.[8]

---

[6] The delay between the registration of ACT's stock with the SEC on September 22, 2006, and the first day of trading on April 3, 2007, was apparently due to the need to obtain approval from the Financial Industry Regulatory Authority ("FINRA").

[7] Interest on the $630,000 owed by ACT to JMB presumably continued to accrue since ACT's shares were illiquid between the date of the SEC registration and the actual commencement of trading.

[8] On its first day of trading, ACT's stock closed at $5.30 per share.  The stock peaked at $8.00 per share on August 31, 2007. The stock first dropped below $2.00 on June 6, 2008, when it closed at $1.90.  By July 2008, the stock was trading at between $0.63 and $0.95 per share.  It currently trades at $0.02 per share.

3.    The Lenders' Secured Interest

Pursuant to a series of contracts (the "Funding Documents"), Plaintiffs provided ACT with more than $6 million in two rounds of financing, the first in 2007 (the "2007 Funding") and the second in 2008 (the "2008 Funding," and collectively, the "Fundings").  See Roswell I, 2009 WL 222348, at *2-*4.  An express condition of the Fundings was that Plaintiffs would hold a senior secured priority interest in all of the assets of ACT (the "Collateral").  Accordingly, Plaintiffs' due diligence leading up to the 2007 Funding was focused on, among other things, ACT's other debt obligations.

In connection with their due diligence, Plaintiffs reviewed, among other things, ACT's SEC filings, including the 2006 SB-2 which indicated that once ACT's stock was registered, whatever debt JMB held in ACT would be converted into equity. On June 28, 2007, Hawkins sent an e-mail to Plaintiffs in response to a due diligence inquiry concerning JMB.  Hawkins indicated that JMB "is the 2% per month note holder we will be taking out.  [JMB's] total investment at one time was about $1.5 million.  Remaining balance of notes is $450[,000], the rest has been converted into stock."  (Emphasis added.)  Accordingly, the schedules to the Funding Documents on which ACT listed all of its outstanding indebtedness, other contracts, and any liens or

encumbrances on ACT's assets did not include the 2006 Note.[9]
These schedules are consistent with ACT's December 31, 2006 Form
10-KSB, which indicated that the 2005 Notes had been
extinguished and which did not include the 2006 Note among ACT's
outstanding notes payable.

In connection with the Fundings, the Plaintiffs and ACT
executed two security agreements, the first dated June 30, 2007
(the "2007 Security Agreement") and the second dated May 8, 2008
(the "2008 Security Agreement") (collectively, the "Security
Agreements").  Each of the Security Agreements granted the
Lenders "a continuing and perfected security interest in" the
Collateral.  Roswell I, 2009 WL 222348, at *3, *5.  In addition,
the Security Agreements provided that the Lenders held a senior
secured priority position over the Collateral and that ACT
otherwise owned the Collateral "free and clear of any liens,
security interests, encumbrances, [or] rights or claims of
others."  On July 5, 2007, shortly after the 2007 Funding
closed, the Lenders filed UCC-1 financing statements with the

---

[9] The schedule of ACT's indebtedness as of March 31, 2007 listed
only three Notes possibly connected to JMB:  (1) a $200,000 note
payable to "Antoinette Pace & James Beshara" due June 2007; (2)
a $101,500 Note payable to "Edward Beshara" due June 2007; and
(3) a $117,702 Note payable to "Antoinette Pace" due June 2007.
The sum of the outstanding balances on these Notes roughly
corresponds to the $450,000 referenced in Hawkins' June 28, 2007
e-mail to Plaintiffs.  JMB does not contend that any of these
Notes represents the 2006 Note on which JMB's purported security
interest in the Collateral is predicated.

Florida Secretary of State to perfect their senior secured priority interest in the Collateral.[10]

In addition, prior to the filing of Plaintiffs' UCC-1 financing statements and the closing of the 2007 Funding, Plaintiffs confirmed with ACT that UCC-3 termination statements[11] were filed to cancel any prior UCC-1 financing statements regarding the Collateral.  On July 2, 2007, Tom Amon ("Amon"), ACT's in-house counsel at the time, sent an e-mail to Bradford Hathorn ("Hathorn"), Roswell's chief legal counsel, to confirm that UCC-3 termination statements were being filed with respect to any previously secured ACT debt.  Indeed, they were filed that very day.  Amon sent another e-mail to Hathorn later on July 2 that stated that UCC-3 termination statements had been filed with the Florida Secretary of State, including one for JMB's UCC-1 financing statement.  The July 2, 2007 UCC-3 filing terminating JMB's security interest was reported on the Florida Secured Transaction Registry.

---

[10] An amendment to one of the Lenders' UCC-1 statements was filed on September 26, 2007.

[11] A UCC-3 termination statement provides creditors and other interested parties with notice of the cancellation of previously existing security interests.  See Fla. Stat. § 679.513.

4.    JMB "Returns" 315,000 Shares of ACT Stock

In July 2008, approximately one year after the closing of the 2007 Funding, JMB returned 315,000 shares of ACT stock to Hawkins.  In August 2008, Hawkins sent JMB a "receipt" for the returned 315,000 shares.  JMB contends that by returning the ACT stock, JMB exercised its right to "unwind" the earlier debt-to-equity conversion and thereby "reconstituted" the $630,000 debt owed by ACT to JMB pursuant to the 2006 Note.


5.    ACT Defaults and Final Judgments are Entered

After the Fundings, ACT defaulted on and otherwise breached the terms of the Funding Documents by, among other things, failing to meet its payment obligations and using loan proceeds for unauthorized purposes.  See Roswell I, 2009 WL 222348, at *9.  After Plaintiffs accelerated the payment obligations under the Funding Documents, as they were authorized to do, ACT was unable to repay its obligations.  Id.

On December 9, 2008, Plaintiffs commenced this litigation against ACT seeking damages and injunctive relief.  In an Order dated December 9, 2008, Plaintiffs were granted a temporary restraining order to prevent the dissipation of the Collateral by ACT's management.  On January 30, 2009, a consolidated preliminary injunction hearing and trial on the merits was held. At the conclusion of the hearing, a preliminary injunction was

issued to (1) preserve ACT's assets comprising the Collateral, and (2) enforce Plaintiffs' rights to control and possess the Collateral in accordance with the terms of the Funding Documents and Security Agreements.  Id. at *18.

Permanent injunctions and final judgments were entered on March 26, 2009 (concerning the 2007 Funding) and on August 26, 2009 (concerning the 2008 Funding) (collectively, the "Judgments").  Pursuant to the Judgments, the Plaintiffs were entitled to "possess, operate, control, foreclose on and otherwise exercise the rights and remedies with respect to the Collateral of a senior secured creditor upon default pursuant to the [2007 and 2008] Funding agreements, the Uniform Commercial Code, and other governing law."  Plaintiffs have since taken possession of ACT's assets and are presently operating ACT's former business through a limited liability company doing business as "Green Product Technologies."

6.   Plaintiffs' Attempt to Foreclose on the Collateral

After entry of the judgment relating to the 2007 Funding, Plaintiffs sought to foreclose on the Collateral.  Plaintiffs moved to amend the complaint to join third parties who purported to hold security interests in the Collateral, including JMB.  By Order dated May 7, 2009, Plaintiffs' motion to amend the complaint to join four junior creditors, including JMB, was

granted.  <u>See</u> <u>Roswell Capital Partners, LLC v. Alt. Constr.</u>
<u>Techs., Inc.</u>, No. 08 Civ. 10647(DLC)(DFE), 2009 WL 1357226, at
*1 (S.D.N.Y. May 7, 2009) (Eaton, MJ).[12]

Plaintiffs resolved the claims of three of the four junior
creditors, with each conceding Plaintiffs' senior secured rights
to the Collateral.  JMB, however, disputes the seniority of
Plaintiffs' security interest.  On October 28, 2009, Beshara and
JMB Associates filed Answers which assert that JMB holds "a
security interest in the assets of [ACT] . . . that is prior to
any interest of the Plaintiffs" and that "secures a debt that is
unsatisfied."

After the completion of discovery concerning JMB's
purported security interest in the Collateral, Plaintiffs moved
for summary judgment on May 12, 2010.  The motion became fully
submitted on June 11.


DISCUSSION

Summary judgment may not be granted unless all of the
submissions taken together "show that there is no genuine issue
as to any material fact and that the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The

---

[12] The complaint was amended to add "JMB & Associates of Ohio,
LLC" an entity in which Beshara has an interest, but which JMB
contends is not relevant to this matter.  On September 3, 2009,
Plaintiffs and JMB entered into a stipulation naming Beshara and
JMB Associates as defendants in this action.

moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In making this determination, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do

more than simply show that there is some metaphysical doubt as to the material facts").

1.   The Equity Conversion Extinguished JMB's Security Interest

JMB claims that it has a perfected security interest in the Collateral that is senior to Plaintiffs' perfected security interest.  The Florida UCC[13] defines a "security interest" as "an interest in personal property or fixtures which secures payment or performance of an <u>obligation</u>."  Fla. Stat. § 671.201(37) (2010) (emphasis added).  A security interest is legally enforceable or "perfected" if (1) the secured party possesses collateral or the debtor has signed a security agreement containing a description of the collateral; (2) value has been given by the secured party; and (3) the debtor has rights in the collateral.  Fla. Stat. § 679.2031; <u>Gibson v. Resolution Trust Corp.</u>, 51 F.3d 1016, 1023 (11th Cir. 1995).  By definition,

---

[13] The parties assume that Florida law applies, but do not address directly the choice-of-law issue.  "Federal courts sitting in diversity look to the choice-of-law rules of the forum state."  <u>Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.</u>, 363 F.3d 137, 143 (2d Cir. 2004).  "New York courts honor choice of law provisions in security agreements so long as the chosen state has some relation to the agreement."  <u>See, e.g.</u>, <u>Wachovia Bank Nat. Ass'n v. EnCap Golf Holdings, LLC</u>, 690 F. Supp. 2d 311, 332 n.4 (S.D.N.Y. 2010).  Because the 2006 Note provides that Florida law governs, and there is no dispute that Florida has some relation to the 2006 Note given that ACT's assets are located there, it is appropriate to apply Florida law.

then, a valid security interest depends on the continuing existence of an "obligation."  Where the underlying debt has been extinguished, a security interest is no longer enforceable. See Gibson, 51 F.3d at 1023; Advanced Aviation, Inc. v. Vann (In re Advanced Aviation, Inc.), 101 B.R. 310, 313 (Bankr. M.D. Fla. 1989); Fowler, White, Burnett, Hurly, Banick & Strickfoot, P.A. v. Ricciardelli (In re G.O. Harris Fin. Corp.), 51 B.R. 100, 103-04 (Bankr. S.D. Fla. 1985).  Put simply, "a security interest cannot exist without a debt."  Air Transp. Leasing v. Belize Airways Ltd. (In re Belize Airways, Ltd.), 7 B.R. 604, 607 (Bankr. S.D. Fla. 1980).

In this case, any security interest held by JMB in the Collateral pursuant to the 2006 Note was extinguished when the underlying obligation was converted into ACT common stock.  By converting JMB's debt into equity, ACT satisfied its obligation under the 2006 Note and thus, JMB's security interest was no longer enforceable.  JMB's shares of ACT stock, which were valued at over $2.2 million after the first day of trading in April 2007, were more than sufficient to satisfy ACT's obligation.  JMB does not contend that it was unable to sell its shares of ACT stock, or provide any other explanation for why the conversion did not pay off ACT's debt.  Accordingly, JMB's assertion of a continuing perfected security interest in the Collateral is unsustainable.

JMB does not dispute that its debt was converted into equity.  Instead, JMB contends that the "unwind provision" in the 2006 Note provided it with a perpetual right to cancel the conversion if the price of ACT's stock dropped below $2.00 per share, and thereby to resurrect its security interest in the Collateral.  JMB contends that it exercised its right to unwind the conversion when it returned 315,000 shares of ACT stock to Hawkins in July 2008 -- after it had already sold some of its shares, and approximately one year after the 2007 Funding closed and the Plaintiffs filed their UCC-1 financing statements with the Florida Secretary of State to perfect their senior secured priority interest in the Collateral.

JMB's argument is without merit.  JMB provides no legal authority to support the proposition that the unwind provision could resurrect a security interest for which the underlying obligation was fully satisfied over a year earlier.  JMB's suggestion that its UCC-1 financing statement somehow preserved its security interest in perpetuity because of the unwind provision in the 2006 Note is unavailing.  The 2006 Note does not state that JMB's security interest in ACT's assets would survive conversion of its debt into equity.  Further, a financing statement alone does not constitute a security agreement without any reference to another document that gives rise to an obligation.  See In re N. Redington Beach Assocs.,

17

<u>Ltd.</u>, 97 B.R. 90, 92 (Bankr. M.D. Fla. 1989).  Notwithstanding the unwind provision, JMB has offered no evidence of any continuing obligation owed to it by ACT as of the time the Plaintiffs filed their UCC-1 financing statements, and therefore JMB has failed to show that it has any enforceable security interest in the Collateral.

2.   JMB's UCC-1 Financing Statement is Ineffective

While JMB's failure to show that it had any enforceable security interest in the Collateral at the time the Plaintiffs filed their UCC-1 financing statements in July 2007 permits summary judgment to be awarded to the Plaintiffs, the parties dispute as well the validity and effect of ACT's filing on July 2, 2007 of the UCC-3 termination statement canceling JMB's financing statement.  The Plaintiffs contend that any perfected security interest retained by JMB after the conversion was cancelled by ACT's filing of a UCC-3 termination statement.  JMB does not dispute that a UCC-3 termination statement was filed as to its UCC-1 financing statement, but argues that the termination statement was ineffective because JMB did not authorize ACT to file it.  JMB points to language in the 2006 Note that requires ACT "to seek the endorsement of JMB Associates prior to the removal of the UCC-1 upon payment."

The Florida UCC provides, in pertinent part, that "[e]xcept as otherwise provided in [Fla. Stat.] § 679.510, upon the filing of a termination statement with the filing office, the financing statement to which the termination statement relates <u>ceases to be effective</u>."  Fla. Stat. § 679.513(4) (emphasis added). Section 679.510, in turn, provides that "[a] filed record is effective only to the extent that it was filed by a person who may file it under [Fla. Stat.] § 679.509."  <u>Id.</u> § 679.510(a). Under § 679.509, a termination statement may be filed by any "person" if "[t]he secured party of record authorizes the filing."  <u>Id.</u> § 679.509(3)(a).  In the event an unauthorized termination statement is filed, a secured party may seek damages for the extent of its loss.  <u>See id.</u> § 679.625(2) ("[A] person is liable for damages in the amount of any loss caused by a failure to comply with this chapter . . .."); <u>see also</u> <u>id.</u> § 679-5021 cmt. 3 ("Section 9-625 provides a remedy for unauthorized filings.  Making an unauthorized filing also may give rise to civil or criminal liability under other law.").

"The termination of a financing statement, <u>even if mistaken</u>, releases the secured creditor's lien against the debtor's property." <u>Peoples Bank of Ky., Inc. v. U.S. Bank, N.A.</u> (<u>In re S.J. Cox Enters., Inc.</u>), No. 08-5066, Bankr. No. 07-50705, 2009 WL 939573, at *4 (Bankr. E.D. Ky. Mar. 4, 2009) (citing <u>Crestar Bank v. Neal</u> (<u>In re Kitchin Equip. Co. of Va.,</u>

<u>Inc.</u>), 960 F.2d 1242, 1245 (4th Cir. 1992)) (emphasis added);
<u>see also</u> <u>In re Silvernail Mirror & Glass, Inc.</u>, 142 B.R. 987,
989 (Bankr. M.D. Fla. 1992) ("[B]y virtue of the filing of the
UCC-3 Termination Statement, [the creditor's] interests in all
collateral covered by the UCC-1 Financing Statement was
extinguished."). "[A] termination statement's effect on a
security interest is dramatic and final." <u>Peoples Bank</u>, 2009 WL
939573, at *5 (citation omitted).

This clear rule accords with the policy of the UCC.
Potential creditors must be able to rely on termination
statements filed in the public record, even if they were filed
in error or without authorization. <u>See</u> <u>Silvernail</u>, 142 B.R. at
989 ("[E]ven if [a] Termination Statement did not reflect the
parties' true intent, it would be materially misleading to a
potential creditor relying on the public records and therefore
should not be set aside." (citing <u>Koehring Co. v. Nolden</u> (<u>In re
Pac. Trencher and Equip., Inc.</u>), 735 F.2d 362 (9th Cir. 1984))).
As noted by the court in <u>Crestar Bank</u>, 960 F.2d 1242, setting
aside termination statements filed in error would "place in
jeopardy liens acquired by other creditors in reliance on [such]
termination statements." <u>Id.</u> at 1246. The UCC therefore places
the burden of monitoring for potentially erroneous UCC-3 filings
on existing creditors, who are aware of the true state of
affairs as to their security interests, rather than potential

creditors who will not be in a position know whether a termination statement was authorized or not.[14]

Here, it is undisputed that the Florida Secured Transaction Registry reflects that JMB's 2006 UCC-1 financing statement was terminated by the filing of a UCC-3 on July 2, 2007.  Even if the termination statement was not authorized by JMB[15], it nonetheless extinguished any perfected security interest JMB had in the Collateral.  Following this termination, Plaintiffs

_____

[14] JMB argues that because the UCC has adopted "notice filing," a system which contemplates further inquiry to determine the scope of a security agreement, Plaintiffs were required to further investigate the filing of the UCC-3 termination statement to determine the true status of JMB's security interest.  JMB relies on S.E.C. v. Credit Bancorp, Ltd., 386 F.3d 438 (2d Cir. 2004), and the Official Comments to UCC § 9-502.  The problem with JMB's argument is that Credit Bancorp and the Official Comments refer only to "financing statements," and not to termination statements.  See Credit Bancorp, 386 F.3d at 454; Fla. Stat. § 679.5021 cmt. 2; see also Crestar Bank, 960 F.2d at 1247 (discussing UCC § 9-402, § 9-502's predecessor).  There is no suggestion in Fla. Stat. § 679.513, which governs termination statements, or the comments thereto, that a prospective creditor must make further inquiry to a formerly secured party of the kind contemplated in UCC § 9-502.

[15] Plaintiffs suggest that JMB authorized the filing of the UCC-3 termination statement pursuant to the March 14, 2006 letter agreement between JMB and ACT.  The March 14, 2006 letter provides, in pertinent part:  "Upon payment of all outstanding monies . . . the UCC-1 filings will be canceled." (Emphasis added.)  Because the conversion of JMB's debt into ACT stock no later than April 3, 2007, satisfied all principal and interest due under the 2006 Note, Plaintiffs contend that ACT was authorized to terminate JMB's UCC-1 financing statement.  This argument need not be considered given that even if the UCC-3 termination statement was unauthorized, it nonetheless extinguished any perfected security interest JMB held in the Collateral after the conversion.

perfected their security interest in the Collateral by filing UCC-1 financing statements with the Florida Secretary of State on July 5, 2007.  This gave Plaintiffs a perfected security interest in the Collateral senior to whatever security interest JMB may have still had at that point.

Finally, even if JMB had a right to return some of its ACT common stock in July 2008 and resurrect at least some portion of the debt that ACT had previously owed JMB, that act could not have given JMB a security interest senior to the interest that Plaintiffs obtained by filing their UCC-1 financing statements on July 5, 2007.  At the very most, JMB was entitled to file a UCC-1 financing statement in July 2008.  Notably, JMB never filed a financing statement in July 2008 when it returned some ACT stock, or at anytime thereafter.  Furthermore, JMB did not assert that the July 2, 2007 UCC-3 termination statement was "unauthorized" until this litigation -- years after the termination statement and the Plaintiffs' UCC-1 financing statements were filed.  Nothing in the law required ACT or any of its creditors to be held hostage to JMB's whims from the time JMB converted its debt into ACT stock until JMB returned a portion of the stock almost two years later.  Having filed the termination statement, ACT was entitled to raise additional

funds and the Plaintiffs were entitled to invest in ACT based on their understanding of ACT's current state of indebtedness.[16]

CONCLUSION

Plaintiffs' May 12, 2010 motion for summary judgment is granted.  Plaintiffs may foreclose on the Collateral pursuant to their perfected priority security interest and in accordance with the Judgments of March 26 and August 26, 2009.  The Clerk of Court shall close the case.


SO ORDERED:

Dated:     New York, New York
           September 1, 2010

                                   _____
                                        DENISE COTE
                                   United States District Judge

---

[16] Plaintiffs also argue that JMB failed to enter into a valid security agreement with ACT because neither the 2005 Notes nor the 2006 Note contains a "granting clause" with a description of the assets encumbered by JMB's security interest.  Because JMB's security interest was extinguished by the equity conversion, and in any event JMB's UCC-1 financing statement was no longer effective after the UCC-3 termination statement was filed, it is unnecessary to consider Plaintiffs' additional argument.